**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| BILAL HASANIE HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHELPS COUNTY SHERIFF'S | ) | |
| DEPARTMENT; PHELPS COUNTY JAIL; | ) | Case No. |
| SHERIFF RICHARD L. LISENBE, | ) | |
| Individually and in His Official Capacity as | ) | |
| Sheriff of Phelps County; DR. ARTHUR | ) | |
| BENTLEY, Individually and in His Official | ) | JURY TRIAL DEMANDED |
| Capacity as a Medical Services Provider at | ) | |
| Phelps County; DIONNE KELLEY; KELLY | ) | |
| RATCLIFF, SERGEANT GLENN; | ) | |
| LIEUTENANT JOE TAYLOR; and DOES 1- | ) | |
| 15, | | |
| | | |
| Defendants. | | |

**COMPLAINT**

Plaintiff, Bilal Hasanie Hill, by and through undersigned counsel, and for his Complaint against

Defendants Phelps County Sheriff's Department, Phelps County Jail, Sheriff Richard L. Lisenbe

("Sheriff Lisenbe"), Dr. Arthur Bentley ("Dr. Bentley"), Dionne Kelley ("Nurse Kelley"), Officer

Kelly Ratcliff, Sergeant Glenn, Lieutenant Joe Taylor, and Does 1-15, states and alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for damages brought to redress the deprivation, under color of state

law, of rights, privileges and immunities secured to Plaintiff by provisions of the Eighth Amendment.

2.      Plaintiff alleges that while confined at the Phelps County Jail, he was denied timely

access to adequate and competent medical care for evaluation and treatment of serious medical

condition. As a direct and proximate result of Defendants' disregard of both Plaintiff's serious medical condition and accepted correctional medical practices, which were occasioned by Defendants under color of state law, not only was Plaintiff's now-terminal lung cancer diagnosis delayed, but he suffered extensive pain prior to and after that diagnosis as a result of that delay.

3.       Plaintiff's injuries are the result of Defendants' deliberate and continued disregard for known, obvious, and excessive risks to Plaintiff's health and safety, denial of access to adequate medical care and treatment for Plaintiff.  Defendants acted under color of state law in disregarding the known risks to Plaintiff's health and denying adequate access to medical care and treatment for Plaintiff, denying Plaintiff his constitutional rights and violating the Eighth Amendment.

## JURISDICTION AND VENUE

4.       The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff presents federal claims arising under the Eighth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, and 42 U.S.C. § 1983.

5.       This Court has jurisdiction over Defendants because the unlawful acts alleged in this Complaint were committed in Rolla, Phelps County, Missouri, which lies within the Eastern District of Missouri.

6.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 105(b) and 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Rolla, Phelps County, Missouri, which lies within the Eastern Division of the Eastern District of Missouri.

## PARTIES

7.       Plaintiff Bilal Hasanie Hill currently resides and is domiciled in North Carolina.

2

8.     Each of the following individuals is a Missouri resident and was contracted and/or employed by the Phelps County Sheriff and/or the Phelps County Jail to provide correctional services and/or comprehensive health care services for inmates confined to the Phelps County Jail where Plaintiff was confined and where the acts and omissions that gave rise to his claims occurred. As such, at all relevant times contemplated herein, and while acting under the color of state law, the below-listed parties materially participated in denying Plaintiff Hill adequate medical care and treatment and in deliberately disregarding known risks to Plaintiff Hill's health:

    a.   Dr. Bentley;

    b.   Nurse Kelley;

    c.   Sheriff Lisenbe;

    d.   Sergeant Glenn;

    e.   Officer Kelly Ratcliff ;

    f.   Lieutenant Joe Taylor; and

    g.   Does 1-15, employees and/or contractors of Phelps County Jail and/or the Phelps County Sheriff's Department.

9.     Defendant Dr. Bentley contracted with Phelps County Jail and/or the Phelps County Sheriff's Department to provide medical services for inmates housed at the Phelps County Jail for the period of time between October 4, 2019 and April 3, 2020.  Dr. Bentley contracted with Phelps County Jail and/or the Phelps County Sheriff's Department to provide medical services for inmates housed at the Phelps County Jail for the period of time between October 4, 2019 and April 3, 2020.  In his capacity as an employee of or contractor for Phelps County Jail and/or the Phelps County Sheriff's

3

Department, Dr. Bentley provided medical services to inmates housed at the Phelps County Jail for the period of time between October 4, 2019 and April 3, 2020.

10.     Defendant Nurse Kelley contracted with Phelps County Jail and/or the Phelps County Sheriff's Department to provide medical services for inmates housed at the Phelps County Jail for the period of time between October 4, 2019 and April 3, 2020.  In her capacity as an employee of or contractor for Phelps County Jail and/or the Phelps County Sheriff's Department, Nurse Kelley provided medical services to inmates housed at the Phelps County Jail for the period of time between October 4, 2019 and April 3, 2020.

11.     Defendant Sheriff Lisenbe was the lead supervisor and/or director of the Phelps County Jail and/or Phelps County Sheriff's Department, including supervision of the medical services provided to inmates of the Phelps County Jail, during the period of time between October 4, 2019 and April 3, 2020.

12.     Defendant Sergeant Glenn was employed by and/or contracted with the Phelps County Jail and/or Phelps County Sheriff's Department and provided services in his or her capacity as an employee or contractor of Phelps County, including the facilitation of medical services, to inmates of the Phelps County Jail during the period of time between October 4, 2019 and April 3, 2020.

13.      Defendant Officer Kelly Ratcliff was employed by and/or contracted with the Phelps County Jail and/or Phelps County Sheriff's Department and provided services in his or her capacity as an employee or contractor of Phelps County, including the facilitation of medical services, to inmates of the Phelps County Jail during the period of time between October 4, 2019 and April 3, 2020.

14.     Defendant Lieutenant Joe Taylor was employed by and/or contracted with the Phelps County Jail and/or Phelps County Sheriff's Department and provided services in his capacity as an

4

employee or contractor of Phelps County, including the facilitation of medical services, to inmates of the Phelps County Jail during the period of time between October 4, 2019 and April 3, 2020.

15.     Defendants Does 1-15 were employed by and/or contracted with the Phelps County Jail and/or Phelps County Sheriff's Department and provided services in their capacity as employees or contractors of Phelps County, including the facilitation of medical services, to inmates of the Phelps County Jail during the period of time between October 4, 2019 and April 3, 2020.

16.     Defendant Phelps County Jail is operated by the Correctional Division of Defendant Phelps County Sheriff's Department.  The Phelps County Jail and the Phelps County Sheriff's Department (collectively, "Phelps County") are located in Rolla, Phelps County, Missouri.  Phelps County, through its employees and/or agents, exercised control over the policies and customs that directly resulted in the denial of adequate medical treatment for Plaintiff's serious medical condition.

## BACKGROUND

17.     In early April 2020, Plaintiff Bilal Hill was diagnosed with terminal, stage IV lung adenocarcinoma after Defendants denied him adequate medical treatment for months despite his frequent and urgent requests for treatment, enduring writhing pain and observably deteriorating physical condition.

18.     Lung cancer is the most common cancer worldwide.  Lung cancer incidence is tightly linked with cigarette smoking.  Plaintiff reported a history of smoking one pack of cigarettes per day when screened at admission to Phelps County Jail in October 2019.

19.     Plaintiff began complaining of pain and other symptoms of lung cancer in November 2019.  The Defendants ignored his complaints and rejected specific requests for diagnostic testing that would have detected his cancer at a treatable, early stage.

20.     Plaintiff's lung cancer arose in the apical (upper) portion of the lung.  Lung cancers that begins in this part of the lung are known as Pancoast tumors.  As Pancoast cancer grows, it compresses the surrounding nerves in an individual's left shoulder and neck, eventually causing severe and unrelenting shoulder and arm pain—much like the pain Plaintiff reported to Phelps County employees and medical staff on January 13, 2020, 81 days before he was diagnosed by outside medical providers.  If untreated, the cancer continues to compress the shoulder and brachial area nerves, eventually resulting in nerve impingement.

21.     Another typical symptom of lung cancer as the cancer grows is chest pain.  Plaintiff reported chest pain to Phelps County employees and medical staff on January 25, 2020, 69 days before he was diagnosed by outside medical providers.

22.     Without treatment, lung cancer spreads directly and through the blood circulation and lymphatic systems.  By February 20, 2020, Plaintiff could feel a knot in the left area of his neck, which he reported to Phelps County employees and medical staff.  Dr. Bentley confirmed the presence of an enlarged lymph node in Plaintiff's neck on February 26, 2020, 68 days before Plaintiff was diagnosed by outside medical providers.  This lymph node never returned to normal, and was eventually biopsied by outside medical providers on April 3, 2020 to confirm Plaintiff's cancer diagnosis.

23.     As untreated cancer grows and spreads, it becomes increasingly metabolically active.  This typically results in weight loss.  Unintentional weight loss of 10 pounds or more is commonly experienced by patients with lung cancer.  By February 26, 2020, 68 days before Plaintiff was diagnosed by outside medical providers, Plaintiff had lost 14 pounds in less than a month.  By April 1, 2020, Plaintiff had lost 28 pounds in slightly more than 2 months.  When finally sent for outside

evaluation on April 3, 2020, Plaintiff had extensive metastases in the neck, mediastinum, thoracic vertebral bones, and retroperitoneum.

24.     Early diagnosis of lung cancer before extensive metastases occurs greatly increases the chance for a cure or longer survival.  Plaintiff was eventually diagnosed with lung adenocarcinoma. Adenocarcinoma typically has the slowest doubling rate of the three major types of lung cancer, and has a 5-year survival rate as high as 70 to 80% if diagnosed before metastases.

25.     Plaintiff presented with multiple symptoms typical of lung cancer no later than January 2020, including a cigarette smoking history, intractable shoulder pain, and chest pain.  If lung cancer is a possible diagnosis, the first test done is typically a chest X-ray.  Pancoast lung cancer appears on a chest X-ray as an apical mass or as increased size of the apical cap.  Plaintiff requested a chest X-ray on January 21, 2020, but did not receive any chest radiology until over two months later on April 3, 2020.  By the point, his lung cancer had extensively metastasized and he had stage IV cancer.

26.     Ultimately, outside medical professionals diagnosed Plaintiff with terminal cancer, estimating he had three months left to live.

## **GENERAL ALLEGATIONS**

27.     While awaiting trial in the United States District Court for the Western District of Missouri, Central Division, Plaintiff was initially housed at the Cole County Jail in Jefferson City, Missouri.

28.     On November 17, 2018, Cole County Jail recorded Plaintiff's weight as 205 pounds and noted Plaintiff smoked one pack of cigarettes per day.

29.     On or about October 4, 2019, the Plaintiff transferred to the Phelps County Jail in Rolla, Missouri.

30. Plaintiff has a long history of heavy cigarette smoking, which Plaintiff reported to the Cole County Jail on or about November 17, 2018 and the Phelps County Jail on or about October 8, 2019.

31. Plaintiff began complaining of pain and other symptoms of lung cancer in November 2019. The Defendants ignored his complaints and rejected specific requests for diagnostic testing that would have detected his cancer at a treatable, early stage.

32. On or about October 4, 2019, Screening Officer Kelly Ratcliff completed a Phelps County Inmate Screening form for Plaintiff, noting Plaintiff's complaints of intermittent pain and his diagnosis by Cole County Jail of a sports hernia.

33. On or about October 8, 2019, Plaintiff self-reported to Phelps County that he smoked one pack of cigarettes per day.

34. Also on or about October 8, 2019, Phelps County medical staff recorded Plaintiff's weight at 196.5 pounds.

35. On or about January 13, 2020, Plaintiff submitted a Medical Services Request ("MSR") to Phelps County staff, in which he complained of extreme back and neck pain shooting from his shoulder blade to his neck.

36. On or about January 13, 2020, Dr. Bentley reported Plaintiff's shoulder and neck pain had been present for approximately one week, the area was tender to the touch, and Plaintiff reported constant pain.

37. At the conclusion of the visit described in Paragraph 27, above, Dr. Bentley prescribed Plaintiff 1000 milligrams of Tylenol, to be taken twice daily for three days. Dr. Bentley further instructed Plaintiff to see the nurse the following day.

8

38.     On or about January 14, 2020, a handwritten progress note in Phelps County records indicates Plaintiff complained of pain between his shoulder blades and down the center of his back, and reported that his discomfort began two weeks prior.  The handwritten progress note further indicated Plaintiff weighed 196 pounds.

39.     On or about January 15, 2020, Plaintiff was prescribed a prednisone "taper."

40.     On or about January 21, 2020, Plaintiff submitted another MSR indicating: his level of pain was increasing and he was beginning to have muscle spasms; and requesting that X-rays be performed.

41.     Four days later, on or about January 25, 2020, Plaintiff reported chest pain described as sharp pain under his left nipple in addition to his shoulder and neck pain.  Dr. Bentley prescribed one 400 milligram dose of Tylenol.

42.     On or about January 27, 2020, a handwritten progress note indicated Plaintiff continued to have chest, shoulder, and back pain.

43.     On or about February 6, 2020, Plaintiff completed an Inmate Grievance Form ("IGR") complaining he had been in extreme pain for the past month and was unable to sleep.  Plaintiff requested to be taken to the emergency room.  Lieutenant Taylor responded in writing and in the same document that he would put Plaintiff on the jail doctor's "list for next week."

44.     On or about February 12, 2020, a handwritten progress note indicated Plaintiff's complaints of upper back pain and that Plaintiff's weight had fallen to 190 pounds.

45.     On or about February 12, 2020, Plaintiff completed another IGR, noting he had been in extreme pain for over a month and he had completely exhausted the grievance procedure.  Plaintiff

9

further noted he had asked on several occasions to be seen by an outside care provider.  Defendants deliberately disregarded his requests.

46.     On or about February 17, 2020, Plaintiff completed another IGR, noting he had been suffering from extreme pain for over 30 days "due to some sort of neck, back and shoulder injury." Plaintiff further noted his ongoing request to be seen by a physician "that can run the proper tests to pinpoint what needs to be done," but Defendants again deliberately disregarded his requests.

47.     On or about February 20, 2020, Plaintiff completed another MSR, noting he had "what feels to be a growth in [his] neck in one of the areas [he] complained to be in severe pain."

48.     On or about February 21, 2020, a handwritten note initialed by a doctor and nurse indicated Plaintiff's weight had dropped to 180 pounds.

49.     On or about February 26, 2020, a handwritten note indicated Plaintiff's lymph node was swollen to the size of peanut, and that Plaintiff weighed only 182 pounds, a loss of 14 pounds since January 27, 2020.

50.     On or about March 7, 2020, Plaintiff completed another MSR, noting: the pain in his bicep hurt so badly he hadn't slept in days, his neck had swollen to a point that the swelling interfered with his breathing, and the pain in his neck and back had not diminished.  Plaintiff once again requested to receive emergency medical attention, and Defendants deliberately disregarded this request.

51.     On or about March 8, 2020, a handwritten progress note indicated Plaintiff's weight had fallen to 175 pounds, a decrease of 21 pounds since January 27, 2020.

52.     On or about March 20, 2020, a nurse completed a handwritten progress note that indicated Plaintiff complained of left shoulder pain and stated he had minimal relief to his shoulder or

10

back pain from the doctor-prescribed Tylenol.  The record also notes Plaintiff's heart rate was up to 112 beats per minute.

53.     On or about March 27, 2020, a nurse completed a handwritten progress note that indicated Plaintiff complained of a new onset of chest pain and had audibly rapid breathing secondary to discomfort.  Plaintiff described the pain as a stabbing pain.  His pulse was recorded as 130 and 139 beats per minute.  Dr. Bentley prescribed 1000 milligrams of Tylenol, to be taken twice daily.

54.     On or about March 30, 2020, Plaintiff submitted yet another MSR, indicated he was "still in severe pain in [his] upper back and left arm" and 75% of his left arm was numb as he continued to lose mobility in that arm.  Plaintiff requested an MRI.

55.     On or about April 1, 2020, a handwritten progress note indicated that Plaintiff weighed 168 pounds—a decrease of 28 pounds since January 27, 2020 and 37 pounds since November 17, 2018.  Plaintiff continued to complain of left back trapezius and left arm pain.  The practitioner noted that a reason for the severe pain had not been found and staff planned to refer Plaintiff to an emergency room for evaluation.

56.     On or about April 3, 2020, at least 10 weeks after Plaintiff's first complaints of severe pain, Phelps County medical staff referred Plaintiff to the Phelps County Hospital emergency room for evaluation.  After evaluation, he was transferred to Cox Health in Springfield, Missouri.

57.     Also on or about April 3, 2020, medical staff at Cox Health in Springfield, Missouri assessed a need for a biopsy given Plaintiff's symptoms and medical history, noting that Plaintiff may have lymphoma or lung cancer and recommending a biopsy.

4820-3391-1232

58.     In a pathology report prepared on or about April 3, 2020, medical staff at Cox Health in Springfield, Missouri noted that Plaintiff's pathology results were "diagnostic for a poorly-differentiated non-small cell adenocarcinoma."

59.     In a radiology report prepared on or about April 3, 2020, medical staff at Cox Health reported abnormal findings, noting that the "[m]ost prominent abnormality is large mass involving left lower neck, left axilla, and left upper mediastinal areas."

60.     At the time Plaintiff was evaluated at Cox Health, he was reporting pain levels at an 8 on a scale of 1-10.

61.     On or about April 9, 2020, Plaintiff was discharged from Cox Health.  Plaintiff's discharge report from Cox Health noted a diagnosis of non-small cell lung cancer with metastasis.  He required multiple medications, including fentanyl, gabapentin, hydromorphone, and lidocaine to control his pain.  Medical staff further noted that Plaintiff had less than three months of life.

62.     Plaintiff submitted at least eight MSRs and grievances over the course of his incarceration at Phelps County Jail, putting Defendants on notice of his increasingly urgent medical condition over a period of several months.

63.     Over the course of at least ten weeks of Plaintiff's increasingly urgent complaints, Phelps County correctional and medical staff deliberately or recklessly disregarded telltale signs of the severity of Plaintiff's condition, including but not limited to: the location of his pain complaints; the severity and constant nature of his pain complaints; Plaintiff's rapid weight loss; and Plaintiff's history of heavy tobacco use.

64.     Due to Defendants' deliberate disregard for or indifference to Plaintiff's serious medical needs and continued denial of adequate healthcare, Plaintiff suffers from a once treatable, but now terminal cancer and ongoing pain.

65.     Due to Defendants' deliberate disregard for or indifference to Plaintiff's serious medical needs, Plaintiff suffered from a delay in adequate medical treatment that caused him months of suffering prior to receiving the necessary and requested medical intervention.

**COUNT I:**
**<u>SECTION 1983: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED</u>**
**Defendants Doctor Arthur Bentley, Nurse Dionne Kelley, Sheriff Richard L. Lisenbe, Sergeant Glenn, Officer Kelly Ratcliff, Lieutenant Joe Taylor, and Does 1-15, each in their individual capacities (the "Individual Defendants")**

66.     Plaintiff incorporates the general allegations above as if fully set forth herein.

67.     Throughout his incarceration at the Phelps County Jail, Plaintiff suffered from a serious medical need, which ultimately developed into a terminal illness—stage IV lung cancer.

68.     The Individual Defendants were each made aware of Plaintiff's serious medical need through several avenues, including but not limited to Plaintiff's repeated oral requests for medical assistance to correctional officers and medical staff, written requests to medical staff, and observably deteriorating physical condition.

69.     Each of the Individual Defendants, while acting under color of law as employees of or contractors for Phelps County Jail and/or the Phelps County Sheriff's Department, was deliberately indifferent to Plaintiff's serious medical needs relating to his lung cancer in numerous ways, including but not limited to, disregarding Plaintiff's obvious need for (i) additional medical treatment, including X-rays, an MRI, and (ii) referral to an outside physician for a timely diagnosis and other appropriate medical care.

13

70.     Each of the Individual Defendants, while acting under color of law as employees of or contractors for Phelps County Jail and/or the Phelps County Sheriff's Department, was deliberately indifferent to Plaintiff's serious medical needs relating to his lung cancer by denying him timely and necessary adequate medical treatment.

71.     As a direct result of the Individual Defendants' deliberate indifference, Plaintiff suffered serious, and eventually terminal, injury.

72.     The Individual Defendants' acts and omissions were not only intentionally willful, wanton, reckless, and malicious but they also evince a complete and deliberate indifference to and a conscious and reckless disregard of the rights of Plaintiff.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient punish Defendants or to deter Defendants and others from like conduct in the future.

73.     Plaintiff is entitled to recover his reasonable attorney fees, costs, and expenses from Individual Defendants as provided by 42 U.S.C. § 1988.

**COUNT II:**
**SECTION 1983: UNCONSTITUTIONAL POLICY, CUSTOM, OR**
**FAILURE TO TRAIN OR SUPERVISE**
**Defendants Phelps County Sheriff's Department; Phelps County Jail; Sheriff Richard L.**
**Lisenbe, in his official capacity; and Dr. Arthur Bentley, in his official capacity**

74.     Plaintiff incorporates the allegations above as if fully set forth herein.

75.     Upon information and belief, the Phelps County Sheriff and/or Phelps County Jail (collectively, "Phelps County") has contracted with Dr. Bentley and/or his employer to provide health care services for inmates at the Phelps County Jail.

14

76.     During the time Plaintiff was housed at the Phelps County Jail, Dr. Bentley had supervisory and oversight responsibilities over Phelps County Jail medical policies, customs, and medical staff, including Nurse Kelley.

77.     During the time Plaintiff was housed at the Phelps County Jail, Sheriff Lisenbe had direct supervisory and oversight responsibilities over Phelps County policies, customs, and staff, including but not limited to those policies and customs related to medical treatment for inmates, Plaintiff included, and the staff with responsibilities related to the inmate grievance and medical service request processes.

78.     Phelps County's policies, procedures, customs, practices, and actions – which, through the conduct and deliberate omissions of its employees and agents, including but not limited to Dr. Bentley, Nurse Kelley, Sheriff Lisenbe, Sergeant Glenn, Officer Kelly Ratcliff, Lieutenant Joe Taylor, and Does 1-15, were so widespread and persistent as to represent official policy – recklessly disregarded substantial risks of serious harm to inmates and inflicted injuries that are actionable under 42 U.S.C. § 1983.

79.     Phelps County's collective abdication of policy-making and oversight responsibilities and/or its inadequate policies, procedures, customs, practices, and actions – as well as its inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies – reached the level of deliberate indifference and resulted in a constitutional injury manifesting itself in the unnecessary and wanton infliction of pain because of their collective and tacit authorization of personnel misconduct.

80.     More specifically, Phelps County's inadequate policies, procedures, customs, practices, and actions – as well as their inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies – permitted:

    a.    Failures to provide professional medical judgment and care that would be ordered by outside treating physicians;

    b.    Failures to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up;

    c.    Delays or non-responses to noted urgent conditions;

    d.    Failures to assure timely access to care by requiring inmates to submit multiple MSRs to be evaluated by a physician, if at all;

    e.    Failures to provide cogent nursing directives for prioritizing MSRs and sick calls;

    f.    Failures to assure staff competency, especially among physicians and nurses, including the establishment of policies, procedures, and processes to detect and respond to incompetency;

    g.    Delegating clinical determinations to nursing personnel who are neither qualified nor licensed to independently make such determinations;

    h.    Poor quality nursing, including failures to: note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments for on-site care or off-site specialty care, and collect past medical records from prior treating physicians;

    i.    Failures to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, not providing adequate treatment; and not providing the care ordered by off-site treating physicians;

    j.    Utilizing "conservative" treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices;

    k.    Belated or untimely authorization of off-site specialty medical care and treatment;

    l.    Failures to provide inmates with qualified medical opinions rendered by on-site and off-site physicians;

m.  Failures to inform inmates of their conditions and diagnoses and to permit them to participate in decisions involving their care.

81.  The systemic deficiencies listed above are the product of official policies, procedures, customs, practices, and actions that were promulgated or tacitly authorized by Phelps County and/or personnel vested with final decision-making authority – and all of them caused or materially contributed to the systemic and unconstitutional deliberate indifference to Plaintiff's serious medical needs and the unnecessary and the wanton infliction of pain he experienced.

82.  Phelps County's official policies, procedures, customs, practices, and actions, which are the moving force behind Plaintiff's injuries, operated to deprive Plaintiff of the right to adequate and appropriate diagnosis and treatment of his serious medical conditions, and, but for the same, he would not have been deprived of rights secured by the Eighth Amendment.

83.  Collectively, Phelps County's acts and omissions not only contemplate a conscious disregard of a substantial risk of serious harm to inmate health and safety, but said acts and omissions are also sufficiently harmful to illustrate a deliberate indifference to the serious medical needs of Plaintiff and the other inmates in their charge.

84.  Plaintiff is entitled to recover his reasonable attorney fees, costs, and expenses from Defendants as provided by 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff requests that this Court after a trial by jury enter Judgment against Defendants for compensatory damages and exemplary or punitive damages are proven at trial; for reasonable attorney fees, costs, and expenses incurred herein as provided by 42 U.S.C. § 1983; and for such further legal and equitable relief as the Court may deem just and proper.

Respectfully Submitted


*/s/ Charles C. Eblen*
Charles C. Eblen, #55166
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO  64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
ceblen@shb.com

*Attorneys for Plaintiff*


18