**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| LADY MAAKIA CHARLENE SMITH, personal representative of the Estate of BILAL HASANIE HILL, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:20-cv-00804-JMB |
| ADVANCED CORRECTIONAL HEALTHCARE, INC.; PHELPS COUNTY SHERIFF'S DEPARTMENT; PHELPS COUNTY JAIL; SHERIFF RICHARD L. LISENBE, Individually and in His Official Capacity as Sheriff of Phelps County; DR. ARTHUR BENTLEY, Individually and in His Official Capacity as a Medical Services Provider at Phelps County; DIONNE KELLEY; KELLY RATCLIFF, SERGEANT GLENN; DR. TRAVIS SCHAMBER; and DOES 1-15, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## THIRD AMENDED COMPLAINT

Plaintiff Lady Maakia Charlene Smith, personal representative of the Estate of Bilal Hasanie Hill, deceased, by and through undersigned counsel, and for her Third Amended Complaint against Defendants (i) Advanced Correctional Healthcare, Inc., (ii) Phelps County, Missouri Sheriff's Department, (iii) Phelps County, Missouri Jail, (iv) Sheriff Richard L. Lisenbe, (v) Dr. Arthur Bentley, (vi) Dionne Kelley, (vii) Officer Kelly Ratcliff, (viii) Sergeant Glenn, (ix) Lieutenant Joe Taylor, (x) Dr. Travis Schamber, and (xi) Does 1-15, filed pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), states and alleges as follows:

1

4834-7617-7388

## PRELIMINARY STATEMENT

1.     This is an action for damages brought to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Bilal Hasanie Hill ("Mr. Hill") by provisions of the Eighth Amendment of the United States Constitution and Defendant's negligence under Missouri State law.

2.     Plaintiff alleges that while Mr. Hill was housed at the Phelps County, Missouri Jail between the approximate dates of October 4, 2019 and April 3, 2020, he suffered from serious medical needs that were so obvious that even a layperson would easily recognize the necessity for a doctor's attention to those needs and that were subsequently diagnosed by physicians as complications resulting from terminal lung cancer and have required numerous treatments.

3.     Plaintiff alleges that while Mr. Hill was housed at the Phelps County, Missouri Jail, Defendants, under color of state law and with deliberate indifference, failed to provide the medical care or direct that the medical care be provided and allow Mr. Hill to obtain the medical care needed within a reasonable time.

4.     As a direct and proximate result of Defendants' deliberate indifference to Mr. Hill's serious medical needs, Mr. Hill's terminal lung cancer diagnosis was irreversibly delayed and he suffered extensive pain prior to and after that diagnosis.

5.     Mr. Hill's injuries are the result of Defendants' deliberate and continued indifference for the known, obvious, and excessive risks to Mr. Hill's health and safety, denial of access to adequate medical care, and treatment for Mr. Hill.

6.     Defendants acted under color of state law in deliberately disregarding the known risks to Mr. Hill's health, denying adequate access to medical care and treatment for Mr. Hill, and failing to

2

direct that medical care be provided, thereby denying Mr. Hill his constitutional rights and violating the Eighth Amendment of the United States Constitution and Missouri State law.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over Counts I and II pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff presents federal claims arising under the Eighth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, and 42 U.S.C. § 1983.

8.      The Court has supplemental jurisdiction over Plaintiff's medical malpractice claim (Count III) and negligent infliction of emotional distress (Count IV) under Missouri State law pursuant to 28 U.S.C.A § 1367 because the Court has original jurisdiction over Plaintiff's claim under 42 U.S.C. § 1983, and those claims are so related that they form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court has jurisdiction over Defendants because the unlawful acts alleged in this Amended Complaint were committed in Rolla, Phelps County, Missouri, which lies within the Eastern District of Missouri.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 105(b) and 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Rolla, Phelps County, Missouri, which lies within the Eastern District of Missouri.

## PARTIES

11.     Plaintiff Lady Maakia Charlene Smith's ("Plaintiff") is the sister of Bilal Hasanie Hill, deceased, and the personal representative of the estate of Bilal Hasanie Hill. Plaintiff is a resident of North Carolina and brings this action as the personal representative of Mr. Hill's estate.

3

12.     Defendant Phelps County, Missouri Jail is operated by the Correctional Division of Defendant Phelps County, Missouri Sheriff's Department.  The Phelps County, Missouri Jail and the Phelps County, Missouri Sheriff's Department (collectively, "Phelps County") are located in Rolla, Phelps County, Missouri.  Phelps County has an obligation under the United States Constitution to provide adequate medical care to those individuals whom it punishes by incarceration—including Mr. Hill—and for all relevant times contemplated herein, acted under color of state law.

13.     Advanced Correctional Healthcare, Inc. ("ACH") was, and is, a corporation authorized to do business within the jurisdiction of Rolla, Phelps County, Missouri, which lies in the Eastern District of Missouri.  ACH was duly organized, created, and exists under and by virtue of the laws of the State of Illinois, with its principal place of business located in the State of Illinois.  Defendant ACH regularly conducts business in Rolla, Phelps County, Missouri, which lies in the Eastern District of Missouri, in conjunction with Defendant Phelps County.

14.     Upon information and belief, and at all relevant times contemplated herein, ACH reached a meeting of the minds and/or mutual understanding, orally and/or in writing, with Phelps County to recruit, contract, employ, train, compensate, and supervise medical professionals to provide medical services including, but not limited to, examinations, treatment, and care to all of the inmates housed at the Phelps County, Missouri Jail at least between the approximate dates of October 4, 2019 and April 3, 2020.  Accordingly, ACH was a willing participant with Phelps County and/or its agents in the joint action that violated Plaintiff's Eighth Amendment right under the United States Constitution and thus qualifies as a state actor acting under color of state law for purposes of this lawsuit under 42 U.S.C. § 1983.

4

15.     Upon information and belief, and at all relevant times contemplated herein, ACH reached a meeting of the minds and/or mutual understanding, orally and/or in writing, with Phelps County and/or its agents regarding the specific medical services including, but not limited to, examinations, treatments, and care, or lack thereof, that would be provided to Plaintiff, or those inmates similarly situated, at least between October 4, 2019 and April 3, 2020.  Accordingly, ACH was a willing participant with Phelps County and/or its agents in the joint action that violated Mr. Hill's Eighth Amendment right under the United States Constitution and thus qualifies as a state actor acting under color of state law for purposes of this lawsuit under 42 U.S.C. § 1983.

16.     ACH, through its employees, agents, or partners, and in conjunction with and pursuant to its meeting of the minds, mutual understanding, and joint action with Phelps County, exercised control over the medical policies, customs, and procedures that directly resulted in the deliberate indifference to Mr. Hill's serious medical needs.  Among other things, ACH and Phelps County, and the individual actors, set a policy whereby Phelps County and its employees claimed they could not— and did not—provide any medical care to inmates, even where a layperson could conclude that inmates like Mr. Hill were suffering extraordinarily from a terminal disease.  This policy ensured that Mr. Hill was denied pain management and lifesaving diagnostic tests while suffering from a painful terminal disease.

17.     For its part, ACH designs these unconstitutional policies for its customers like Phelps County; it does so to minimize cost, legal liability and jail resources and the result is deliberately indifferent care.  Moreover, in addition to its participation setting Phelps County policy, among other things, ACH has a policy, custom and practice of denying or delaying necessary diagnostic tests that require outside care.  Indeed, it is ACH's acknowledged policy and practice to delay outside care so

5

that the suffering inmate either gets transferred to another facility or is released on his own recognizance.  This policy denies inmates like Mr. Hill lifesaving care and causes needless suffering so that ACH can maximize its profits.

18.     Each of the following individuals is a Missouri resident and was contracted and/or employed by ACH and/or Phelps County to provide correctional services and/or medical services to inmates housed at the Phelps County, Missouri Jail where Mr. Hill was confined and where the acts and omissions that gave rise to his claims occurred.  As such, at all relevant times contemplated herein and while acting under the color of state law, the below-listed parties materially participated in deliberately disregarding Mr. Hill's serious medical needs by failing to provide the medical care or direct that the medical care be provided or allow Mr. Hill to obtain the medical care needed within a reasonable time, including, but not limited to, certain examinations, treatment, and care:

a.  Dr. Arthur Bentley ("Dr. Bentley");

b.  Nurse Dionne Kelley ("Nurse Kelley");

c.  Sheriff Richard L. Lisenbe ("Sheriff Lisenbe");

d.  Sergeant Glenn;

e.  Officer Kelly Ratcliff ("Officer Ratcliff");

f.  Lieutenant Joe Taylor  ("Lieutenant Taylor"); and

g.  Does 1-15, employees and/or contractors of Phelps County Jail and/or the Phelps County Sheriff's Department.

19.     Upon information and belief, Defendant Dr. Bentley reached a meeting of the minds and/or mutual understanding, orally and/or in writing, with ACH and/or Phelps County to provide medical services to inmates housed at the Phelps County, Missouri Jail, including the approximate

6

period between October 4, 2019 and April 3, 2020.  In his capacity as an employee or contractor for ACH and/or Phelps County, Dr. Bentley did provide medical services, or lack thereof, including, but not limited to, examinations, treatment, and care to all inmates housed at the Phelps County, Missouri Jail—including Mr. Hill—for the approximate period between October 4, 2019 and April 3, 2020. Accordingly, Dr. Bentley was a willing participant with ACH and Phelps County and/or their agents in the joint action that violated Mr. Hill's Eighth Amendment rights under the United States Constitution and thus qualifies as a state actor acting under color of state law for purposes of this lawsuit under 42 U.S.C. § 1983.

20.     Upon information and belief, Defendant Nurse Kelley reached a meeting of the minds and/or mutual understanding, orally and/or in writing, with ACH and/or Phelps County to provide medical services to inmates housed at the Phelps County Jail for the approximate period between October 4, 2019 and April 3, 2020.  In her capacity as an employee or contractor for ACH and Phelps County, Nurse Kelley did provide medical services, or lack thereof, including, but not limited to, examinations, treatment, and care to all inmates housed at the Phelps County, Missouri Jail—including Mr. Hill—for the approximate period between October 4, 2019 and April 3, 2020. Accordingly, Nurse Kelley was a willing participant with ACH and Phelps County and/or their agents in the joint action that violated Mr. Hill's Eighth Amendment rights under the United States Constitution and thus qualifies as a state actor acting under color of state law for purposes of this lawsuit under 42 U.S.C. § 1983.

21.     Upon information and belief, Defendant Sheriff Lisenbe was the lead supervisor and/or director of the Phelps County, Missouri Jail and/or Phelps County, Missouri Sheriff's Department, with job duties which included the facilitation and supervision of the medical services provided to all

7

inmates of the Phelps County, Missouri Jail, including Mr. Hill, during the approximate period between October 4, 2019 and April 3, 2020.

22.     Upon information and belief, Defendant Sergeant Glenn was employed by Phelps County and provided services in that capacity, including, but not limited to, the facilitation and supervision of medical services to all inmates of the Phelps County, Missouri Jail, including Mr. Hill, during the approximate period between October 4, 2019 and April 3, 2020.

23.      Upon information and belief, Defendant Officer Ratcliff was employed by Phelps County and provided services in that capacity, including, but not limited to, the facilitation and supervision of medical services to all inmates of the Phelps County, Missouri Jail, including Mr. Hill, during the approximate period between October 4, 2019 and April 3, 2020.

24.     Upon information and belief, Defendant Lieutenant Taylor was employed by Phelps County and provided services in that capacity including, but not limited to, the facilitation and supervision of medical services to all inmates of the Phelps County, Missouri Jail, including Mr. Hill, during the approximate period between October 4, 2019 and April 3, 2020.

25.     Upon information and belief, Dr. Travis Schamber was, and is, the Director of Medical Services for ACH.  In his capacity as an employee of ACH, he is tasked with ensuring inmates receive appropriate care. Dr. Schamber did conduct a review of the medical care (or lack thereof) provided to Mr. Hill by Defendants and authorized the Defendants' conduct that violated Mr. Hill's Eighth Amendment rights to receive adequate medical care. Dr. Shamber's "medical review" is really just another attempt to guard against liability while minimizing the cost of patient care.  Dr. Shamber's review of Mr. Hill's case in March 2020 instead ensured Mr. Hill did not receive the life-saving diagnostics, treatment and pain relief he needed. Dr. Shamber only reviewed documents cherry-picked

8

by lawyers, ignored medical records showing a serious medical problem and avoided reviewing blood tests showing Mr. Hill had a serious medical.  Mr. Schamber's liability-avoiding medical review resulted in jail personnel being informed that Mr. Hill was fine and was receiving adequate care when even a lay person could see that was not the case.  Dr. Schamber and ACH follow this same custom and practice every time they conduct a "medical review," which is intended only to insulate them from liability and not ensure adequate care to inmates.

26.     Upon information and belief, Defendants Does 1-15 were employed by and/or contracted with ACH and Phelps County and provided services in that capacity including, but not limited to, the facilitation and supervision of medical services to all inmates of the Phelps County, Missouri Jail, including Mr. Hill, during the approximate period between October 4, 2019 and April 3, 2020.

## BACKGROUND

27.     In early April of 2020, Bilal Hill was diagnosed with terminal, stage IV lung adenocarcinoma after Defendants denied him adequate medical treatment for months despite his frequent and urgent requests for treatment and observably deteriorating physical condition.

28.     Lung cancer is the most common cancer worldwide.  Lung cancer incidence is tightly linked with cigarette smoking.  Mr. Hill reported a history of smoking one pack of cigarettes per day when screened at admission to Phelps County Jail in October 2019.

29.     Mr. Hill's lung cancer arose in the apical (upper) portion of the lung.  Lung cancers that begin in this part of the lung are known as Pancoast tumors.  As Pancoast cancer grows, it compresses the surrounding nerves in an individual's left shoulder and neck, eventually causing severe and unrelenting shoulder and arm pain—much like the pain Mr. Hill reported to Phelps County

9

employees and medical staff on January 13, 2020, 81 days before he was diagnosed by outside medical providers.  If untreated, the cancer continues to compress the shoulder and brachial area nerves, eventually resulting in nerve impingement.

30.     Another typical symptom of lung cancer as the cancer grows is chest pain.  Mr. Hill reported chest pain to Phelps County employees and medical staff on January 25, 2020, 69 days before he was diagnosed by outside medical providers.

31.     Without treatment, lung cancer spreads directly and through the blood circulation and lymphatic systems.  By February 20, 2020, Mr. Hill could feel a knot in the left area of his neck, which he reported to Phelps County employees and medical staff.  Dr. Bentley confirmed the presence of an enlarged lymph node in Mr. Hill's neck on February 26, 2020, 37 days before Mr. Hill was diagnosed by outside medical providers.  This lymph node never returned to normal, and was eventually biopsied by outside medical providers on April 3, 2020 to confirm Mr. Hill's cancer diagnosis.

32.     As untreated cancer grows and spreads, it becomes increasingly metabolically active.  This typically results in weight loss.  Unintentional weight loss of 10 pounds or more is commonly experienced by patients with lung cancer.  By February 26, 2020, 37 days before Mr. Hill was diagnosed by outside medical providers, Mr. Hill had lost 14 pounds in less than a month.  By April 1, 2020, Mr. Hill had lost 28 pounds in slightly more than two months.  When finally sent for outside evaluation on April 3, 2020, Mr. Hill had extensive metastases in the neck, mediastinum, thoracic vertebral bones, and retroperitoneum.

33.     Early diagnosis of lung cancer before extensive metastases occur greatly increases the chance for a cure or longer survival.  Mr. Hill was eventually diagnosed with lung adenocarcinoma.

10

Adenocarcinoma typically has the slowest doubling rate of the three major types of lung cancer, and has a five-year survival rate as high as 70 to 80 percent, if diagnosed before metastases.

34.     Mr. Hill presented with multiple symptoms typical of lung cancer in January 2020, including a cigarette smoking history, intractable shoulder pain, and chest pain.  If lung cancer is a possible diagnosis, the first test done is typically a chest X-ray.  Pancoast lung cancer appears on a chest X-ray as an apical mass or as increased size of the apical cap.  Mr. Hill requested a chest X-ray on January 21, 2020, but did not receive any chest radiology until over two months later on April 3, 2020.  By that point, his lung cancer had extensively metastasized and he had stage IV cancer.

35.     Ultimately, outside medical professionals diagnosed Mr. Hill with terminal cancer, estimating he had three months left to live.

36.     Due to Defendants' complete indifference for Mr. Hill's condition, Mr. Hill ultimately succumbed to his terminal stage IV lung cancer on January 14, 2021.

## GENERAL ALLEGATIONS

37.     At some point prior to October 4, 2019, ACH reached a meeting of the minds and/or mutual understanding with Phelps County to recruit, contract, employ, train, compensate, and supervise medical professionals to provide medical services including, but not limited to, examinations, treatment, and care to all of the inmates housed at the Phelps County, Missouri Jail, including Mr. Hill, at least between the approximate dates of October 4, 2019 and April 3, 2020.

38.     While awaiting trial in the United States District Court for the Western District of Missouri, Central Division, Mr. Hill was initially housed at the Cole County Jail in Jefferson City, Missouri.

11

4834-7617-7388

39.     On or about November 17, 2018, Cole County Jail recorded Mr. Hill's weight as 205 pounds and noted Mr. Hill smoked one pack of cigarettes per day.

40.     On or about October 4, 2019, Mr. Hill transferred to the Phelps County Jail in Rolla, Missouri.

41.     Mr. Hill has a long history of heavy cigarette smoking, which Mr. Hill reported to the Cole County Jail on or about November 17, 2018 and the Phelps County Jail on or about October 8, 2019.

42.     On or about October 4, 2019, Screening Officer Ratcliff completed a Phelps County Inmate Screening form for Mr. Hill, noting his complaints of intermittent pain and his diagnosis by Cole County Jail of a sports hernia.

43.     On or about October 8, 2019, Mr. Hill self-reported to Phelps County that he smoked one pack of cigarettes per day.

44.     Also on or about October 8, 2019, Phelps County medical staff recorded Mr. Hill's weight at 196.5 pounds.

45.     On or about January 13, 2020, Mr. Hill submitted a Medical Services Request ("MSR") to Phelps County staff, in which he complained of extreme back and neck pain shooting from his shoulder blade to his neck.

46.     On or about January 13, 2020, Dr. Bentley reported Mr. Hill's shoulder and neck pain had been present for approximately one week, the area was tender to the touch, and Mr. Hill reported constant pain.

12

47.     At the conclusion of the visit described in Paragraph 42, above, Dr. Bentley prescribed Mr. Hill 1000 milligrams of Tylenol, to be taken twice daily for three days.  Dr. Bentley further instructed Mr. Hill to see a nurse the following day.

48.     On or about January 14, 2020, a handwritten progress note in Phelps County records indicates Mr. Hill complained of pain between his shoulder blades and down the center of his back, and reported that his discomfort began two weeks prior.  The handwritten progress note further indicated Mr. Hill weighed 196 pounds.

49.     On or about January 15, 2020, Mr. Hill was prescribed a prednisone "taper."

50.     On or about January 21, 2020, Mr. Hill submitted another MSR indicating his level of pain was increasing and he was beginning to have muscle spasms and requesting that X-rays be performed.

51.     On or about January 25, 2020, four days after submitting the MSR described in Paragraph 45, above, Mr. Hill reported chest pain described as sharp pain under his left nipple in addition to his shoulder and neck pain.  Dr. Bentley prescribed one 400 milligram dose of Tylenol.

52.     On or about January 27, 2020, a handwritten progress note indicated Mr. Hill continued to have chest, shoulder, and back pain.

53.     On or about February 6, 2020, Mr. Hill completed an Inmate Grievance Form ("IGR") complaining he had been in extreme pain for the past month and was unable to sleep.  Mr. Hill requested to be taken to the emergency room.

54.     Lieutenant Taylor spoke with Nurse Kelly regarding Mr. Hill's February 6, 2020 IGR wherein Mr. Hill indicated that he was in extreme pain, and that his Eighth Amendment rights to be free from cruel and unusual punishment were being violated by Defendants' deliberate indifference to

his plain, obvious, and serious medical needs.  Lieutenant Taylor responded in writing that he would put Mr. Hill on the jail doctor's "list for next week."

55.     On or about February 12, 2020, a handwritten progress note indicated Mr. Hill's complaints of upper back pain and that Mr. Hill's weight had fallen to 190 pounds.

56.     On or about February 12, 2020, Mr. Hill completed another IGR, noting he had been in extreme pain for over a month and he had completely exhausted the grievance procedure.  Mr. Hill further noted he had asked on several occasions to be seen by an outside care provider.  Defendants deliberately disregarded his requests.

57.     On or about February 17, 2020, Mr. Hill completed another IGR, noting he had been suffering from extreme pain for over 30 days "due to some sort of neck, back and shoulder injury." Mr. Hill further noted his ongoing request to be seen by a physician "that can run the proper tests to pinpoint what needs to be done," but Defendants again deliberately disregarded his requests.

58.     On or about February 20, 2020, Mr. Hill completed another MSR, noting he had "what feels to be a growth in [his] neck in one of the areas [he] complained to be in severe pain."

59.     On or about February 21, 2020, a handwritten note initialed by a doctor and nurse indicated Mr. Hill's weight had dropped to 180 pounds.

60.     On or about February 26, 2020, a handwritten note indicated Mr. Hill's lymph node was swollen to the size of a peanut, and that Mr. Hill weighed only 182 pounds, a loss of 14 pounds since January 27, 2020.

61.     Around this same time, jail personnel observed that Mr. Hill had a baseball-sized mass on his shoulder.

14

62.     On or about February 26, 2020, Lieutenant Taylor received a grievance from Mr. Hill indicating that he was dealing with issues in his rotator cuff, bicep tendon, and back.  Shortly thereafter, Lieutenant Taylor contacted ACH—the Phelps County, Missouri Jail's contracted health care provider—for additional assistance regarding Mr. Hill's care.

63.     On or about March 5, 2020, approximately two months after Mr. Hill's first complaint of extreme shoulder and neck pain, Lieutenant Taylor, and not the licensed medical professionals who were providing "treatment" to Mr. Hill—e.g., Dr. Bentley and Nurse Kelley—finally called ACH employee Jennifer Nolawski, who served as the Regional Nurse Manager for ACH's Southwestern District.  Lieutenant Taylor—and not Dr. Bentley or Nurse Kelley—explained to Jennifer Nolawski, "what was going on with Mr. Hill and [his] concerns."  Rather than recommend that Mr. Hill receive appropriate medical treatment such as X-rays, a CT scan, or CAT scan by an outside medical provider, ACH employee Jennifer Nolawski "suggested a review of Mr. Hill's medical records by a Doctor Review Board at ACH."

64.     Lieutenant Taylor agreed with ACH employee Jennifer Nolawski's recommendation and "requested that it be done."

65.     On or about March 7, 2020, Mr. Hill completed another MSR, noting: the pain in his bicep hurt so badly he hadn't slept in days; his neck had swollen to a point that the swelling interfered with his breathing; and the pain in his neck and back had not diminished.  Mr. Hill once again requested to receive emergency medical attention, and Defendants deliberately disregarded this request.

66.     On or about March 8, 2020, a handwritten progress note indicated Mr. Hill's weight had fallen to 175 pounds, a decrease of 21 pounds since January 27, 2020.

67.     On March 9, 2020, Lieutenant Taylor received the results of the ACH review conducted by Dr. Schamber.  Dr. Schamber found that Mr. Hill, based on the record, "is receiving objectively reasonable care based on the complaints given." Rather than recommend any alternative treatment methods, Dr. Schamber suggested that Lieutenant Taylor create an "activity log" to determine if Mr. Hill's "subjective complaints," which had been ongoing and constant for about two months, matched his "activity level."

68.     As set forth above, however, the "medical review" by Dr. Schamber was intended to further delay taking Mr. Hill to get appropriate testing, treatment and pain management, in hopes Mr. Hill would soon transfer out of Phelps County. To this end, Dr. Schamber and ACH intentionally avoided reviewing documents that demonstrating how dire Mr. Hill's condition had become by having ACH lawyers cull those documents from his review.  In turn, Dr. Schamber misrepresented to the jail that his independent medical review showed objectively reasonable care when he and ACH knew that was inaccurate.

69.     On or about March 17, 2020, approximately eight days after Lieutenant Taylor received the ACH review board findings, Mr. Hill was moved to a holding cell and placed on "medical watch."

70.     On or about March 20, 2020, a nurse completed a handwritten progress note that indicated Mr. Hill complained of left shoulder pain and stated he had minimal relief to his shoulder or back pain from the doctor-prescribed Tylenol.  The record also notes Mr. Hill's heart rate was up to 112 beats per minute.

71.     On or about March 27, 2020, a nurse completed a handwritten progress note that indicated Mr. Hill complained of a new onset of chest pain and had audibly rapid breathing secondary

16

to discomfort.  Mr. Hill described the pain as a stabbing pain.  His pulse was recorded as 130 and 139 beats per minute.  Dr. Bentley prescribed 1000 milligrams of Tylenol, to be taken twice daily.

72.     On or about March 30, 2020, Mr. Hill submitted yet another MSR, indicating he was "still in severe pain in [his] upper back and left arm" and 75 percent of his left arm was numb as he continued to lose mobility in that arm.  Mr. Hill requested an MRI.

73.     On or about April 1, 2020, a handwritten progress note indicated that Mr. Hill weighed 168 pounds—a decrease of 28 pounds since January 27, 2020 and 37 pounds since November 17, 2018.  Mr. Hill continued to complain of left back trapezius and left arm pain.  The practitioner noted that a reason for the severe pain had not been found and staff planned to refer Mr. Hill to an emergency room for evaluation.

74.     On or about April 3, 2020, at least 10 weeks after Mr. Hill's first complaints of severe pain, Phelps County medical staff referred Plaintiff to the Phelps County Hospital emergency room for evaluation.  After evaluation, he was transferred to Cox Health in Springfield, Missouri.

75.     Also on or about April 3, 2020, medical staff at Cox Health in Springfield, Missouri assessed a need for a biopsy given Mr. Hill's symptoms and medical history, noting that Mr. Hill may have lymphoma or lung cancer and recommending a biopsy.

76.     In a pathology report prepared on or about April 3, 2020, medical staff at Cox Health in Springfield, Missouri noted that Mr. Hill's pathology results were "diagnostic for a poorly-differentiated non-small cell adenocarcinoma."

77.     In a radiology report prepared on or about April 3, 2020, Cox Health medical staff reported abnormal findings, noting that the "[m]ost prominent abnormality is large mass involving left lower neck, left axilla, and left upper mediastinal areas."

4834-7617-7388

78.   At the time Mr. Hill was evaluated at Cox Health, he was reporting pain levels at an 8, on a scale of 1 to 10.

79.   On or about April 9, 2020, Mr. Hill was discharged from Cox Health.  Mr. Hill's discharge report from Cox Health noted a diagnosis of non-small cell lung cancer with metastasis.  He required multiple medications, including fentanyl, gabapentin, hydromorphone, and lidocaine to control his pain.  Medical staff further noted that Mr. Hill had less than three months of life.

80.   Mr. Hill submitted at least eight MSRs and grievances over the course of his incarceration at Phelps County Jail, putting Defendants on notice of his increasingly urgent medical condition over a period of several months.

81.   Over the course of at least 10 weeks of Mr. Hill's increasingly urgent complaints, Defendants deliberately or recklessly disregarded telltale signs of the severity of Mr. Hill's condition, including, but not limited to: the location of his pain complaints; the severity and constant nature of his pain complaints; Mr. Hill's rapid weight loss; and Mr. Hill's history of heavy tobacco use.

82.   Due to Defendants' deliberate disregard for or indifference to Mr. Hill's serious medical needs and continued denial of adequate healthcare, Mr. Hill suffered from a once treatable, but now terminal cancer and ongoing pain.

83.   Due to Defendants' deliberate disregard for or indifference to Mr. Hill's serious medical needs, Mr. Hill suffered from a delay in adequate medical treatment that caused him months of suffering prior to receiving the necessary and requested medical intervention.

84.   Due to Defendants' deliberate disregard for or indifference to Mr. Hill's serious medical needs, Mr. Hill ultimately succumbed to his terminal stage IV lung cancer on January 14, 2021.

4834-7617-7388

85.     On March 30, 2021, the North Carolina probate court issued Letters Testamentary to Plaintiff, naming Plaintiff as Executor of Mr. Hill's estate in file number 2021-E-01029.

86.     On May 14, 2021, the Court granted Plaintiff's Motion to Substitute Lady Maakia Charlene Smith, as personal representative of the Estate of Bilal Hill, to represent Mr. Hill's interest in this matter.

**COUNT I:**
**PLAINTIFF'S CLAIM FOR SURVIVAL PURSUANT TO 42 U.S.C. 1983: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**

87.     Plaintiff, as personal representative of the Estate of Bilal Hill, pursuant to RSMo 537.020, hereby brings this action on behalf of Mr. Hill, against Defendants Doctor Arthur Bentley, Nurse Dionne Kelley, Sheriff Richard L. Lisenbe, Sergeant Glenn, Officer Kelly Ratcliff, Lieutenant Joe Taylor, Dr. Travis Schamber, and Does 1-15, each in their individual capacities (the "Individual Defendants"), as if he was living and bringing this lawsuit for his damages, and states as follows: Plaintiff incorporates the general allegations 1-86 above as if fully set forth herein.

88.     Throughout his incarceration at the Phelps County Jail, Mr. Hill suffered from a serious medical need, which ultimately developed into a terminal illness—stage IV lung cancer.

89.     The Individual Defendants were each made aware of Mr. Hill's serious medical need through several avenues, including but not limited to Mr. Hill's repeated oral requests for medical assistance to correctional officers and medical staff, written requests to medical staff, and observably deteriorating physical condition.

90.     Each of the Individual Defendants, while acting under color of law as employees of or contractors for ACH and/or Phelps County, deliberately disregarded Mr. Hill's serious medical needs relating to his lung cancer in numerous ways, including but not limited to, deliberately disregarding

19

Mr. Hill's obvious need for (i) additional medical treatment, including X-rays, an MRI, and (ii) referral to an outside physician for a timely diagnosis and other appropriate medical care.

91.     Each of the Individual Defendants, while acting under color of law as employees of or contractors for ACH and Phelps County, deliberately disregarded Mr. Hill's serious medical needs relating to his lung cancer by failing to provide the medical care or direct that the medical care be provided or allow Mr. Hill to obtain the medical care needed within a reasonable time.

92.     As a direct result of the Individual Defendants' deliberate indifference, Mr. Hill suffered serious, and eventually terminal, injury.

93.     The Individual Defendants are liable to Plaintiff for the injuries sustained by Mr. Hill pursuant to RSMo § 537.020.

94.     The Individual Defendants' acts and omissions were not only intentionally willful, wanton, reckless, and malicious but they also evince a complete and deliberate indifference to and a conscious and reckless disregard of the rights of Mr. Hill.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

95.     Plaintiff is entitled to recover reasonable attorney fees, costs, and expenses from Individual Defendants as provided by 42 U.S.C. § 1988.

## COUNT II:
### PLAINTIFF'S CLAIM FOR SURVIVAL PURSUANT TO 42 U.S.C.  1983: UNCONSTITUTIONAL POLICY, CUSTOM, AND FAILURE TO TRAIN OR SUPERVISE

96.     Plaintiff, as personal representative of the Estate of Bilal Hill, pursuant to RSMo 537.020, hereby brings this action on behalf of Mr. Hill, against Defendants Advanced Correctional

4834-7617-7388

Healthcare, Inc.; Dr. Travis Schamber; Phelps County Sheriff's Department; Phelps County, Missouri Jail; Sheriff Richard L. Lisenbe, in his official capacity; and Dr. Arthur Bentley, in his official capacity, as if he was living and bringing this lawsuit for his damages, and states as follows:

97.     Plaintiff incorporates the allegations in Paragraphs 1-95 above as if fully set forth herein.

98.     ACH and Phelps County reached a meeting of the minds and/or mutual understanding, at some point prior to October 4, 2019, to recruit, contract, employ, train, compensate, and supervise medical professionals to provide medical services including, but not limited to, examinations, treatment, and care to all of the inmates housed at the Phelps County, Missouri Jail, including Mr. Hill. Accordingly, ACH was a willing participant with Phelps County and/or its agents in the joint action that violated Mr. Hill's Eighth Amendment rights under the United States Constitution and thus qualifies as a state actor acting under color of state law for purposes of this lawsuit under 42 U.S.C. § 1983.

99.     ACH and/or Phelps County reached a meeting of the minds and/or mutual understanding with Dr. Bentley to provide medical services, including, but not limited to, evaluations, diagnosis, treatment, and care to all inmates housed at the Phelps County, Missouri Jail for the approximate period between October 4, 2019 and April 3, 2020—including Mr. Hill.

100.    During the time Mr. Hill was housed at the Phelps County, Missouri Jail, ACH, Phelps County, Dr. Bentley, Sheriff Lisenbe, and/or Dr. Schamber, had oversight and supervisory responsibilities over the Phelps County, Missouri Jail's medical policies, customs, procedures, and medical staff, including Nurse Kelley.

101.    During the time Mr. Hill was housed at the Phelps County Jail, Sheriff Lisenbe, in conjunction with ACH and its employees, had direct supervisory and oversight responsibilities over ACH's and Phelps County's policies, customs, procedures, and staff, including, but not limited to, the policies and customs related to medical treatment for inmates, Mr. Hill included, and the staff with responsibilities related to the inmate grievance and medical service request processes.

102.    ACH's and Phelps County's policies, procedures, customs, practices, and actions – which, through the conduct and deliberate omissions of its employees and agents, including but not limited to Dr. Bentley, Dr. Schamber, Jennifer Nolawski, Nurse Kelley, Sheriff Lisenbe, Sergeant Glenn, Officer Kelly Ratcliff, Lieutenant Joe Taylor, and Does 1-15, were so widespread and persistent as to represent official policy – recklessly disregarded substantial risks of serious harm to inmates and inflicted injuries that are actionable under 42 U.S.C. § 1983.

103.    ACH and Phelps County's collective abdication of policy-making and oversight responsibilities and/or its inadequate policies, procedures, customs, practices, and actions—as well as its inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies—reached the level of deliberate indifference and resulted in a constitutional injury manifesting itself in the unnecessary and wanton infliction of pain because of their collective and tacit authorization of personnel misconduct.

104.    More specifically, ACH and Phelps County's inadequate policies, procedures, customs, practices, and actions—as well as their inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies—permitted with respect to Mr. Hill and all other inmates at Phelps County:

22

a.    Failures to provide professional medical judgment and care that would be ordered by outside treating physicians;

b.    Failures to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up;

c.    Delays or non-responses to noted urgent conditions;

d.    Failures to assure timely access to care by requiring inmates to submit multiple MSRs to be evaluated by a physician, if at all;

e.    Failures to provide cogent nursing directives for prioritizing MSRs and sick calls;

f.    Failures to assure staff competency, especially among physicians and nurses, including the establishment of policies, procedures, and processes to detect and respond to incompetency;

g.    Delegating clinical determinations to nursing personnel who are neither qualified nor licensed to independently make such determinations;

h.    Poor quality nursing, including failures to: note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments for on-site care or off-site specialty care, and collect past medical records from prior treating physicians;

i.    Failures to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, not providing adequate treatment; and not providing the care ordered by off-site treating physicians;

j.    Utilizing "conservative" treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices;

k.    Belated or untimely authorization of off-site specialty medical care and treatment;

l.    Designing policies for the Jail to avoid liability by claiming they were powerless to take Mr. Hill for testing or alleviate his extreme pain;

m.    Creating sham processes like a "medical review" that is designed to protect against liability and save costs and misleads clients to believe they can continue ignoring obvious pain and suffering;

n.    Failures to provide inmates with qualified medical opinions rendered by on-site and off-site physicians;

23

o.   Failures to inform inmates of their conditions and diagnoses and to permit them to participate in decisions involving their care.

105.   The systemic deficiencies listed above are the product of official policies, procedures, customs, practices, and actions that were promulgated or tacitly authorized by ACH and Phelps County and/or personnel vested with final decision-making authority, and all of them caused or materially contributed to the systemic and unconstitutional deliberate indifference to Mr. Hill's serious medical needs and the unnecessary and the wanton infliction of pain he experienced.

106.   The systematic deficiencies listed above evince the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by employees of both ACH and Phelps County that constitutes deliberate indifference to or tacit authorization of such conduct by ACH's policymaking officials after notice to the officials of that misconduct.

107.   ACH and Phelps County's official policies, procedures, customs, practices, and actions, which are the moving force behind Mr. Hill's injuries, operated to deprive Mr. Hill of the right to adequate and appropriate diagnosis and treatment of his serious medical needs, and, but for the same, he would not have been deprived of rights secured by the Eighth Amendment.

108.   Collectively, ACH and Phelps County's acts and omissions not only contemplate a conscious disregard of a substantial risk of serious harm to inmate health and safety, but said acts and omissions are also sufficiently harmful to illustrate a deliberate indifference to the serious medical needs of Mr. Hill and the other inmates in their charge.

109.   The Individual Defendants are liable to Plaintiff for the injuries sustained by Mr. Hill pursuant to RSMo § 537.020. ACH and Phelps County's acts and omissions were not only intentionally willful, wanton, reckless, and malicious, but they also evince a complete and deliberate indifference to and a conscious and reckless disregard of the rights of Mr. Hill and all inmates in the custody of Phelps

24

4834-7617-7388

County, who have Phelps County and/or Dr. Bentley and Nurse Kelley as their sole source of medical care.

110.    Plaintiff is entitled to recover reasonable attorney fees, costs, and expenses from Defendants as provided by 42 U.S.C. § 1988.

## COUNT III:
## PLAINTIFF'S CLAIM FOR SURVIVAL - MEDICAL NEGLIGENCE

111.    Plaintiff, as personal representative of the Estate of Bilal Hill, pursuant to RSMO 537.020, hereby brings this action on behalf of Mr. Hill against Defendants Drs. Arthur Bentley, Dr. Travis Schamber, Nurse Kelley, and Advanced Correctional Healthcare, Inc. as if he was living and bringing this lawsuit for his damages, and states as follows:

112.    Plaintiff incorporates the allegations of Paragraphs 1-110 above as if fully set forth herein.

113.    A patient-physician relationship existed between (i) Dr. Arthur Bentley (as Mr. Hill's physician), Dionne Kelly (as Mr. Hill's nurse), Dr. Travis Schamber (as Director of Medical Services at ACH), ACH (as the entity responsible for providing medical care to Mr. Hill) and (ii) Mr. Hill, and they owed Mr. Hill a duty to provide medical care by using the degree of skill and learning ordinarily used under the same or similar circumstances by members of the medical profession while Mr. Hill was an inmate at the Phelps County, Missouri Jail.

114.    Dr. Travis Schamber, as Director of Medical Services at ACH, was responsible for overseeing, reviewing, and tacitly approving and/or authorizing the care that was provided to Mr. Hill or that should be provided to Mr. Hill, and therefore owed a legal duty to protect Mr. Hill from injury.

4834-7617-7388

115.    At minimum, Dr. Schamber, as Director of Medical Services at ACH and/or ACH, is vicariously liable for Dr. Bentley's and Dionne Kelly's conduct that caused Mr. Hill's injuries, including, but not limited to, the failure to diagnose Mr. Hill's lung cancer and/or recommend that Mr. Hill received treatment from outside medical providers.

116.    Dr. Bentley, Dionne Kelly, Dr. Schamber, ACH (collectively, "Defendants") breached their duty—multiple times and in multiple ways—and were therefore negligent in the following respects, including, but not limited to:

    a.    Failing to diagnose Mr. Hill's lung cancer;

    b.    Failing to provide professional medical judgment and care that would be ordered by outside treating physicians, including, but not limited to, x-rays and MRIs, which, if provided, would have led to the diagnosis of Mr. Hill's lung cancer;

    c.    Failing to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up, including, but not limited to, Mr. Hill's smoking history, massive weight loss, irregular blood work, chronic pain, and a baseball-size mass growing in Mr. Hill's neck which, if noted, would have led to the diagnosis of Mr. Hill's lung cancer;

    d.    Delaying or being non-responsive to urgent medical conditions that were known to him and his staff, including, but not limited to, Mr. Hill's smoking history, massive weight loss, irregular blood work, chronic pain, and a baseball-size mass growing in Mr. Hill's neck which, if properly responded to, would have led to the diagnosis of Mr. Hill's lung cancer;

    e.    Failing to provide timely access to medical care, including, but not limited to, x-rays and MRIs which, if provided, would have led to the diagnosis of Mr. Hill's lung cancer;

    f.    Providing medical care that fell below the degree of skill and learning ordinarily used under the same or similar circumstances by members of Dr. Bentley's profession, including failures to: note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments for on-site care or off-site specialty care, and collect past medical records from prior treating physicians;

4834-7617-7388

g.  Failing to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, not providing adequate treatment; and not providing the care ordered by off-site treating physicians;

h.  Failing to provide medical care and employ particular treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices, to cut costs and save money for Phelps County and ACH;

i.  Delaying the authorization of off-site specialty medical care and treatment to cut costs and save money for Phelps County and ACH;

j.  Failing to provide Mr. Hill with qualified medical care and opinions rendered by on-site and off-site physicians which, if provided, would have led to the diagnosis of Mr. Hill's lung cancer;

k.  Failing to conduct an adequate review of the medical care provided to Mr. Hill at Phelps County

117.   As a direct and proximate result of Defendants' negligence, Defendants failed to timely diagnose Mr. Hill's lung cancer.  Mr. Hill's lung cancer subsequently metastasized and is now terminal.

118.   As a direct and proximate result of Defendants' negligence, the diagnosis of Mr. Hill's lung cancer by outside medical providers was irreversibly delayed.   Mr. Hill's lung cancer subsequently metastasized and was terminal.

119.   Had Defendants' provided Mr. Hill with proper medical care and permitted Mr. Hill to received medical care from outside medical providers, Mr. Hill had a great chance of surgical care and prolonged survival.  Mr. Hill had a shortened life span, was unable to perform his usual forms of recreation and enjoyment of life, suffered unimaginable physical pain, mental anguish, and physical impairment, and incurred substantial expenses for medical treatment.

120.   The Individual Defendants are liable to Plaintiff for the injuries sustained by Mr. Hill pursuant to RSMo § 537.020.

121.    Plaintiff is entitled to recover all applicable damages under Mo. Ann. Stat. § 538.205, including, but not limited to, damages related to Mr. Hill's pain and suffering, mental anguish, disfigurement, loss of capacity to enjoy life, loss of consortium, attorney's fees, and physical impairment.

122.    Defendants' acts and omissions were intentionally willful, wanton, reckless, and malicious and evince a complete and deliberate indifference to and a conscious and reckless disregard of the rights of Mr. Hill.  Therefore, Mr. Hill is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants and to deter others from like conduct in the future.

### COUNT IV:
### PLAINTIFF'S CLAIM FOR SURVIVAL - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

123.    Plaintiff, as personal representative of the Estate of Bilal Hill, pursuant to RSMo 537.020, hereby brings this action on behalf of Mr. Hill, against Defendants Drs. Arthur Bentley, Dr. Travis Schamber, Nurse Kelley, and Advanced Correctional Healthcare, Inc. as if he was living and bringing this lawsuit for his damages, and states as follows:

124.    Plaintiff incorporates the allegations of Paragraphs 1-122 above as if fully set forth herein.

125.    Dr. Arthur Bentley, as Mr. Hill's physician, and Dionne Kelly, Mr. Hill's nurse, while Mr. Hill was housed at Phelps County, owed a legal duty to Mr. Hill to provide adequate medical care and, in doing so, to protect Mr. Hill from injury.

126.    Dr. Travis Schamber, as Director of Medical Services at ACH, was responsible for overseeing, reviewing, and tacitly approving and/or authorizing the care that was provided to Mr. Hill

or that should have been provided to Mr. Hill, and therefore owed a legal duty to protect Mr. Hill from injury.

127.     At minimum, Dr. Schamber, as Director of Medical Services at ACH and/or ACH, is vicariously liable for Dr. Bentley's and Dionne Kelly's conduct that caused Mr. Hill's injuries, including, but not limited to, his mental and emotional distress that was committed within the scope of their employment under ACH.

128.     Dr. Bentley, Dionne Kelly, Dr. Schamber, and ACH breached that duty—multiple times and in multiple ways—including, but not limited to, the following respects:

a.      Failing to diagnose Mr. Hill's lung cancer;

b.      Failing to provide professional medical judgment and care that would be ordered by outside treating physicians, including, but not limited to, x-rays and MRIs, which, if provided, would have led to the diagnosis of Mr. Hill's lung cancer;

c.      Failing to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up, including, but not limited to, Mr. Hill's smoking history, massive weight loss, irregular blood work, chronic pain, and a baseball-size mass growing in Mr. Hill's neck which, if noted, would have led to the diagnosis of Mr. Hill's lung cancer;

d.      Delaying or being non-responsive to urgent medical conditions that were known to him and his staff including, but not limited to, Mr. Hill's smoking history, massive weight loss, irregular blood work, chronic pain, and a baseball-size mass growing in Mr. Hill's neck which, if properly responded to, would have led to the diagnosis of Mr. Hill's lung cancer;

e.      Failing to provide timely access to medical care, including, but not limited to, x-rays and MRIs which, if provided, would have led to the diagnosis of Mr. Hill's lung cancer;

f.      Providing medical care that fell below the degree of skill and learning ordinarily used under the same or similar circumstances by members of Dr. Bentley's profession, including failures to: note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments

29

for on-site care or off-site specialty care, and collect past medical records from prior treating physicians;

g.     Failing to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, not providing adequate treatment; and not providing the care ordered by off-site treating physicians;

h.     Failing to provide medical care and employ particular treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices, to cut costs and save money for Phelps County and ACH;

i.     Delaying the authorization of off-site specialty medical care and treatment to cut costs and save money for Phelps County and ACH;

j.     Failing to provide Mr. Hill with qualified medical care and opinions rendered by on-site and off-site physicians which, if provided, would have led to the diagnosis of Mr. Hill's lung cancer;

129.    As a direct and proximate cause of Dr. Bentley's, Dionne Kelly's, Dr. Schamber's, and ACH's negligence, Mr. Hill's lung cancer diagnosis was severely delayed and caused Mr. Hill to suffer severe emotional distress. Dr. Bentley, Dionne Kelly, and Dr. Schamber—as licensed medical professionals—should have realized that the aforementioned conduct of failing to provide adequate medical care to Mr. Hill, failing to permit Mr. Hill to receive medical care from outside medical providers, and allowing Mr. Hill to suffer extreme and debilitating pain relating to his terminal lung cancer, involved an unreasonable risk of causing distress.

130.    Indeed, the emotional distress or mental injury suffered by Mr. Hill as a result of Defendants' conduct is medically diagnosable and is of sufficient severity to be medically sufficient.

131.    The Individual Defendants are liable to Plaintiff for the injuries sustained by Mr. Hill pursuant to RSMo § 537.020.

132.    Plaintiff is entitled to recover all applicable damages, including, but not limited to, damages related to Mr. Hill's pain and suffering, mental anguish, disfigurement, loss of capacity to enjoy life, loss of consortium, attorney's fees, and physical impairment.

4834-7617-7388

133.     Dr. Bentley's, Dionne Kelly's, Dr. Schamber's, and ACH's acts and omissions were intentionally willful, wanton, reckless, and malicious and evince a complete and a conscious and reckless disregard of the rights of Mr. Hill.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Dr. Bentley and to deter others from like conduct in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff requests that this Court, after a trial by jury, enter Judgment against Defendants for compensatory damages and exemplary or punitive damages proven at trial; for reasonable attorney fees, costs, and expenses incurred herein as provided by 42 U.S.C. § 1983; and for such further legal and equitable relief as the Court may deem just and proper.


Respectfully Submitted,


*/s/ Charles C. Eblen*
Charles C. Eblen, #55166
Brandon K. Gutshall, #61848
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO  64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
ceblen@shb.com
bgutshall@shb.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2021, the foregoing was filed electronically with the Clerk of the Court and will be served by operation of the Court's electronic filing system upon all attorneys of record.

/s/*Brandon K. Gutshall*
Brandon K. Gutshall
**ATTORNEY FOR PLAINTIFF**

4834-7617-7388