## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| LADY MAAKIA CHARLENE SMITH, | ) | |
| personal representative of the Estate of BILAL | ) | |
| HASANIE HILL, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:20-CV-00804-JMB |
| ADVANCED CORRECTIONAL | ) | |
| HEALTHCARE, INC.; PHELPS COUNTY | ) | |
| SHERIFF'S DEPARTMENT; PHELPS | ) | |
| COUNTY JAIL; SHERIFF RICHARD L. | ) | |
| LISENBE, Individually and in His Official | ) | |
| Capacity as Sheriff of Phelps County; DR. | ) | |
| ARTHUR BENTLEY, Individually and in His | ) | |
| Official Capacity as a Medical Services | ) | |
| Provider at Phelps County; DIONNE | ) | |
| KELLEY; KELLY RATCLIFF, SERGEANT | ) | |
| GLENN; LIEUTENANT JOE TAYLOR; DR. | ) | |
| TRAVIS SCHAMBER, DOES 1-15, | ) | |

Defendants.

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

4827-9061-0675

TABLE OF CONTENTS

FACTUAL BACKGROUND .......................................................................................................... 2

LEGAL STANDARD ................................................................................................................... 2

ARGUMENT ............................................................................................................................... 3

I.       Genuine issues of material fact preclude summary judgment on Plaintiff's individual
         capacity claims against the Jail and ACH employees. ......................................................... 3

         A.       A reasonable jury could conclude the individual Phelps County Jail Defendants
                  acted with deliberate indifference to Hill's serious medical needs. ........................ 5

                  1.       Qualified Immunity does not apply. ........................................................ 11

         B.       A reasonable jury could conclude Dr. Bentley acted with medical negligence and
                  deliberate indifference to Hill's serious medical needs. ........................................ 12

         C.       A reasonable jury could conclude Nurse Kelley acted with medical negligence
                  and deliberate indifference to Hill's serious medical needs. ................................. 17

         D.       A reasonable jury could conclude Dr. Schamber acted with medical negligence
                  and deliberate indifference to Hill's serious medical needs. ................................. 24

II.      Genuine issues of material fact preclude summary judgment on Plaintiff's official
         capacity claims against the Phelps County Jail and ACH. ............................................... 25

         A.       The Jail adhered to an unconstitutional policy of blind deference to ACH despite
                  knowing Mr. Hill was suffering and his health rapidly deteriorating. ................... 27

         B.       ACH's policies, practices, and training intentionally seek to avoid or delay
                  sending inmates for outside care even when the need to do so is obvious and risks
                  graves consequences. ............................................................................................. 32

         C.       Substantial evidence demonstrates ACH has a policy and a custom and practice of
                  intentionally avoiding sending inmates for outside care. ....................................... 33

         D.       ACH's training and marketing demonstrates it is a litigation risk-manager, not a
                  healthcare company, and creates an issue of fact for Mr. Hill's deliberate
                  indifference claim. ................................................................................................. 41

         E.       ACH's sham "board" review, which for the first time it labels a "medicolegal"
                  review, demonstrates an unconstitutional custom that obstructs care for sick
                  inmates like Mr. Hill. ............................................................................................ 44

CONCLUSION .......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Fowler,*
   98 F.3d 1069, 1076 (8th Cir.1996) ....................................................................27, 39

*Atkinson v. City of Mountain View, Mo.,*
   709 F.3d 1201,1214 (8th Cir. 2013) .........................................................................25

*Beck v. Skon,*
   253 F.3d 330, 333–34 (8th Cir.2001) ..................................................................13, 18

*Boyd v. Knox,*
   47 F.3d 966, 969 (8th Cir.1995) ...............................................................................17

*Brockinton v. Cty. of Sherwood, Ark.,*
   503 F.3d 667, 674 (8th Cir. 2007) ............................................................................26

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 322 (1986)............................................................................................2

*City of Canton, Ohio v. Harris,*
   489 U.S. 378, 388 (1989)..........................................................................................25

*Dadd v. Anoka Cty.,*
   827 F.3d 749, 756 (8th Cir. 2016) ...................................................................3, 4, 17

*David Brown II, as Independent Administrator of the Estate of David Brown,*
   *deceased v. ACH, et. al.,*  Case No. 18-cv-01168-JBM-JEH (C.D. Ill. 2018).........................34

*David Ivey v. ACH, et al.*
   Case No. 2:17 CV 82-CDP (E.D. Mo. July 16, 2019),
   https://casetext.com/case/ivey-v-audrain-cnty..................................................................36, 40

*Estelle v. Gamble,*
   429 U.S. 97, 106 (1976).......................................................................28, 29, 31, 43

*Farmer v. Brennan,*
   511 U.S. 825, 835, 839-940 (1994) .............................................................4, 5, 7, 23

*Fields v. Corizon Health, Inc.,*
   490 F. App'x 174, 185 (11th Cir. 2012) ....................................................................43

*Garden v. Central Nebraska Housing Corp.,*
   719 F.3d 899, 906 (8th Cir. 2013) .........................................................................2, 3

*Gordon ex rel. Gordon v. Frank*,
    454 F.3d 858, 862 (8th Cir. 2006) ...................................................................................... *passim*

*Greason,* 891 F.2d at 835.................................................................................................................17

*Harper v. Lawrence Cty.*,
    592 F.3d 1227, 1235 (11th Cir. 2010) ....................................................................................11

*Hartsfield v. Colburn*,
    371 F.3d 454, 457 (8th Cir. 2004) ............................................................................................9

*Hartsfield v. Colburn*,
    491 F.3d 394, 401 (8th Cir.2007) .............................................................................................7

*Hayes v. Faulkner Cnty., Ark.*,
    388 F.3d 669, 674 (8th Cir. 2004) ..........................................................................................26

*Hearn v. City of Gainesville*,
    688 F.2d 1328, 1334 (11th Cir. 1982) ....................................................................................29

*Helling v. McKinney*,
    509 U.S. 25, 31 (1993).............................................................................................................12

*Johnson–El v. Schoemehl*,
    878 F.2d 1043, 1055 (8th Cir. 1989) ......................................................................................15

*Johnson v. Douglas Cnty. Med. Dept.*,
    725 F.3d 825, 829 (8th Cir. 2013) ..........................................................................................27

*Johnson v. Hamilton*,
    452 F.3d 967, 973 (8th Cir. 2006) (discussing a § 1983 claim against a prison
    medical provider)......................................................................................................................26

*Jolly v. Knudsen*,
    205 F.3d 1094, 1096 (8th Cir. 2000) ......................................................................................12

*Jones v. Minn. Dep't of Corr.*,
    512 F.3d 478, 481-82 (8th Cir. 2008).......................................................................................4

*Kahle v. Leonard*,
    477 F.3d 544, 551 (8th Cir 2007) ...........................................................................................12

*King v. Kramer*,
    680 F.3d 1013, 1021 (7th Cir. 2012) ......................................................................................29

*Krein v. Norris*,
    309 F.3d 487, 491 (8th Cir. 2002) ............................................................................................5

4827-9061-0675

*Lamonte Brazelton v. ACH, et al.*
Case No. 4:16-cv-29 (N.D. Ind. 2016)....................................................................................35

*Langford v. Norris*,
614 F.3d 445, 460 (8th Cir. 2010) ................................................................................. *passim*

*Lester v. ACH*,
14:17-cv-158 (W.D. Ky 2017)................................................................................................36

*McKee v. Correct Care Sols., LLC*,
No. 6:18-CV-06117, 2021 WL 2152513, at *6 (W.D. Ark. May 26, 2021) ....................39, 40

*McRaven v. Sanders*,
577 F.3d 974 (8th Cir. 2009) ......................................................................................... *passim*

*Mettler v. Whiteledge*,
165 F.3d 1197, 1204 (8th Cir. 1999) .....................................................................................26

*Miller v. Schoenen*,
75 F.3d 1305, 1310 (8th Cir. 1996) .......................................................................................13

*Moore v. Jackson*,
123 F.3d 1082, 1084–87 (8th Cir.1997) (per curiam)............................................................17

*Nelson v. Shuffman*,
603 F.3d 439, 446 (8th Cir. 2010) ...........................................................................................4

*Pearson v. Callahan*,
129 S.Ct. 808, 816 (2009)......................................................................................................11

*Pool v. Sebastian County, Ark.*,
418 F.3d 934, 942 (8th Cir. 2005) .........................................................................................12

*Raymond Nugent v. ACH*,
4:18-cv-2042-AGF (E.D. Mo.) ..............................................................................................36

*Rellergert by Rellergert v. Cape Girardeau County, Mo.*,
924 F.2d 794, 797 (8th Cir. 1991) ...........................................................................................3

*Rhonda Hehrer, as Personal Representative of the Estate of Joseph Hehrer*,
*deceased, v. ACH et al.* 1:20-cv-01079-JTN-RSK (W.D. Mich.) ..........................................37

*Roberson v. Bradshaw*,
198 F.3d 645, 648 (8th Cir. 1999) .........................................................................................17

*Robert Weintraub, as Natural Parent and Surviving Heir of William Weintraub,*
*deceased, and as Administrator of the Estate of William Weintraub,*
Case 1:15 -cv- 01213 –AT (N.G. Ga. 2015)...........................................................................35

*Robinson v. Moreland*,
  655 F.2d 887, 890 (8th Cir. 1981) ........................................................................................17

*Russel v. Hennepin Cnty.*,
  420 F.3d 841, 847 (8th Cir. 2005) ........................................................................................26

*Sanders v. Sears, Roebuck & Co.*,
  984 F.2d 972, 975–76 (8th Cir. 1993) ..................................................................................26

*Schaub v. VonWald*,
  638 F.3d 905, 914 (8th Cir. 2011) .......................................................................................3, 4

*Schlarb v. ACH* ...............................................................................................................................36

*Small v. McCrystal*,
  708 F.3d 997, 1003 (8th Cir. 2013) ........................................................................................3

*Smith v. Jenkins*,
  919 F.2d 90, 93 (8th Cir. 1990) .........................................................................................4, 13

*Thompson v. King*,
  730 F.3d 742, 749 n. 3 (8th Cir. 2013) ...................................................................................3

*Timothy Strayer v. ACH, et. al.*,
  Case 4:12-cv-00098-RLY-TAB (S.D. Ind.) ...........................................................................37

*Tlamka v. Serrell*,
  244 F.3d 628, 633 (8th Cir.2001) ..........................................................................................17

*Vaughn v. Gray*,
  557 F.3d 904, 909 (8th Cir. 2009) .........................................................................................10

*Waldrop v. Evans*,
  871 F.2d 1030, 1035 (11th Cir.1989) ....................................................................................17

*Ware v. Jackson Cnty., Mo.*,
  150 F.3d 873, 880 (8th Cir. 1998) .........................................................................................26

*Wever v. Lincoln County, Nebraska*,
  388 F.3d 601, 607-8 (8th Cir. 2004) ......................................................................................39

*White v. McKinley*,
  519 F.3d 806, 813 (8th Cir. 2008) ..........................................................................................2

*Winslow v. Smith*,
  696 F.3d 716, 730 (8th Cir. 2012) ...........................................................................................2

*Wyatt v. Cole*,
  504 U.S. 158, 161 (1992)...........................................................................................................3

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................................2

Fed. R. Civ. P. 56(c) ......................................................................................................................2

**Other Authorities**

Eighth Amendment .........................................................................................3, 11, 12, 17

*"Broken Jail Healthcare System Poses Dangers Behind Bars"* (also available at
    https://www.cbsnews.com/news/broken-jail-healthcare-system-poses-danger-
    behind-bars/) ...........................................................................................................................36

4827-9061-0675

Bilal Hill died of lung cancer in January 2021.  Before he died, he was an athletic 42-year-old man in the Phelps County Jail.  He had a family, friends and a great sense of humor.  He could be alive right now.  He could have avoided months of hellish suffering.  He instead endured three months of suffering and deterioration that ACH and Phelps County watched pursuant to joint business objectives.  His suffering was obvious; and this is inexcusable in our democracy.  When he finally got to a hospital, he had already deteriorated beyond recognition.  Indeed, the doctor who diagnosed Mr. Hill with stage-four terminal cancer, a war veteran with *zero* interest in this case, testified about his diagnosis of Mr. Hill as follows:

> Q. I'm trying to find it in here, but at one point in a couple of your reports, uh, you – you called this an unfortunate case. What did you mean by that?
>
> A. So honestly, you know, I've -- I've been a medical director in a prison, I've treated prisoners with the Army, and, um, I've been a physician since, uh, 1997, and I think it was very sad that he had to, um, learn this diagnosis when there's nothing to be done about it. And so when he came in, there was nothing we could do but treat his pain and help him through the process of dying.
>
> Q. As a physician, and with the experience you've described, was it surprising to you that it took as long as it did for Mr. Hill to get outside care, uh, in a hospital like yours?
>
> A. Yes.
>
> Q. Explain why.
>
> A. Uh, just from my experience, I don't see how anyone could have missed, um, and not treated a person with pain that ultimately was caused by cancer.
>
> Q. And by the time Mr. Hill presented to you, if -- if you set aside your role as a physician, do -- do you think Mr. Hill's objective physical condition was something that it was pretty obvious to anyone that this man wasn't well?
>
> A. It's really –
>
> A. It's really difficult to remove myself as a physician since I've been doing it for so long, but the reality is, he was emaciated, skeletal appearing, and had an odor of death. I would think that anybody, regardless of the background, would know that something was wrong with him.

1

SOF ¶ 133. Moreover, Dr. Fawkes testified that Mr. Hill had been in this death-like condition for at least a month inside the Phelps County Jail. SOF ¶ 131.

This testimony speaks for itself.  But, as set forth below, defendants should explain to a jury how this happened to Mr. Hill.  There are genuine issues of material fact regarding why Mr. Hill's suffering was ignored for three months and suffered as a result.  To be sure, a jury should determine whether ACH's business practices, which the Jail blindly adopted, are consistent with our Constitution.  They are not, and the Court should deny summary judgment and allow all claims to proceed to a jury trial.

## FACTUAL BACKGROUND

Plaintiff incorporates by reference herein its Statement of Material Facts, filed concurrently herewith.

## LEGAL STANDARD

If, based upon evidence introduced in the summary judgment record, there exists a genuine issue of material fact or the movant is not entitled to judgment as a matter of law, the court must deny summary judgment. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment, including a party moving for qualified immunity in a § 1983 action, has the burden of establishing the relevant predicate facts, proving the absence of a triable issue, and showing entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012); *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). If the movant properly supports its motion and establishes the absence of a triable issue and entitlement to judgment as a matter of law, the burden shifts to the non-movant to designate specific evidence creating a triable controversy. Fed. R. Civ. P. 56(a) and (c); *Garden v. Central Nebraska Housing Corp.*, 719 F.3d 899, 906 (8th Cir. 2013). If, however, the movant

2

fails to properly support its motion with evidence establishing the absence of a triable issue, the court must deny summary judgment and the non-movant is not required to designate evidence in order to survive summary judgment. *Id.*

When deciding a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-movant. *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013). When the parties offer conflicting facts, the court must adopt the non-movant's version of the facts unless that version is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Thompson v. King*, 730 F.3d 742, 749 n. 3 (8th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## ARGUMENT

## I.     Genuine issues of material fact preclude summary judgment on Plaintiff's individual capacity claims against the Jail and ACH employees.

A pretrial detainee has a constitutional right to adequate medical care while in custody. *Dadd v. Anoka Cty.*, 827 F.3d 749, 756 (8th Cir. 2016). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "The Eighth Amendment prohibits the infliction of cruel and unusual punishment." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). For claims brought pursuant to § 1983, it is well established that "[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

"Indifference is apathy or unconcern." *Rellergert by Rellergert v. Cape Girardeau County, Mo.*, 924 F.2d 794, 797 (8th Cir. 1991). "Deliberate indifference is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a

substantial risk of serious harm to the inmate." *Schaub,* 638 F.3d at 914-915 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 839-940 (1994)). "Grossly incompetent or inadequate care can [also] constitute deliberate indifference." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990). To show deliberate indifference, a plaintiff is required to prove two elements: "[1] an objectively serious medical need and [2] that prison officials knew of the need but deliberately disregarded it." *Gordon*, 454 F.3d at 862 (citing *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)). "Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact." *Schaub*, 638 F.3d at 915.

The second requirement is subjective and requires that the inmate prove that the prison officials had a "sufficiently culpable state of mind." *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010) (quoting *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)). A claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842; and *Schaub*, 638 F.3d at 916. "The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481-82 (8th Cir. 2008); *Schaub,* 638 F.3d at 915 ("An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate").

A serious medical need is "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Dadd v. Anoka Cty.*, 827 F.3d 749, 755 (8th Cir. 2016). Here, it is undisputed that Mr. Hill suffered from a serious medical need while incarcerated

at Phelps County Jail. *See, e.g.,* PCJ SOF ¶ 5 ("Stage IV lung cancer is an objectively serious medical need"). The question is whether Defendants knew of that need. Here, the overwhelming evidence establishes Defendants knew Mr. Hill was suffering physical ailments and in severe pain for months, yet failed to do anything about it.

### A. A reasonable jury could conclude the individual Phelps County Jail Defendants acted with deliberate indifference to Hill's serious medical needs.

Defendants seek to avoid liability by claiming they did not know the precise source of Mr. Hill's suffering was Stage IV lung cancer. [Doc 128, p. 7]. This is irrelevant. The Supreme Court has "made clear" a plaintiff "is *not* required to allege and prove that the defendant ... specifically knew about or anticipated the precise source of the harm." *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002). Thus, to be deliberately indifferent, it is not necessary that the individual defendants knew Mr. Hill was specifically suffering from Stage IV lung cancer; it suffices that Defendants knew facts from which the inference could be drawn that a substantial risk of serious harm existed, and then drew the inference. *See Farmer,* 511 U.S. at 837. Both are satisfied here, because Defendants knew Mr. Hill experienced obvious physical suffering for months while at Phelps County. County Defendants admit that each "knew Mr. Hill was experiencing pain and making requests for medical attention." [Doc 128, p. 8]. And Correctional Officer Ratcliff herself explained Mr. Hill's "suffering" was "obvious." SOF ¶ 166.

Mr. Hill was openly suffering from severe pain and alarming physical symptoms over the course of three months. Indeed, the record is overwhelming with disturbing accounts of how Mr. Hill's suffering became "obvious" to those around him, including Defendants. Mr. Hill's pod-mates describe in detail Mr. Hill's striking physical decline from October 2019 to April 2020. Over the course of 3-4 months, Mr. Hill went from being healthy, active, and muscular (SOF ¶ 12) to weak, gaunt, 28-pounds-lighter, with a mass on his neck, a sunken face, and a body that had already

started the decaying process. SOF ¶ 133. One pod-mate explained that Hill "deteriorated fast." SOF ¶ 20. Multiple inmates testified Hill lost a lot of weight almost immediately (SOF ¶¶ 18-19), going from being muscular to looking skinny and aged, like whatever was causing his pain "ate him up." They described the growth on his neck as "real big," SOF ¶21 ("it was like a little alien was on [his neck]. It was real big . . . Everybody that was in the pod saw it"). They witnessed Mr. Hill's voice's "dramatic" change from a deep, loud voice to high pitched and raspy. SOF ¶ 17. One pod-mate described Hill's deterioration as watching a "healthy individual shrivel up . . . to a different life form almost. I couldn't even describe with words how bad it was." SOF ¶ 30. One described Mr. Hill as looking "like a skeleton."  SOF ¶ 31. According to his pod-mate Jason Johnson, "[a]nybody with a mind would know that he was in pain, that he was hurting." SOF ¶ 33.

And as Mr. Hill's physical condition deteriorated, so did his physical abilities. Hill's pod-mates described him as "bedridden" once he got sick. SOF ¶ 20. He couldn't walk to the bathroom by himself. SOF ¶ 23. He couldn't walk to the shower by himself. *Id.* He couldn't eat food; he couldn't even hold a food tray. SOF ¶ 22. And for "months and months and months" Hill's pod-mates testified Hill laid in bed in the pod monitored by Defendants, moaning, crying, and screaming in severe pain "every night" "all night" and "every morning." SOF ¶¶ 27-29. He cried out in pain "so much every night" that he was "causing problems" with the other inmates in the pod, prompting one of Hill's pod-mates, Jason Johnson, to have Hill sleep in his bed while Jason slept on the floor so he could "keep an eye on him." *Id.* One inmate, Mark Sooter, testified that he couldn't even describe "how miserable it was not just for [Hill], but for everyone just to see him like that, I mean screaming, moaning, like nonstop." SOF ¶ 30. Sooter expressed that he could not "comprehend the pain level that would make you sit there and scream and moan like that. I mean it was every day all day." *Id.*

Defendants knew as early as December 2019 that Mr. Hill was experiencing untreated and unmanaged pain and suffering. In December, Hill told Defendants about pain in his back radiating down his left harm, so severe he would cry and scream often in his cell. SOF ¶¶ 38-41. In January, Defendants knew the pain got worse, and Mr. Hill began to experience muscle spasms, sharp shooting pain under his left nipple, developed difficulty breathing, his voice changed dramatically, and he developed a sinister lump on his neck. SOF ¶¶ 43-44, 50, 52. In February, Defendants knew Mr. Hill's pain persisted, and he lost significant weight and began to lose feeling in his left arm. SOF ¶¶ 56, 60, 64, 67-69, 79, 80. By this point, Defendants had developed concerns about the medical care ACH was providing to Mr. Hill. SOF ¶ 62. By the end of February, Mr. Hill believed he was going to die in jail. SOF ¶ 89. By the end of March, Hill's left arm was almost completely numb. SOF ¶ 123.

Having established Defendants knew of a substantial risk of serious harm to Mr. Hill, the remaining question is whether Defendants disregarded the risk "by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 842. Because Defendants ignored Mr. Hill's repeated attempts to communicate his suffering, failed to take any action in response to his complaints of a misdiagnosis, failed to ensure he had adequate pain management, and ultimately isolated him for nine days while he deteriorated in "medical isolation," a genuine issue of fact exists regarding whether Defendants were deliberately indifferent.

A reasonable jury could find Defendants were deliberately indifferent to Mr. Hill's suffering by repeatedly ignoring Mr. Hill's repeated attempts to communicate his suffering directly to Defendants. *See Hartsfield v. Colburn,* 491 F.3d 394, 401 (8th Cir.2007) (noting that an inference of deliberate indifference is strengthened when "an inmate communicates his distress directly...and prison officials fail to respond"). Mark Sooter confirmed that "every single shift"

7

Hill "talked to every [correctional officer] here," in an attempt to get medical attention. SOF ¶ 32. Sooter explained the correctional officers would "just hang up on him almost every time," or refuse to even answer Mr. Hill when he tried to call them to seek help. *Id.* Jason Johnson confirmed Mr. Hill tried to get the Phelps County Defendants to send him to the doctor, but they "wouldn't do none of that." SOF ¶ 33. Mr. Johnson was so concerned for Hill that he advocated on his behalf to the correctional officers, yet they still did nothing.[1] SOF ¶ 34.

Mr. Hill was keenly aware of his dire circumstances. On eight different occasions he requested outside medical care or diagnostic tests from the jail employees and medical staff. SOF ¶¶ 48, 56, 60, 64, 68, 85, 99, and 124. His requests were ignored on every occasion.

Defendants claim they did not display deliberate indifference because they occasionally provided Mr. Hill with sick call request forms and Mr. Hill was seen on several occasions by Nurse Kelley and Dr. Bentley, and because they "followed those licensed medical professionals' orders for his medical care." While reliance on the recommendations of a trained medical professional can weigh against a finding of deliberate indifference, reliance on a medical assessment must be "objectively reasonable." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 864 (8th Cir. 2006). Phelps County Defendants' reliance on ACH's treatment was anything but. The magnitude, severity, and longevity of Mr. Hill's suffering and deterioration renders reliance on ACH's failure to address Hill's needs objectively unreasonable – at the very least, a fact issue exists for the jury. "A reasonable officer would know that it is unlawful for officers to delay medical treatment for an inmate with obvious signs of medical distress, especially one who communicates this distress

---

[1] Defendants' choice to ignore Mr. Hill appears to be, in part, due to a failure to take Mr. Hill's suffering seriously. SOF ¶ 34 (testifying Defendants ignored inmates' request for help for Hill even though Defendants could see him lying on the floor "[they] did not care if he was in pain or not. . . They just think everything was a joke"); SOF ¶53 (Phelps County officer accusing Mr. Hill of "put[ting] on a good show last week for us claiming he was having severe pains"); SOF ¶ 57 ("If he is observed exercising in any kind of way I would like to know the date and time please").

directly to officers." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006). For example, the fact that Mr. Hill was not sent to the hospital as early as December 2019, or even February 2020, made one Phelps County officer, Rick Spadoni, question the level of care that was being provided to Mr. Hill. SOF ¶ 168. He testified that someone making as many requests and was as adamant about his pain as Mr. Hill was "should have received outside medical care, outside diagnostic care," and that responsible parties "should have acted quicker than they did." SOF ¶ 170. He believed ACH failed to take Mr. Hill's complaints seriously, and believes others at Phelps County felt the same way. SOF ¶ 170.

Here, a reasonable jury could find Defendants were deliberately indifferent to Mr. Hill's serious medical needs by ignoring Mr. Hill's progressive pain and symptoms despite knowledge Mr. Hill was not responding to treatment and believed to be misdiagnosed. *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (holding district court erred in granting summary judgment against jail officials and jail medical staff where inmate presented evidence that he suffered extreme pain from loose and infected teeth, difficulty sleeping and difficulty eating, because these symptoms constituted a need for medical attention that "would have been obvious to a lay person"). Likewise, a reasonable jury could find Defendants were deliberately indifferent to Mr. Hill's serious medical need by taking little to no action in response to Mr. Hill's concerns that he had been misdiagnosed. From December on, Mr. Hill repeatedly pled with the Phelps County Jail employees in person and through grievances that ACH had misdiagnosed him, and begged to go to the emergency room several times. SOF ¶¶ 48, 56, 59, 60, 64, 67, 68, 85, 99, and 124. These requests were ignored. Mr. Hill was so desperate to receive proper diagnostic care that he threatened to fight the jail defendants in hopes they would beat him up to the point he would be taken to the hospital.  SOF ¶¶ 77-78. This, too, was ignored.

9

Even more shocking than Defendants' choice to ignore Hill's complaints while in the pod, is Defendants' choice to isolate Mr. Hill in a cell and call it a "medical watch." On March 17, Phelps County Sergeant Marvin Jackson found Mr. Hill collapsed on the floor, unable to get up on his own because of the pain. SOF ¶¶ 112-115. Rather than taking Mr. Hill to the emergency room or to the doctor, Defendants moved Mr. Hill to a holdover cell for what Defendants described as a "medical watch." SOF ¶ 112. During the move, Sergeant Jackson had to help Mr. Hill walk, and noted it seemed like he was weak. *Id.* Defendants isolated Mr. Hill in the cell for *nine days*. SOF ¶ 119. During this "medical watch" conducted by Defendants, they purportedly checked on Mr. Hill every 15 minutes. SOF ¶ 116. At every check, Defendants observed Mr. Hill laying on the floor, screaming and crying in pain. *Id.* Mr. Hill's fellow inmates thought his 9-day absence meant Hill was receiving medical care (SOF ¶¶ 114-115). Yet during his nine-day stay in this cell for "medical watch," Mr. Hill received no medical care or attention whatsoever. *Id.* And although Defendants captured video of Mr. Hill's time in "medical watch," they failed to preserve it. SOF ¶ 120.

In sum, based on Defendants' knowledge of Mr. Hill's suffering, coupled with his persistent requests for medical assistance, a reasonable jury could determine Defendants were actually aware Mr. Hill needed medical attention but failed to take reasonable steps to abate it *See Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009) (holding a reasonable jury could conclude jail officials were aware of and ignored inmate's serious medical need where inmate vomited throughout the night and requested medical attention, despite official's claims they did not draw the inference that vomiting was a serious medical need).

Defendants claim they were not deliberately indifference by failing to take additional steps on Mr. Hill's behalf because he "never suffered an acute medical emergency . . . such that the

individual Phelps County Defendants should have known that he required immediate emergency medical treatment." [Doc. 128, p. 7]. Mr. Hill indeed suffered from severe and excruciating pain over the course of months, which Defendants knew about, and for which he should have received immediate and additional attention. Phelps County Jail's standard of care is that you cannot let an inmate's health deteriorate. SOF ¶ 171. Defendants' choice to wait for some manifest emergency – more severe than Hill screaming in pain every night for months, looking skeletal, and being unable to eat, walk, or urinate without assistance – before providing him constitutionally adequate care constitutes deliberate indifference. *See, e.g., Harper v. Lawrence Cty.*, 592 F.3d 1227, 1235 (11th Cir. 2010) (holding a jail official "who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care [for a pretrial detainee] is deliberately indifferent to the inmate's constitutional rights") (emphasis added). Because Defendants chose to do nothing to help Mr. Hill, he was forced – for months – to rely on his fellow pod-mates to help him eat, urinate, walk, shower, sleep, and buy Tylenol. SOF ¶¶ 23, 24, 25, 26, 29. That Defendants chose to ignore Hill's suffering pursuant to an unconstitutional policy (*infra* Section II) does not absolve them from the consequences of their constitutional violations. A reasonable juror could find the individual Phelps County Defendants displayed deliberate indifference to Mr. Hill's serious medical needs. Summary judgment should be denied.

### 1. Qualified Immunity does not apply.

A district court may not grant qualified immunity to prison officials if the following two questions can be answered in the affirmative: (1) whether "the facts alleged show the officer's conduct violated a constitutional right," *Pearson v. Callahan,* 129 S.Ct. 808, 816 (2009); and (2) whether the right was "clearly established at the time of the alleged misconduct." *Id.* Plaintiffs have alleged Defendants were deliberately indifferent to Mr. Hill's serious medical needs while imprisoned in violation of the Eighth Amendment. "[T]he treatment a prisoner receives in prison

11

and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993). It is well established that "[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Gordon,* 454 F.3d at 862 (citing *Estelle,* 429 U.S. at 106). Therefore, the first question is answered affirmatively.

At the time of Defendants' alleged misconduct, *i.e.,* December 2019 – April 2020, the law was clearly established that a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See e.g., Pool v. Sebastian County, Ark.*, 418 F.3d 934, 942 (8th Cir. 2005); *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000). Therefore, the second question is also answered affirmatively and qualified immunity cannot be granted to Defendants.

Defendants argue they did not deprive Hill of any constitutional right because they deferred to ACH for decision on Hill's care and, therefore, were not deliberately indifferent to Hill medical needs. As explained above, however, the evidence establishes Defendants had actual knowledge of a substantial risk to Hill yet did nothing to ensure Hill received needed medical treatment. At a minimum, a reasonable jury could reach such a conclusion.

### B. A reasonable jury could conclude Dr. Bentley acted with medical negligence and deliberate indifference to Hill's serious medical needs.

Dr. Bentley argues he was not deliberately indifferent as a matter of law because he was never aware of "Plaintiff's serious medical need for cancer treatment" prior to Mr. Hill's diagnosis. This argument is unfounded. *Kahle,* 477 F.3d at 551 ("a plaintiff is not required to allege and prove that the defendant ... specifically knew about or anticipated the precise source of the harm"). Rather, summary judgment is inappropriate if, construing all facts in Plaintiff's favor, a reasonable jury could find Dr. Bentley knew Mr. Hill faced a substantial risk of serious harm, and

disregarded that risk by failing to take reasonable measures to abate it. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir.1990) (explaining indifference may be demonstrated "by prison doctors who fail to respond to prisoner's serious medical needs", or a delay in treatment, or a doctor's decision to follow an ineffective course of treatment).

That Dr. Bentley ignored Mr. Hill's pain and suffering – and obvious signs that should have prompted additional diagnostic testing – is confirmed by Cox Health's Dr. Fawks' initial visual evaluation of Mr. Hill upon transfer from the ER on April 1:  Dr. Fawks noted that Mr. Hill had progressive and unrelenting shoulder and arm pain for the previous three months. SOF ¶ 131. He also noted that Mr. Hill lost 40 lbs. in three months. *Id.* Dr. Fawks described Mr. Hill as looking skeletal and emaciated in that his facial muscles were wasting away. *Id.* Further, Dr. Fawks described Mr. Hill has having a ketotic smell, which he said is akin to a dead corpse, meaning his body had entered the dying process. *Id.* Dr. Fawks testified Mr. Hill likely had that smell for at least a month before he arrived. *Id.* These facts, alone, allow a reasonable juror to conclude Dr. Bentley displayed deliberate indifference to Mr. Hill's condition while at the jail.

Defendants confirm Mr. Hill interacted with Dr. Bentley numerous times for his symptoms. While Defendants cite this as evidence that Dr. Bentley was not deliberately indifferent, it actually proves the opposite. A "total deprivation of care" is not a necessary condition for a finding of a constitutional violation. *Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir.1990). Deliberate indifference may be shown even when medical personnel frequently attend to an inmate's medical needs. *See Beck v. Skon,* 253 F.3d 330, 333–34 (8th Cir.2001) (noting a medical staff's multiple contacts do not preclude a finding of deliberate indifference). At issue is the quality, not quantity: "the question is whether the defendants provided [the inmate] with the care he needed at the time he needed it." *Miller v. Schoenen*, 75 F.3d 1305, 1310 (8th Cir. 1996). And

13

while the fact that Dr. Bentley encountered Mr. Hill on several occasions does not relieve him from liability, it does confirm Dr. Bentley was acutely aware of Mr. Hill's physical symptoms and unmanaged pain and failed to take any action to diagnose his condition or abate his pain.

To be sure, there is no dispute: Dr. Bentley knew of Mr. Hill's worsening and progressive symptoms and severe pain starting in January 2020, and displayed a disturbing inaction and inattentiveness to Mr. Hill's medical deterioration, failing failed to take any steps to either diagnose or treat Mr. Hill's pain. SOF ¶¶ 44, 47, 49, 51. Specifically, from January 2020 to April 1, 2020, Dr. Bentley performed no meaningful diagnostic testing whatsoever, and despite Mr. Hill's dire and decaying physical condition, the sole measure Dr. Bentley took to treat Mr. Hill was to prescribe prednisone, and Tylenol Mr. Hill was forced to purchase himself, despite knowing these treatments were woefully ineffective. SOF ¶¶ 44, 47, 61.

Dr. Bentley knew in early January of Mr. Hill's neck and shoulder pain. SOF ¶ 44. In late January, Dr. Bentley knew Mr. Hill's symptoms had both grown and worsened – his voice began to change, he began having difficulties breathing, and he had a developed an unexplained lump on his neck. SOF ¶ 49. When Mr. Hill met with Dr. Bentley about these worsening and new symptoms, Dr. Bentley did nothing – he did not order any diagnostic testing, and he did not prescribe any meaningful treatment. *Id.* He expressed interested only in when Mr. Hill might be transferred out of Phelps County, or be released, implying the cost of treatment was a concern.[2] *Id.* Still, in January, Dr. Bentley learned Mr. Hill was experiencing sharp pain under his left nipple. SOF ¶ 50. Dr. Bentley knew Mr. Hill, who still was receiving no meaningful treatment or diagnostic testing, had the same symptoms persist into February. *See* SOF ¶¶ 67, 72. In mid-February, Dr. Bentley examined Mr. Hill and acknowledged he had lost six pounds, was agitated, and continued

---

[2] This is consistent with Defendants' policy discussed more fully below. *See* Section II.

4827-9061-0675

to experience pain. SOF ¶ 61. Nonetheless, Dr. Bentley chalked this up to a "normal exam" and again provided no meaningful treatment or attempt to diagnose. *Id.* Dr. Bentley knew Mr. Hill's symptoms persisted and worsened through March, and yet provided no aid. *See* SOF ¶¶ 93-96.

Despite these troubling and progressive symptoms and pain, Dr. Bentley delayed the provision of any meaningful examination or diagnostic testing. *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989) ("Delay in . . . providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature"). Despite Hill's repeated requests for outside care, diagnostics, and/or treatment on at least eight different occasions, Dr. Bentley ignored these requests each and every time. SOF ¶37. In fact, Dr. Bentley completed *no* meaningful diagnostic testing for Mr. Hill. And when Dr. Bentley received the result of the only test he did order for Mr. Hill, he ignored them. In late February/early March, Dr. Bentley ordered a single blood count test for Mr. Hill that actually *confirmed* something with Mr. Hill was amiss. SOF ¶¶ 93-96. The lab results revealed that three samples from Mr. Hill's blood (Creatinine, Potassium, and Total Carbon Dioxide) were outside the normal limits. *Id.* Yet Dr. Bentley not only took no action in response to this abnormal finding – including no additional follow up testing – Dr. Bentley affirmatively misrepresented the results of this test to Mr. Hill, falsely stating these lab results were "normal." *Id.* This conduct is, at best, deliberately indifferent. Phelps County Jail officials themselves deemed Dr. Bentley's actions with the blood tests as "troubling" and inconsistent with the jail's standard of care for inmates. SOF ¶ 97.

Likewise, Dr. Bentley not only delayed, but at no point provided, any meaningful treatment to Mr. Hill for his pain or symptoms.[3] *See Johnson–El v. Schoemehl*, 878 F.2d 1043, 1055 (8th

---

[3] Dr. Bentley's attempt to avoid liability by callously citing to Mr. Hill's supposed "work out regime" in an attempt to question the level of pain Mr. Hill was experiencing is disingenuous. The record establishes Dr. Bentley specifically told Mr. Hill that he could continue working out,

Cir. 1989) ("Delay in the provision of treatment . . . can violate inmates' rights when the inmates' ailments are medically serious or painful in nature"). Dr. Bentley "treated" Mr. Hill only by dismissively suggesting Mr. Hill buy his own Tylenol. Throughout the months-long saga of Mr. Hill's distressing and obvious medical decline, this "treatment plan" never changed course: not in response to Mr. Hill's neck growth, weight loss, voice change, chest pain, difficulty breathing, or weakness, and not when Mr. Hill became so weak he had to rely on others to walk, eat, and urinate. Dr. Bentley did not relent in solely directing Mr. Hill to buy Tylenol in January, February, and March – despite knowing it had been wholly ineffective in alleviating Mr. Hill's pain dating back three months. In short, Dr. Bentley refused to adequately manage Mr. Hill's pain, prescribing Tylenol month after month, knowing full well it was not alleviating Mr. Hill's suffering.

Medical experts confirm: Dr. Bentley committed deliberate indifference in his care of Mr. Hill. SOF ¶ 158. To a reasonable degree of medical certainty, Dr. Bentley significantly deviated from the standard of care in abdication of any diagnostic workup for Mr. Hill despite clearly progressive symptoms. SOF ¶ 158. To a reasonable degree of medical certainty, Dr. Bentley's choice to not seek any diagnostic testing, more likely than not, contributed to the advancement of Mr. Hills disease. SOF ¶157. To a reasonable degree of medical certainty, the diagnostic delay experienced by Mr. Hill, more likely than not, directly resulted in Mr. Hill's death. *Id.* Initiation of diagnosis and treatment at an earlier date would have, more likely than not, significantly improved Mr. Hill's survival. *Id.* And to a reasonable degree of medical certainty, Dr. Bentley's refusal to adequately manage Mr. Hill's pain, more likely than not, resulted in significant

---

in part because it made him feel better. SOF ¶ 55. Dr. Bentley further stated that working out would not cause any additional harm, and to continue working out/exercising despite his reported shoulder, neck, and back pain. *Id.* That Mr. Hill worked out does not blind Dr. Bentley to the pain and suffering Mr. Hill endured or absolve him of his obligation to seek a diagnosis and treat him.

16

worsening and prolongation of Mr. Hill's physical and mental suffering and anguish. SOF ¶ 157.

Thus, a reasonable jury could find Dr. Bentley was deliberately indifferent and medically negligent

to Mr. Hill's serious medical needs when he failed to conduct diagnostic testing or provide pain

management, causing Mr. Hill to suffer extreme pain, physically deteriorate, and decay before his

very eyes. *See, e.g., Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999) (reversing grant of

summary judgment for jail doctor where genuine issue of fact existed regarding whether doctor

ignored inmate's complaints of adverse reaction to medication and intentionally kept him on that

medication);[4] *see Greason,* 891 F.2d at 835 (conflicting expert testimony concerning extent to

which doctor may have departed from professional standards in abruptly discontinuing inmate's

medication must be resolved by trier of fact); *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th

Cir.1989) (same). . Further, these facts establish a reasonable jury could find Dr. Bentley recklessly

displayed extreme and outrageous conduct that caused Mr. Hill severe emotional distress, resulting

in bodily harm. This Court should deny summary judgment.

## C. A reasonable jury could conclude Nurse Kelley acted with medical negligence and deliberate indifference to Hill's serious medical needs.

Nurse Kelley's attempt to avoid liability by claiming she technically is not the one

---

[4] *Robinson v. Moreland*, 655 F.2d 887, 890 (8th Cir. 1981) (holding defendants were liable for a two-day delay in receiving treatment that resulted in greater pain); *Dadd v. Anoka Cty.*, 827 F.3d 749, 756 (8th Cir. 2016) ("two days' delay of pain treatment may be the basis of a constitutional claim"); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("delays in treating painful medical conditions, even if not life-threatening, may support an Eighth Amendment claim"); *Tlamka v. Serrell,* 244 F.3d 628, 633 (8th Cir.2001) (holding that the prison staff's ten minute delay in administering CRP to an inmate, who had a severe heart attack and whose face was turning blue and purple, violated the Eighth Amendment); *Moore v. Jackson,* 123 F.3d 1082, 1084–87 (8th Cir.1997) (per curiam) (where inmate repeatedly complained of severe tooth pain in medical requests and grievances, and it took from April to December for him to receive treatment, genuine issue of material fact existed as to whether prison dentist was aware of inmate's serious dental condition); *Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (three-week delay in dental care, coupled with knowledge that inmate is suffering, can support finding of Eighth Amendment violation).

17

4827-9061-0675

responsible to diagnose or order treatment fails on its face; she was the primary medical provider for Mr. Hill during his time at Phelps County, and was responsible for patient interaction and recommending treatment. *See* SOF ¶ 3. Nurse Kelley confirms she is a licensed practical nurse (Kelley SOF ¶ 3) who was responsible for pulling inmate sick call requests and scheduling inmates to be seen in medical. Kelley SOF ¶ 9. She confirms she alone was responsible for performing an "assessment" on each inmate, and relaying the results of that assessment to Dr. Bentley so that he could assess "orders." *Id.* She alone was responsible for fielding, recording and communicating relevant health information to the doctor. *Id.* On all of these counts, she failed Mr. Hill.

Defendants cite to the number of times Mr. Hill interacted with Nurse Kelley as evidence that she was not deliberately indifferent. That Nurse Kelley had frequent contact with Mr. Hill does not preclude a finding of deliberate indifference. *See Beck v. Skon,* 253 F.3d 330, 333–34 (8th Cir.2001) (explaining a medical staff's multiple contacts do not preclude a finding of deliberate indifference). Instead, the fact that Nurse Kelley both (1) personally received and responded to Mr. Hill's sick call requests and grievances, and (2) personally "assessed" Mr. Hill "several times" between January and March confirms she was acutely aware of Mr. Hill's physical suffering during this time frame.

Nurse Kelley watched as Mr. Hill transformed over the course of three months from an active, 196 pound man to, as Mr. Sooter put it, a "different life form almost," (SOF ¶ 30) as Mr. Johnson put it, "like a skeleton," (SOF ¶31) or as Dr. Fawks put it, "skeletal," "emaciated" and smelling like a dead corpse. SOF ¶ 131. Yet Nurse Kelley would have this court believe that she did not see any symptoms requiring outside care? *See* Kelley SOF ¶72. That she did not observe any symptoms requiring more intervention that simple Tylenol? Such conclusions border on the absurd. These facts alone create a triable issue of fact on Nurse Kelley's deliberate indifference.

18

A review of the extensive sick calls and grievances Mr. Hill submitted to Nurse Kelley reveals a detailed account of Mr. Hill's troubling and worsening symptoms of which Nurse Kelley had notice and took no action to abate. *See* SOF ¶¶ 43-128. At a high level, because of the extensiveness of the record: in January, Nurse Kelley knew Mr. Hill was experiencing extreme back and neck pain that increased with inactivity (SOF ¶ 45-46, 51); she knew he was having muscle spasms (SOF ¶ 48), that his voice began to change, that he had a mass growing on his neck, and that he was having difficulty breathing. SOF ¶49. Nurse Kelley knew Mr. Hill was upset that he was not getting any help for his pain. SOF ¶ 52. Yet Nurse Kelley did not take him seriously, and was preoccupied with when Mr. Hill would be transferred out, implying cost of care was her chief concern. *See* SOF ¶ 49. In February, Nurse Kelley knew these symptoms and severe pain continued and worsened and were not responding to Tylenol (SOF ¶¶ 56, 64), that Mr. Hill was getting no sleep (SOF ¶ 56), that his neck growth persisted (SOF ¶73), that he had lost 16 pounds (SOF ¶75), that he was losing feeling in his left arm (SOF ¶ 80) and that he was begging for help (SOF ¶¶ 67-69). In March, Nurse Kelley knew these symptoms and suffering continued and worsened and were still not responding to Tylenol (SOF ¶¶ 91, 98, 99), that Mr. Hill continued to lose weight (SOF ¶ 91), that Mr. Hill's neck continued to swell (SOF ¶ 98), and that Mr. Hill was having to take dangerous levels of Tylenol to try to deal with the pain (SOF ¶ 99). All this time, Nurse Kelley knew Mr. Hill both that Mr. Hill's condition was escalating *and* that Mr. Hill's severe pain was persisting unmanaged by appropriate medication or treatment.

A review of the extensive sick calls and grievances Mr. Hill submitted to Nurse Kelley also reveals a detailed account of Nurse Kelley ignoring and rejecting Mr. Hill's requests for specific diagnostic care, and foreshadows Mr. Hill's fate. From January to March, Mr. Hill repeatedly requested diagnostic testing to figure out what was wrong with him. *See* SOF ¶¶ 66, 91, 99. For

19

example, in February, he begged to be seen by a physician who could run the proper tests to pinpoint what needed to be done (SOF ¶ 68) and requested an MRI (SOF ¶ 85). Likewise in March, he pled for "emergency medical attention ASAP" and said he felt like he was "going to die." (SOF ¶¶ 91, 99). In total, Mr. Hill pleaded for outside care, diagnostics, and/or treatment from Nurse Kelley on at least eight different occasions over the span of three months, and each time she ignored him, opting to do nothing. SOF ¶ 37.

Nurse Kelley claims, even now, that she "promptly and appropriately" responded to each and every one of Mr. Hill's request/grievances. This self-serving conclusion lacks any basis in fact, and is directly disproven by her written records, which reveal Nurse Kelley refused to credit Mr. Hill's complaints of pain or take any action to remedy it, contributing to significant delay in both diagnostic work and pain management. For example, when Mr. Hill pled for help to Nurse Kelley in a grievance on March 4, stating "I have a serious medical conditions that are being overlooked purposefully by the doctor. I have lost 20lbs. since I first complained. I feel like I am going to die," Nurse Kelley not only waited *six days* to respond to Mr. Hill, but when she said, she commented only: "What is your Grievance?" SOF ¶ 91. Is this care "appropriate for a licensed practical nurse" as Nurse Kelley claims? Phelps County Jail, at least, states no: they admitted that Nurse Kelley's response to Mr. Hill was "unacceptable" and acknowledged no inmate should be treated in this manner. SOF ¶ 92.

There are more examples; Nurse Kelley's response to Hill's March 4 grievance is just one of many times Nurse Kelley failed to provide proper intervention for Mr. Hill. When Mr. Hill reported a painful grown in his neck in February, Nurse Kelley admits she assessed Mr. Hill, yet she made *no mention* of the growth in her "exceptional charting." SOF ¶75: *see* Kelley SOF ¶ 12. And when Mr. Hill first complained of his left arm numbness in a February grievance, she not only

*failed* to communicate the arm numbness to Dr. Bentley, but instead of scheduling Mr. Hill for a medical visit, Nurse Kelley insisted Mr. Hill fill out another form: "Mr. Hill if you have new symptoms or conditions I suggest filling out a sick call request form to see the physician." SOF ¶ 81.[5] Ironically, Nurse Kelley cites this instance as support for her claim that she provided prompt and appropriate responses. In another instance in February, Mr. Hill literally begged Nurse Kelley for help – "I'm begging for medical help!!!" – the only time in Nurse Kelley's 20-year plus career where a patient begged her for help. SOF ¶¶ 69-70. But instead of scheduling him for a medical visit or relaying this information to Dr. Bentley, Nurse Kelley took *no* action, instead responding to Mr. Hill's grievance by saying that Dr. Bentley and the U.S. Marshals Service were aware of his condition, prior visits, orders and each inmate request. SOF ¶ 72. Likewise, Nurse Kelley responded to a February 27 grievance stating Mr. Hill continued to experience extreme pain and asking for an MRI, not by scheduling Mr. Hill to be seen by medical, but by stating "This is a question you probably should have asked the Physician during your visit on yesterday afternoon. Fill out a sick call request form to be placed back on the list to see the physician on Wednesday." SOF ¶¶ 85-86. Phelps County jail personnel confirm this response falls below Phelps County Jail's standard of care. SOF ¶ 87.

Clearly, Nurse Kelley's responses to Mr. Hill's requests for help, by themselves, paint a troubling picture of Nurse Kelley's regard for and inaction to, Mr. Hill's suffering. Nurse Kelley's written responses align with Mr. Hill's testimony that Nurse Kelley often accused Mr. Hill of faking his pain (SOF ¶ 36), and laughed at and mocked Mr. Hill when he complained of his weight

---

[5] ACH nurses are expected to discuss grievances with the ACH site doctors, and ACH expects its nurses to create a grievance log of an inmates subjective complaints. Consistent with Nurse Kelley's repeated omission of key medical details from Mr. Hill's chart, there is no evidence Nurse Kelley created any grievance log for Mr. Hill. SOF ¶¶ 146-147.

21

loss and worsening condition. SOF ¶ 88. That Nurse Kelley still maintains her responses were "prompt and appropriate" evidences a continuing disregard for providing proper medical care. This much has apparently been recognized by Phelps County and ACH, who longer retain Nurse Kelley to provide medical services at Phelps County because of the way she handled Mr. Hill's case. SOF ¶ 136.

Not only did Nurse Kelley leave Mr. Hill to experience unnecessarily unmanaged physical suffering, but her failure to respond promptly and appropriately to Mr. Hill's painful symptoms directly caused a delay in diagnostic care, including a troubling *thirty-four day* delay in Dr. Bentley learning of Mr. Hill's arm numbness,. Far from the "exceptional charting" Nurse Kelley claims to have employed, Nurse Kelley learned in February that Mr. Hill's left arm was going numb, but did not record, chart, or communicate this symptom in any way to Dr. Bentley. SOF ¶ 83. She withheld this information from Dr. Bentley for *thirty-four days*, during which time Mr. Hill continued to openly endure severe pain and suffering which Nurse Kelley took no action to abate. SOF ¶¶ 83-84. When Dr. Bentley finally learned of the arm numbness on March 30 from Mr. Hill himself, he could no longer deny Mr. Hill's condition was something sinister, like cancer, and referred him for outside care. SOF ¶83.

Instead of recommending Mr. Hill be sent for outside care, Nurse Kelley and Dr. Bentley, together, watched Mr. Hill suffer obvious severe physical pain that they chose to treat only with ineffective Tylenol for three months. Nurse Kelley's claim that her treatment did not cause Mr. Hill to suffer any pain he would not otherwise suffer from his cancer is illogical; Nurse Kelley cannot seriously claim no pain management options other than Tylenol exist. Had Mr. Hill been appropriate evaluated and his complaints *taken seriously*, he could have and should have been provided appropriate medication to alleviate his pain and suffering. And despite Nurse Kelley's

22

misleading argument to the contrary, Plaintiff *has* developed verifying medical evidence that this delay actually impacted Mr. Hill's suffering. To a reasonable degree of medical certainty, the failure to adequately manage Mr. Hill's pain resulted in significant worsening and prolongation of Mr. Hill's physical and mental suffering and anguish. SOF ¶ 157. Beyond the experts, laypersons close to the situation agree: Mr. Hill suffered significantly more because of the care and treatment, or lack thereof, provided by Nurse Kelley. SOF ¶ 156.

Not only has Plaintiff established verifying medical evidence that the delay increased Mr. Hill's suffering, but verifying medical evidence exists that the delay more likely than not resulted in Mr. Hill's death. According to Dr. Muscato, Phelps County Jail Defendants' expert – and confirming what even a lay person can recognize – Nurse Kelley missed several red flags that should have prompted additional testing to diagnose Mr. Hill. SOF ¶ 135. To a reasonable degree of medical certainty, Nurse Kelley significantly deviated from the standard of care in abdication of any diagnostic workup for Mr. Hill despite clearly progressive symptoms. SOF ¶158. To a reasonable degree of medical certainty, initiation of diagnosis and treatment at an earlier date would have more likely than not significantly improved Mr. Hill's survival, and the diagnostic delay he experienced more likely than note directly resulted in his death. SOF ¶ 157.

A reasonable jury could find Nurse Kelley was deliberately indifferent and medically negligent to Mr. Hill's serious medical needs; that she failed to act despite knowledge of a substantial risk of serious harm. *Farmer,* 511 U.S. at 842. Further, these facts establish a reasonable jury could find Nurse Kelley recklessly displayed extreme and outrageous conduct that caused Mr. Hill severe emotional distress, resulting in bodily harm. Summary judgment should be denied.

23

**D.**     **A reasonable jury could conclude Dr. Schamber acted with medical negligence and deliberate indifference to Hill's serious medical needs.**

Dr. Schamber seeks to avoid liability by claiming he did not "personally participate" in the care or treatment provided to Decedent. The law does not require Dr. Schamber personally treat Mr. Hill to be liable for his role in a violation of Mr. Hill's constitutional rights. In this case, Dr. Schamber was the Medical Director for ACH, responsible for overseeing ACH's medical operations. SOF ¶ 103. This includes making sure medical care is successfully delivered. *Id.* As it relates to Mr. Hill's treatment, his role involved providing a medical "board" review of the health care doctors provided to Mr. Hill. *Id.* The record makes clear Dr. Schamber was responsible for an increased delay in Mr. Hill's diagnostic care and pain management because of this sham "board review," the conclusion of which was (1) accusing Mr. Hill of faking and (2) finding the care he received was objectively reasonable based on a handful of documents hand-selected by an in-house attorney. SOF ¶ 106.

By mid-February 2020, Lieutenant Joe Taylor questioned whether ACH was doing its job, because Mr. Hill's condition continued to deteriorate under ACH's care. SOF ¶ 65. He asked ACH to review the care being provided. *Id.* ACH represented that it would conduct a "medical board review" of the adequacy of Mr. Hill's care. *Id.* Mr. Taylor understood that this board would consist of multiple doctors, who would set about to ensure Mr. Hill was receiving the right course of treatment.  *Id.* The board turned out to be a board of one: ACH's Corporate Medical Director, Dr. Travis Schamber. *Id.*

Dr. Schamber testified that he reviewed 21 pages of documents hand-selected by an in-house attorney. *Id.* Reading those documents alone, which did not include MR. Hill's grievances or available bloodwork tests – Dr. Schamber blindly concluded that Mr. Hill was receiving "objectively reasonable care." *Id.* He also testified that in 120 of the 120 similar "board" reviews

24

he had conducted for ACH, he concluded in every single one that ACH was providing appropriate medical care. For each one, he followed the same process of reviewing the subset of documents that an in-house attorney for ACH sent to him. *Id.*

To a reasonable degree of medical certainty, the medicolegal review conducted by Dr. Schamber was inadequate for determining the adequacy of medical care given the incompleteness of information reviewed. Additionally, given the information at Dr. Schamber's disposal at the time, he more likely than not reached the incorrect conclusion regarding the adequacy of Mr. Hill's medical care.

Because of Dr. Schamber's sham board review, ACH continued to provide the same inadequate care to Mr. Hill based on Dr. Schamber's recommendation. SOF ¶110. Plaintiff incorporates by reference the discussion in Section II(E) below regarding Dr. Schamber's "medical review" as further explanation of Dr. Schamber's deliberate indifference and medical negligence. Further, these facts establish a reasonable jury could find Dr. Schamber recklessly displayed extreme and outrageous conduct that caused Mr. Hill severe emotional distress, resulting in bodily harm. For these reasons, summary judgment should be denied.

## II. Genuine issues of material fact preclude summary judgment on Plaintiff's official capacity claims against the Phelps County Jail and ACH.

Mr. Hill's claims against the Jail and ACH in their official capacity fall into three recognized categories: (1) an "official municipal policy"; (2) an unofficial "custom"; or (3) a deliberately indifferent failure to train or supervise. *Atkinson v. City of Mountain View, Mo*., 709 F.3d 1201,1214 (8th Cir. 2013)(citing *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 691 (1978), and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

To prove a claim against a county, or a corporation like ACH acting under state law, a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable

injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (discussing a § 1983 claim against a prison medical provider); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975–76 (8th Cir. 1993). This requires proof of "a deliberate choice of a *guiding principle or procedure* made by the [corporate officer] who has final authority regarding such matters." *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (emphasis added). "A 'policy' is a 'deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible [under state law] for establishing final policy with respect to the subject matter in question.'" *Hayes v. Faulkner Cnty., Ark.*, 388 F.3d 669, 674 (8th Cir. 2004) (quoting *Pembaur v. Cty. of Cincinnati*, 475 U.S. 469, 483–84 (1986)). A policy is deliberately indifferent to a person's constitutional rights when its inadequacy is both obvious and likely to result in the alleged deprivation of constitutional rights. *Russel v. Hennepin Cnty.*, 420 F.3d 841, 847 (8th Cir. 2005) (citing *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999)).

"A ... custom involves a pattern of persistent and widespread ... practices which become so permanent and well settled as to have the effect and force of law." *Brockinton v. Cty. of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007). To establish the existence of a custom, a plaintiff must demonstrate:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the ... entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the ... entity's policymaking officials after notice to the officials of that misconduct; and

(3) That plaintiff was injured by acts pursuant to the ... entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998).

26

Under this standard, "multiple incidents involving a single plaintiff could establish a custom if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." *Johnson v. Douglas Cnty. Med. Dept.*, 725 F.3d 825, 829 (8th Cir. 2013).

Inadequate training creates a constitutional claim where (1) the training practices are inadequate; (2) there is deliberately indifference to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice, and (3) an alleged deficiency in training procedures caused the plaintiff's injury. The need for more or different training is so must be obvious such that the inadequacy will likely result in the violation of constitutional rights. *Andrews v. Fowler,* 98 F.3d 1069, 1076 (8th Cir.1996) (citations omitted).

### A.   The Jail adhered to an unconstitutional policy of blind deference to ACH despite knowing Mr. Hill was suffering and his health rapidly deteriorating.

The Jail admittedly adopted and executed an unconstitutional policy whereby the Jail would never send inmates for outside medical care without ACH's approval. The Jail adhered to this policy even though it admitted through its corporate representative that it is unconstitutional to allow an inmate to suffer and deteriorate on its watch. While the Jail understood that for acute "emergencies" it could take an inmate to for outside medical care, the Jail adhered to its policy that it and its employees would otherwise not take a badly suffering and deteriorating inmate (even one like Mr. Hill who had admittedly suffered miserably for many months) for outside treatment or care absent ACH's approval. Here, this policy led to tragic consequences: the Jail, its employees and other inmates admittedly knew Mr. Hill was suffering and deteriorating before their eyes (to the point that he was near death and physically decomposing, according to the doctor who diagnosed Mr. Hill's cancer). Yet the Jail still claims that they were powerless to do anything

27

about it.  This defies the law and common sense.  Rather, the law holds them accountable for observing this suffering and precipitous health decline daily, yet never taking any long overdue steps to get Mr. Hill the help he had begged for and desperately needed because of its policy of blind deference to ACH.  *McRaven v. Sanders,* 577 F.3d 974 (8th Cir. 2009).

The Jail's policy is unconstitutional and caused Mr. Hill harm (or at minimum creates a genuine issue of material fact for trial on these issues).  Foundational to the Eight Amendment right to constitutionally adequate medical care is the bedrock principle that the denial of medical care should not "result in pain and suffering which no one suggests would serve any penological purpose."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Indeed, the Supreme Court stated "The infliction of such ***unnecessary suffering*** is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."  *Id*. at 104. (emphasis added).

And the Jail likewise admitted that it must adhere to this standard in its 30(b)(6) testimony:

> Q. Let me break it up for you. You agree no inmate should suffer pain for a prolonged period of time within your county jail, correct?
>
> A. Oh, absolutely. You would hope that's case, but that's not the case.
>
> Q. Well, let me ask you this way: You're aware that it's actually a constitutional violation for an inmate to endure pain and suffering?
>
> A. Absolutely.

SOF ¶ 148.

Unfortunately for Mr. Hill, the Jail's policy caused just that to occur.  There is abundant evidence from many witnesses (the Jail's corporate designees, several guards (i.e. Officer Ratcliff acknowledging Hill was suffering but her "hands were tied"), numerous inmates, medical records,

28

4827-9061-0675

the testimony of the Jail's own expert and the audio and video records showing Mr. Hill's precipitous decline in real time). SOF ¶¶ 10-133, 135, 162-170. Despite the Jail's knowledge that Mr. Hill was suffering and deteriorating over many months it adhered to its unconstitutional policy:

> Q. So would you agree that it's the policy of the jail in nonemergency situations, to always defer to the conclusion of the ACH representatives as far as when an inmate should be sent outside of the jail for medical care?
>
> A. Well, we -- we contract with ACH to provide us inmate health care. And in doing so, we rely on the licensed professional physicians and health care providers to provide us with the information we -- we need. If they say we need to send somebody, we send them.
>
> Q. And what about the opposite scenario; if they say we don't need to send him out, is it the jail's policy or practice to always defer to ACH on that conclusion?
>
> A. I would say so, yes.

SOF ¶171; Jail Defendants SOF ¶ 25 (admitting a policy of deference to ACH).

Supreme Court law and Sheriff Lisenbe's testimony align to conclude that allowing an inmate to suffer and deteriorate—here as a result of a policy—is unconstitutional. *Estelle*, 429 U.S. at 103-4. Recent, Eighth Circuit case law is in accord. *McRaven v. Sanders,* 577 F.3d 974 (8th Cir. 2009) (holding prison officials are deliberately indifferent where they hide behind the clearly unreasonable or inadequate recommendations of medical providers); *Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010) (duty to provide constitutionally adequate medical care is non-delegable); *accord King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (under highly analogous circumstances county was denied summary judgment for deliberate indifference where policy of blind deference to medical contractor, despite knowledge of problems, led to an inmate death) and *Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir. 1982) (where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy). Indeed, "where the duty to furnish treatment is unfulfilled, the mere contracting of

services with an independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment." *Langford,* 614 F.3d at 460 (citations omitted).

The Jail defendants omit any discussion of *McRaven*, a case where the Eighth Circuit held several jail officials could not avoid liability for their deliberate indifference by rote deference to medical professionals. *McRaven*, 577 F.3d at 981-82. In *McRaven*, several jailers contended that they were not deliberately indifference because they relied upon a licensed nurse's conclusion that an inmate exhibiting signs of an overdose did not need hospitalization. *Id.* There, the Court concluded reliance upon the nurse's judgment did not insulate the various jailors from deliberate indifference liability because her judgment was based upon faulty information (the inmate demonstrated objective signs of extreme intoxication that did not improve over time). *Id.* The guiding principle from *McRaven* is that jailers are not relieved of their duty to provide constitutionally adequate care where the facts suggest deference to medical contracts was unreasonable. *Id.*

This case is distinguishable from *McRaven* in only one respect: the evidence of the consequences of the Jail's policy of blind deference to ACH is more unreasonable because the evidence is stronger and the conduct transpired over several months while Mr. Hill wasted away. By the time Mr. Hill received outside care in April 2020, as Dr. Fawks testified, Mr. Hill was emaciated and smelled like the death process had begun. SOF ¶ 131. The Jail's own video and audio tapes, which a jury will receive in evidence, depict this occurring real-time over many months. SOF ¶ 125. Many Jail witnesses also admit Mr. Hill was badly suffering, had a baseball sized tumor on his neck and had his health decline precipitously. SOF 74. He had lost 40 pounds, would sleep on the concrete for pain relief; cry and scream himself to sleep; and even needed the

assistance of other inmates to relieve himself in water bottles.  SOF ¶¶ 12, 24, 29, 31. A reasonable

jury could infer that the Jail knew ACH's treatment was failing miserably as Mr. Hill went from a

healthy 42 year-old to beginning the dying process under the Jail's watch.  Therefore, this record

demonstrates that the Jail's policy rote deference to ACH is constitutionally irreconcilable with

*Estelle, McRaven, Langford* and even the Sheriff's own admissions.

Eighth Circuit precedent also dictates that the Jails spoliation of seven-days of video

depicting Mr. Hill's suffering in late March supports denying summary judgment.  *Langford,* 614

F.3d at 462.  As briefed in the accompanying Motion for an Adverse Inference Against the Jail

Defendants, the Jail knew litigation was forthcoming yet chose not to preserve video and audio

tapes of 7 days of Mr. Hill's worst suffering from March 17-24, 2020.  During that timeframe, Mr.

Hill's health continued its precipitous decline and the Jail placed him in a medical isolation cell

for "monitoring."  SOF ¶ 116-120.  Under *Langford*, a jury can construe this evidence to infer that

the Jail knew ACH's care continued to cause horrific suffering and deterioration against the Jail.

*Id.* (citing *Int'l Union, UAW v. NLRB,* 459 F.2d 1329, 1336 (D.C.Cir.1972) ("Simply stated," the

adverse inference rule "provides that when a party has relevant evidence within his control which

he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.")).

*Langford* thus holds that the Jail's spoliation—long after the Jail knew Mr. Hill was not receiving

effective care—is as an additional basis to deny summary judgment.  *Id.*

Summary judgment on Mr. Hill's official capacity claims against the Jail is inappropriate;

a jury should consider whether the Jail's policy of blind deference to ACH, despite knowing of

Mr. Hill's suffering and deterioration, violated Mr. Hill's constitutional rights.

31

**B.      ACH's policies, practices, and training intentionally seek to avoid or delay sending inmates for outside care even when the need to do so is obvious and risks graves consequences.**

ACH has articulated "a deliberate choice of a *guiding principle*" of avoiding sending significantly ill inmates for appropriate outside care to avoid the expense and administrative burden it could create for ACH or ACH's clients like the Jail Defendants.  SOF ¶¶ 180, 182. ACH's founder and CEO said so explicitly in 2004. *Id.*  Since then, its policies, customs, and training (and the consequences this objective has wrought in prior cases) all demonstrate that ACH is a litigation risk-management company that only functions as medical provider when doing so coincides with the business aims of ACH and its clients.  Here, substantial evidence demonstrates that ACH's various policies, customs and training create a fact issue for the jury as to Mr. Hill's claims against ACH.  Specifically: (1) ACH through its founder, articulated a guiding principle of avoiding sending seriously ill inmates for outside care; direct and circumstantial evidence— including a pattern of the similar deliberate indifference in prior lawsuits that have never prompted any change of policy, custom or training—all demonstrate that is exactly what happened in this case; (2) ACH is a litigation risk-management company that required the Jail to follow an unconstitutional policy and trains its clients to adhere its unconstitutional policy of abdicating all medical responsibility for inmate care (which helps illuminate why the Jail did nothing to help Mr. Hill even though it knew Mr. Hill was suffering and his health deteriorating); and (3) ACH employs a fraudulent "board review" to further mitigate its and its clients' litigation risks that has never provided any medical benefit to a single patient but instead delays outside care for critically ill patients like Mr. Hill.

**C.      Substantial evidence demonstrates ACH has a policy and a custom and practice of intentionally avoiding sending inmates for outside care.**

ACH's founder and CEO, Dr. Norman Johnson, articulated as a guiding principle in 2004 that ACH keeps client costs down by identifying critically ill inmates and (rather than sending them to the hospital) waits for them to bond out of jail or transfer to a different facility.   Indeed, in describing how to save money for ACH's clients, Dr. Johnson stated:

> He stated that when you think about the increase in health insurance costs, that is unheard of at 3 % but because they were able to work with him, *they were able to identify sick cases ahead of time and he's been able to get those really bad cases OR'd or sent elsewhere so that he was not responsible for those and it doesn't come off the contract*.

SOF ¶ 182. (italics added).

This was not mere puffery.  Several years later, the federal government investigated ACH for this very practice after a critically ill patient in an ACH jail went many days without outside care, and was released from custody to avoid treatment; the federal government investigated ACH for "inmate dumping" to avoid medical expense and pass it along to federal taxpayers. SOF ¶ 183.

And, since then, the record is replete with examples of ACH intentionally avoiding or delaying sending inmates for outside care pursuant to its founder's guiding principle.  When this happens, and when the inmate who suffered through this practice is fortunate enough to have competent representation, ACH sweeps the claim into its risk-management program, settles the matter and does nothing to alter its policies, practices or training to avoid future inmates from suffering the same fate.  This demonstrates knowledge, intent and a commitment to—as a "guiding principle"—avoiding costly but critical outside care for suffering inmates like Mr. Hill.  There are many examples (some of which also garnered significant media attention) that are eerily similar to Mr. Hill's situation and establish notice that ACH understands the consequence of its policies and customs:

- *David Brown II, as Independent Administrator of the Estate of David Brown, deceased v. ACH, et. al.,* Case No. 18-cv-01168-JBM-JEH (C.D. Ill. 2018) – the decedent Mr. Brown died when health declined rapidly over two weeks and ACH's site doctor and nurse refused to send him to outside care despite obvious signs of declining health. Mr. Brown entered the jail with kidney and prostate issues and needed to use a catheter. Mr. Brown complained about 10/10 flank pain and that he was struggling to urinate (indicating he urinated small amounts many times a day). After about two weeks of declining health, ACH and its medical staff took no action and did not send him for outside evaluation. Despite pleading that "something ain't right" and requesting to go to the hospital, ACH did nothing and he died two weeks after booking into the jail. ACH settled this matter and did not change its policies, practices or training. This incident also received media attention. [SOF ¶ 208] Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 230-31; 243-44 and Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo Exhibits 18 and 22.

- *"Lawsuit Filed After Three Inmates Die Under Medical Care at Jail in Alabama"* – A national media article from CNN outlined three fatalities that became federal lawsuits related to inmates who died from treatable conditions when their health deteriorated. They were never sent for outside care by ACH. The article begins "The deaths sound like they come from the logs of a Civil War POW encampment, but all three are alleged to have befallen detainees at the Madison County Jail in Huntsville, Alabama, while they were awaiting trial in 2013." The common thread in all three cases is "that the county and ACH reached a 'deliberately indifferent' agreement to delay or deny care as a cost -saving measure . . . and delayed or denied medically necessary referrals to outside providers." [SOF ¶ 209]

  First, Deundrez Woods, only 19 years old, became highly disoriented and his health declined rapidly over a couple weeks. After 11 days of declining health, his foot reeked so badly the guards made him clean it out. When his mom visited him, his lips were discolored and he was confused and disoriented. She begged them to take him to the hospital. ACH did not do so and he died days later of a gangrene infection. [SOF ¶ 209]

  Second, Nikki Listau checked into the jail with withdrawal symptoms. She fell and broke several bones. She was found naked and incoherently rambling on a jail floor. She was not provided medical care or taken to a hospital. She died in the jail. [SOF ¶ 209]

  Third, Tanisha Jefferson checked into the jail at only 30 years old. In a 16-day timeframe, she complained of severe abdominal pain and received no treatment. She complained numerous times of her pain and inability to have a bowel movement. She was eventually given laxatives when her pain became so bad she could hardly walk. At the end of the 16 days, she complained she was sweating and could not breathe. The nurse sent her back to her cell. She was not sent for outside care until days later after being found unresponsive in the jail. She died at the hospital. [SOF ¶ 209]

ACH settled these three lawsuits and did nothing to change its policies, customer or training as a result. [SOF ¶ 209] (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 232-40 (Ex. Y), and Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo Exhibit 20 (Ex. KK)).

- *Robert Weintraub, as Natural Parent and Surviving Heir of William Weintraub, deceased, and as Administrator of the Estate of William Weintraub,* Case 1:15 -cv-01213 –AT (N.G. Ga. 2015) – Dr. Weintraub was a Ph.D. Physics profession whose life had taken a bad turn. He was being transported from a jail facility in Colorado to one in South Carolina. On April 14, 2015 he begin transport. In transit, he complained of severe stomach pain related to an ulcer. On April 18. 2015, he arrived at the Daviess County, Indiana jail, an ACH-managed facility. During his six day stay at the ACH-managed facility, he experienced severe pain, was clearly ill and begged for care. He also filed medical requests that went untreated. While in Daviess County, the ulcer grew and the pain was so intense that Dr. Weintraub passed out on the floor. Like Hill, he would moan throughout the night and wake up other inmates. Even other inmates banged on the doors and yelled for medical to help Dr. Weintraub. ACH ignored these pleas. At that time, Dr. Weintraub had lost 46 pounds since being arrested. Despite these symptoms of a serious illness, the nurse (five days after Dr. Weintraub arrived at the ACH facility) only gave him antacids. His health continued to decline, yet ACH did not treat him and allowed him to continue his transfer to South Carolina. He died the day he left the ACH-managed facility in the transit vehicle because a bleeding ulcer allowed toxic fluid to accumulate in his gut. ACH settled the Weintraub case and did not change its policies, customs or training as a result of his preventable death. [SOF ¶ 210] (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 203-8 (Ex. Y) and (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 9 (Ex. KK).

- *Lamonte Brazelton v. ACH, et al.* Case No. 4:16-cv-29 (N.D. Ind. 2016) – During a 5-day span in August 2016, Mr. Brazelton experienced severe pain, uncontrollable nausea and the inability to eat and had constant diarrhea. He had obvious signs of appendacitis and the doctor's course of treatment did nothing to alleviate his condition. Mr. Brazelton continued deteriorating rapidly. Only after Mr. Brazelton's mother intervened did the jail send him to the hospital. He was diagnosed with acute appendicitis and had to wait several days for the poison to clear his body to have surgery. But for his mother's intervention and threat of a lawsuit he would have died in jail. ACH settled this matter and did not change any policy, custom or training as a result. [SOF ¶ 211] (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 240-43 (Ex. Y), and (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 21 (Ex. KK)).

- *"Broken Jail Healthcare System Poses Dangers Behind Bars"* – This national CBS news piece references six preventable deaths in ACH-managed facilities. One case involved the death of Danny Ray Burden in Grant County, Kentucky. On the day Mr. Burden, in his 30s, checked into an ACH managed facility he had

extraordinarily high blood sugar and COPD.  In the hours following his check-in, he sought emergency medical attention and showed signs of rapidly deteriorating health.  ACH did not send Mr. Burden for outside care and he died in the jail.  *See also* CITE BURDEN COMPLAINT.  [SOF ¶ 212]   (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 209-11 (Ex. Y); and Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibits. 11 and 19 (Ex. KK)(also available at https://www.cbsnews.com/news/broken-jail-healthcare-system-poses-danger-behind-bars/).

A second inmate, 39-year-old Dante Wilson, also died under ACH's care when complaints of heart-attack symptoms went ignored.  He complained multiple times and was sent to his cell and then collapsed and died.  During the investigation of the death, the ACH facility nurse responded "Oh, yeah, we don't want to drag it out. Shit happens."  [SOF ¶ 212]  ((Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 218-19 (Ex. Y); (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 19 (Ex. KK)).

- *David Ivey v. ACH, et al.* Case No. 2:17 CV 82-CDP (E.D. Mo. July 16, 2019)(order denying summary judgment on ACH official capacity claims) – asthmatic inmate who had withdrawal symptoms died two nights after booking in an ACH-managed facility.  Over those two nights, he exhibited worsening symptoms of withdrawal and other issues, including seizures, vomiting, defecating himself and decreased appetite.  He was not sent for outside care and died in the jail.  The district court held that ACH's training gave rise to official capacity claims and denied summary judgment. ACH settled the case and, like all other cases, did not change its policies, customs or training as a result of this fatality.  [SOF ¶ 213] https://casetext.com/case/ivey-v-audrain-cnty.

- *Raymond Nugent v. ACH,* 4:18-cv-2042-AGF (E.D. Mo.) – Mr. Nugent developed clear symptoms of appendicitis, a treatable condition.  Rather than monitor and treat these symptoms, ACH ignored Mr. Nugent and never sent him for outside care. Mr. Nugent's appendix ruptured and he died alone in his cell in the jail.  This case remains pending.  Nugent Complaint (Ex. LL)  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 211-12 (Ex. Y).  [SOF ¶ 214]

- *Lester v. ACH,* 14:17-cv-158 (W.D. Ky 2017) – ACH delayed taking Mr. Lester, despite signs of a serious medical need related to detoxification, for outside care. Mr. Lester died in jail as a result of the lack of treatment.  ACH settled this matter and did not change its policies, customs or training as a result of this preventable death.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 211-12 (Ex. Y); Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 12 (Ex. KK)).  [SOF ¶ 215]

- *Schlarb v. ACH* - Brittany Rae Schlarb died at age 35 after 5 days in the Summit County, Ohio jail, an ACH-managed facility.  She showed signs of drug detoxification and dehydration.  She showed clear signs of needing hospitalization two days before her death but was never taken for outside care or treatment.  She

died in the jail.  ACH settled the case pre-suit and did not change its policies, customs or training as a result of this preventable death.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  212-14 (Ex. Y); Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 13 (Ex. KK)).  [SOF ¶ 216]

- *Rhonda Hehrer, as Personal Representative of the Estate of Joseph Hehrer, deceased, v. ACH et al.* 1:20-cv-01079-JTN-RSK (W.D. Mich.) – This 91-page complaint details how Mr. Hehrer, a 26-year-old inmate jailed for a DUI, like Mr. Hill, exhibited numerous symptoms of suffering and deterioration but did not receive outside care until near death (he died four days after being admitted to the hospital).  Mr. Hehrer began feeling sick on March 1, 2018 and from then until March 9th had a cascade of worsening symptoms, including repeatedly vomiting blood, hypothermia, nausea, lethargy, visible yellow bruising on his body, low blood pressure and weight loss.  Despite continued deterioration, ACH did not send him for outside care.  He died of diabetic ketoacidosis, a preventable condition.  This case is pending.  Hehrer Complaint, (Ex. LL, pp. 16-38; Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  214-15; Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 14 (Ex. KK)).  [SOF ¶ 217]

- *Timothy Strayer v. ACH, et. al.,* Case 4:12-cv-00098-RLY-TAB (S.D. Ind.) – In this case Mr. Strayer complained repeatedly to jail and ACH personnel about his deteriorating medical condition.  He entered the jail with a hernia that worsened dramatically over a couple weeks.  This caused intense pain, increasing delirium, vomiting, and an inability to eat. Jail and medical personnel ignored his pleas and by the time he was finally taken to the hospital he was diagnosed with a near-fatal septic ulcer.  ACH settled this matter and did not change any policy, practice or training as a result of the near-fatal ulcer and suffering resulting from the delay in care.  Strayer Amended Complaint, Ex. LL, pp. 4-6; Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.203 (Ex. Y); Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 10 (Ex. KK).  [SOF ¶ 217]

ACH knows its policy and custom of delaying care has adverse medical consequences.  Yet it sticks to its business model; ACH testified that it has never changed its policies, practices or training to improve future outcomes for inmates who suffered and died.  SOF ¶ 141.

ACH remains equally strident about Mr. Hill's case—every ACH witness who testified cannot see anything about Mr. Hill's suffering, and his adverse medical outcome, worth studying and incorporating into policy or training to alleviate future inmate suffering or foster better medical outcome.  *See e.g.,* SOF ¶¶ 138-140. This demonstrates that ACH, despite years of notice, remains

dogmatic to its philosophy of avoiding outside care to further its business objectives, irrespective

of the consequences.  This is not deliberate indifference; it is intentional conduct.

And there is direct evidence ACH adhered to its playbook of delaying outside and trying

to make Mr. Hill someone else's responsibility.  Mr. Hill testified that Dr. Bentley was more

interested the timing of Mr. Hill's transfer out of Phelps County than his medical condition.  About

a visit with Dr. Bentley on January 27, 2020, as Mr. Hill's symptoms were worsening, Mr. Hill

testified:

> Q. Did [Dr. Bentley] seem concerned or like he cared?
>
> A. Not at all. He asked me when I was going home.
>
> Q. He asked you what?
>
> A. He asked me when I was going home. And I --and I -- when he asked me when I was going home, I told him, What does have that to do with my medical condition and me getting some assistance here with my medical -- with my medical condition? He said, Oh, I just want to know when you're going home or, you know, if you're going home, because maybe it's something that you could take care of when you get on the outside. And I told him, I said, Well, I'm not going home, and I'm not going home anytime soon.
>
> Q. How did that make you feel when the doctor's reaction to your second round of symptoms and complaints was to ask you when you were going home?
>
> A. I was kind of -- it made me feel -- it made me feel real -- real messed up inside. Because at that point -- at that point, from me filling out the MSRs and -- and from his response to asking me when I'm going home, it made me feel like he didn't care – he didn't care to give me the medical attention I needed, that he was just worried about passing me off to the next person that was going to handle me. And if it was going to be so I get handled, you know, by a care physician on the outside when I got home and that was it, or if I got handled by a care physician in the federal one, I got to the -- my next step in federal custody, then that was it. But it almost felt like he wasn't willing to do his job. And his job was to, you know, help me with my medical condition, with whatever was going on, for him to at least diagnose it, find out, and give me the proper treatment. And he never really seemed like he cared, like he cared to even know what was going on with me. He was just –
>
> Q. Other than –

A. He was just trying to pass me off.

SOF ¶ 155. This testimony dovetails with the constant run-around Mr. Hill encountered (briefed *supra*) and further supports the inference that ACH intended to delay taking Mr. Hill for outside care. This evidence includes the sham "board review," which delayed care by 6 weeks and was orchestrated by ACH's Medical Director. SOF ¶¶ 100-111. Another example is Nurse Kelley's feigned ignorance about Mr. Hill's March 2, 2020 complaint where he said "I have a serious medical conditions that are being overlooked purposefully by the doctor. I have lost 20lbs. since I first complained. I feel like I am going to die," and Nurse Kelley not only waited *six days* to respond to Mr. Hill, but when she said, she commented only: "What is your Grievance?" SOF ¶ 91.

Mr. Hill's evidence of ACH's policy and custom of delaying critical outside care is incomparable to cases where the Eighth Circuit (and other courts) have held that a policy or custom may violate the Constitution. For instance, in *Wever v. Lincoln County, Nebraska*, the Eighth Circuit held that knowledge of two prior inmate suicides provided sufficient notice of a constitutionally deficient custom or practice regarding prevention of inmate suicides. 388 F.3d 601, 607-8 (8th Cir. 2004); *see also Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996)(notice of two prior sexual assaults was sufficient notice to deny summary judgment).

Recent cases from federal district courts denying summary judgment on official capacity claims underscore that there are numerous triable issues of fact on Mr. Hill's official capacity claims against ACH. In *McKee v. Correct Care Sols., LLC*, No. 6:18-CV-06117, 2021 WL 2152513, at *6 (W.D. Ark. May 26, 2021) the Court denied summary judgment because there was a genuine issue of material fact as to whether defendants, who were contracted to provide medical services to inmates, had a policy, custom or practice that caused decedent's death. In *McKee*, the

39

decedent suffered a chronic lung disease and died while serving his prison sentence.  Despite a record that is threadbare when compared to this one, the court found triable issues of fact as to whether the Correct Care "(1) failed to develop and implement policies, practices, and procedures to ensure the decedent would receive appropriate care for serious illness and, if necessary, outside services; (2) failed to have properly trained staff to deliver medical services for serious illnesses and failed to provide outside medical services; (3) failed to properly train, supervise and discipline its medical personnel to ensure inmates would receive appropriate care for serious illnesses; and (4) entered a contractual agreement that required it to pay for outside medical services that created a financial disincentive for medical staff to send an inmate for outside medical services." *Id*.

In support of these allegations, plaintiff argued that there was a "policy and a custom, that defendants allowed its nurses to follow nursing protocols, i.e., no-standard protocol, that were not authorized and resulted in substandard care to inmates, defendants failed to comply with several prison policies, failed to implement its own policies to adhere to the requisite standards, and had a general culture of providing substandard care to inmates." *Id*.  This evidence precluded summary judgment.  *Id*.; *see also David Ivey v. ACH*, et al. Case No. 2:17 CV 82-CDP (E.D. Mo. July 16, 2019) (denying summary judgment to ACH because fact issues regarding its training precluded summary judgment on official capacity claim).

Here, substantial evidence shows that—from the very top down—ACH has an intentional guiding principle *and* custom aimed at delaying outside medical treatment designed to make an inmate's serious medical needs someone else's problem.  For ACH, this remains a profitable exercise because it avoids costly but critical care by delaying treatment and passing the buck; and if litigation results it just gets funneled into ACH's well-calculated risk-management program (i.e. its insurance coverage).  Our Constitution does not condone this as a business practice; therefore,

a jury should decide whether ACH's stated policy and custom of delaying care for the sickest inmates is an actionable official capacity claim that caused Mr. Hill to unnecessarily suffer.

### D. ACH's training and marketing demonstrates it is a litigation risk-manager, not a healthcare company, and creates an issue of fact for Mr. Hill's deliberate indifference claim.

ACH's marketing and training to Phelps County and other clients help demonstrate why Phelps County adopted a policy that improperly shirked its non-delegable obligation to provide adequate care to Mr. Hill. This material (including comments and training from ACH's founder and its current CEO) demonstrate that insulating clients from litigation liability is ACH's paramount focus.

Yet again, this mindset starts at the top. Speaking to Daviess County in 2004, ACH's Founder stated:

> One of the first things [ACH] would do is to train the staff, not only the nurse but also the correctional officers how to not take any medical responsibility because right now they are taking responsibility as they have to make a judgment call as to whether somebody goes to the doctor, etc. He stated there is a system whereby they can remove all of that responsibility and place that on the doctor, which is what they do.
> . . .
> They also have quarterly meetings where they implement a quality improvement program with written policies and procedures that belong to the Sheriff to protect him and written procedural protocols for the nurse so they have a written system of how they approach things and then there is the training of professional officers and nurses on how to transfer responsibility to the doctors so that they are not the ones at risk.

SOF ¶¶ 178, 182.

ACH's marketing material, including in a recent RPF to the Jail, contains similar statements touting their risk-management program and how ACH attempts to insulate clients from liability by telling the Jail not to take any medical responsibility. Indeed, after spending three pages of the RFP touting ACH's ability to protect and defend against litigation ACH tells Phelps County:

The site's practitioner may, at their own discretion, suggest an alternate treatment plan. *The site's practitioner does NOT contact ACH's corporate office for any type of approval in order to send a patient off-site.* The site's practitioner retains final authority and responsibility for the decision to send a patient off-site, ***and can only be overruled by the Sheriff /Jailer if the Sheriff /Jailer has a security concern.***

***If the site's practitioner determines that off-site care would NOT be appropriate for the patient, the on-site medical staff may follow the practitioner's alternate treatment plan***.

If the site's practitioner determines that off -site care would be appropriate for the patient, the onsite medical and /or custody staff then work together to make any appointments, etc.

SOF ¶¶180, 185, (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Ex. 1, p. 21 (Ex. GG))

Thus, this document, part of the contract process with the Jail, directs that absent an emergency only the site doctor can send an inmate for outside care. Numerous additional training documents further instill this concept that all decisions regarding outside care must flow through ACH. For instance, ACH's training video "Introduction to Correctional Healthcare", presented by its founder and CEO, repeatedly trains jails not to take any responsibility for inmate care. SOF ¶¶ 178, 205. Indeed, the CEO Dr. Johnson states over and again to "take no responsibility for inmate healthcare". *Id*.

This training DVD and others (as well as numerous training PowerPoints provided to ACH clients like the Jail) also train the Jail to trivialize inmate complaints. For instance, ACH trains that:

- "Take no responsibility for inmate health care."

- "Health is not the goal of inmates seeking care."

- "Eighty percent of detainees seek care for comfort."

- "Instant gratification is the goal of inmates seeking medical care."

42

- • "The standard of care is that you can't let anyone's health deteriorate."

- • "A serious medical need is on that will cause the inmate's health to deteriorate."

- • "Inmates are known to exaggerate all their symptoms."

- • "Jailers can prevent themselves from being successfully sued by not taking any medical responsibility.

SOF ¶¶ 178, 181, 186-189.

Additional training material further demonstrate ACH's focus as a litigation risk-manager, not a healthcare company. For instance, the DVD and PowerPoint regarding proper medical charting for nurses does not speak to the medical purpose for patient records but makes over a dozen recommendations for how to construct medical records to be a "litigation asset". Similarly, ACH's longest PPT training slide is entitled "How to Prepare for Your First Deposition." Finally, even a short sampling of the three DVD's tender to the Court as part of this opposition demonstrates in tone, demeanor and content dismissiveness toward legitimate healthcare needs and a passion for managing litigation risk.

In the face of this evidence, is there any mystery why, despite knowing Mr. Hill's health was deteriorating and he was suffering, the Jail blindly deferred to ACH's training to "put everything on medical"? ACH touted and trained that under its litigation risk-management program that was precisely what the Jail should do to avoid deliberate indifference lawsuits. But what ACH trained here caused right the opposite: watching an inmate suffer and deteriorate for three months and not taking action *is* deliberate indifference. *Estelle*, *McRaven* and *Langford* support that conclusion; therefore, a jury should determine whether ACH's training focused on litigation risk management caused Mr. Hill's needless suffering. *See also Fields v. Corizon Health, Inc*., 490 F. App'x 174, 185 (11th Cir. 2012)(affirming jury verdict against corporate

43

medical provider where policy limiting anyone other than doctor from sending an inmate for outside care caused confusion and delayed care leading to paralysis from a spider bite).

**E.      ACH's sham "board" review, which for the first time it labels a "medicolegal" review, demonstrates an unconstitutional custom that obstructs care for sick inmates like Mr. Hill.**

By mid-February 2020, Defendant Joe Taylor (the Jail Administrator and corporate 30(B)(6) designee for the Jail) questioned whether ACH was doing its job because Mr. Hill's condition continued to deteriorate under ACH's care. See Ex. B: Joseph Taylor, April 30, 2021 Deposition, pp: 15:18-16:16. So he asked ACH to review in mid-February 2020 why that was happening. See Ex. C: Joseph Taylor, April 30, 2021 30(b)(6) Deposition, pp: 112:16-113:7. ACH represented to the Phelps County Jail that it would conduct a medical "board review" of the adequacy of Mr. Hill's care. Joseph Taylor April 30, 2021 Deposition, pp: 17:14-25 (Ex. B).

Mr. Taylor understood, naturally, that the "board" would consist of multiple doctors who would set about to ensure Mr. Hill was receiving the right course of treatment. SOF ¶ 100. The "board" turned out to be a board of one: ACH's Corporate Medical Director, Defendant Travis Schamber (who has since left ACH). Dr. Schamber testified that he reviewed 21-pages of documents that he received from an in-house attorney. See Ex. D: Travis Schamber, D.O., November 2, 2020, Deposition, pp: 18:18-19:4, 21:23-22:4. Reading those documents alone— which did not include Mr. Hill's grievances about his woefully inadequate medical care, or available bloodwork tests—Dr. Schamber concluded Mr. Hill was receiving "objectively reasonable care." *Id.*, pp: 60:22-61:19. Dr. Schamber also testified that in 120 of the 120 similar "board" reviews he had conducted for ACH, he concluded in every single one that ACH was providing appropriate medical care. *Id.*, pp: 83:2-16. For each one, he followed the same process of reviewing the subset of documents that an in-house attorney for ACH had sent to him. *Id.*, pp: 19:5-20:20. SOF ¶ 107.

44

Defendant Joe Taylor, the Jail Administrator, Defendant Phelps County's expert witness, Dr. Joseph Muscato; and Plaintiff's expert witness, Dr. Nathaniel Evans, have all testified that this process reeked of fraud (or a synonymous term) since it seemed implausible that every ACH "board" review in a sample size that large would arrive at the same conclusion. See Joseph Taylor, 4/30/2021 Depo. 20:17-21:11; 22:4-23:4 (Ex. N); Joseph Muscato 4/29/2021 Depo. 45:10-47:16 (Ex. H); and Nathaniel Evans 2/24/2021 Depo. 131:8-132:2 (Ex. Z). SOF ¶¶ 149 and 150.

So too could a reasonable jury. Like Mr. Taylor, Dr. Muscato and Dr. Evans, who have already concluded this "board" review reeks of a sham process designed as a corporate rubber-stamp (i.e. it merely protects the ACH and its client's legal and financial interests, but does not provide any medical benefit) a jury could see this as a custom designed to avoid care and protect litigation interests. Indeed, there is not one example where ACH's "board" review altered someone's course of treatment then there is no medical purpose for this process. Therefore, a reasonable juror could conclude the "board" review is a self-serving litigation tool whose purpose is to delay outside treatment and induce detrimental reliance from ACH clients, exactly what it did here. A jury should determine whether this unconstitutional custom harmed Mr. Hill by delaying his treatment, thereby causing needless suffering. SOF ¶¶ 149 and 150.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court deny Defendants' Motions for Summary Judgment.

45

Date:  July 26th, 2021

Respectfully Submitted

*/s/ Charles C. Eblen*
Charles C. Eblen, #55166
Brandon K. Gutshall, #61848MO
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO  64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
ceblen@shb.com
bgutshall@shb.com
*Attorneys for Plaintiff*

46

4827-9061-0675

## CERTIFICATE OF SERVICE

COMES NOW Plaintiff, by and through undersign counsel, and certifies that they served

an original copy of **PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS'**

**MOTIONS FOR SUMMARY JUDGMENT** by delivering the same along with a copy of this

Certificate of Service via Electronic Mail, this 26th day of July 2021, to the following counsel of

record:

Michael G. Berry
Brittany Briggs
NEWMAN COMLEY PC
601 Monroe Street
P.O. Box 537
Jefferson City, MO  65102
Telephone:  573-634-2266
michaelberry@ncrpc.com
briggsb@ncrpc.com

**ATTORNEY FOR DEFENDANTS PHELPS COUNTY SHERIFF'S DEPARTMENT;
PHELPS COUNTY JAIL; SHERIFF RICHARD L. LISENBE; KELLY RATCLIFF;
SERGEANT GLENN; AND LIEUTENANT JOE TAYLOR**

J. Thaddeus Eckenrode
Lisa H. Howe
ECKENRODE MAUPIN
11477 Olde Cabin Rd.
Suite 110
St. Louis, MO 63141
314-726-6670
Fax: 314-726-2106
jte@eckenrode-law.com
lhh@eckenrode-law.com
**ATTORNEY FOR DEFENDANTS DR. ARTHUR BENTLEY, DIONNE KELLEY,
DVANCED CORRECTIONAL HEALTHCARE, INC., AND DR. TRAVIS
SCHAMBER**

Respectfully submitted,

*/s/ Charles C. Eblen*
Charles C. Eblen, #55166
Brandon K. Gutshall, #61848MO
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO  64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
ceblen@shb.com
bgutshall@shb.com
*Attorneys for Plaintiff*

4827-9061-0675