Case No. 4:20-CV-00804-JMB

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| LADY MAAKIA CHARLENE SMITH, personal representative of the Estate of BILAL HASANIE HILL, deceased, <br><br> Plaintiff, <br><br> v. <br><br> ADVANCED CORRECTIONAL HEALTHCARE, INC.; PHELPS COUNTY SHERIFF'S DEPARTMENT; PHELPS COUNTY JAIL; SHERIFF RICHARD L. LISENBE, Individually and in His Official Capacity as Sheriff of Phelps County; DR. ARTHUR BENTLEY, Individually and in His Official Capacity as a Medical Services Provider at Phelps County; DIONNE KELLEY; KELLY RATCLIFF, SERGEANT GLENN; LIEUTENANT JOE TAYLOR; DR. TRAVIS SCHAMBER, DOES 1-15, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 4:20-CV-00804-JMB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**LADY MAAKIA CHARLENE SMITH'S AFFIRMATIVE STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents ..................................................................................................................... i

General Background .................................................................................................................. 1

Pain and Suffering/ ................................................................................................................... 2

Medical Complaints in the Jail *Generally* ............................................................................... 2

    December 2019 ...................................................................................................................... 7

    January 2020 .......................................................................................................................... 8

    February 2020 ....................................................................................................................... 10

    March 2020 ........................................................................................................................... 17

    March 2020 Medical "Review Board" .................................................................................... 19

    Hill's March 2020 "Medical Watch" ...................................................................................... 21

    April 2020 ............................................................................................................................. 24

    Post-Diagnosis ...................................................................................................................... 26

ACH ........................................................................................................................................ 27

Phelps County Jail ................................................................................................................... 31

ACH's Policies, Customs, and Procedures ............................................................................... 34

## General Background

1.      Bilal Hill was a federal detainee confined at Phelps County Jail from October 2019 through April 2020. (Ex. A:  PCJ 53-54; 303[1])

2.      Advanced Correctional Healthcare, Inc. (ACH) is a healthcare provider, which contracts with Phelps County Jail to provide healthcare services. (Agreement for the Provision of Heath Care to Incarcerated Patients Phelps County).

3.      At all times while Plaintiff was incarcerated at Phelps County Jail, Dionne Kelley was the site nurse placed at Phelps County Jail by ACH. She was on site 40 hours per week usually 8 hours/day, Monday – Friday. (Ex. B:  Dionne Kelley 12/9/2020 Depo. 27:21-25-28:1-5, 29:13-25)

4.      At all times while Plaintiff was incarcerated at Phelps County Jail, Dr. Arthur Bentley was the site doctor and visited the Phelps County Jail one day per week. (Ex. C:  Arthur Bentley 12/11/2020 Depo. 6:19-25, 40:1-6).

5.      On October 4, 2019, Bilal Hill was booked into the Phelps County Jail (PCJ 53-54).

6.      Mr. Hill received an initial screening from Officer Kelly Ratcliff on October 4, 2019. Mr. Hill did not report any complaints related to shoulder and/or back pain. (PCJ 47-50).

7.      On October, 8 2019, Nurse Kelley performed another medical assessment on Bilal Hill. Dr. Bentley also signed this evaluation. (PCJ 38). At the time of his October 8, 2019 medical

---

[1] Composite Ex. A:  PCJ exhibits [hereinafter "Ex. A"]

evaluation Mr. Hill weighed 196.5 lbs., stood 6' 3" tall, and had a blood pressure of 137/81. He did not report any other major medical ailments. The medial staff did make a note that Mr. Hill had a history of smoking one pack of cigarettes per day. (PCJ 38)

8.      While at Phelps County Jail, Mr. Hill was known as a physically fit inmate who worked out 5 days per week. He maintained this exercise regime until early 2020 (Ex. D: Bilal Hill 8/24/2020 Depo. 10:9-10; Ex. E: Jason Johnson 5/4/2021 Depo. 31:8-25 – 32:1-13).

9.      Mr. Hill's exercise regime included pushups, dips, squats, running in place, jumping jacks, and calisthenics. (Bilal Hill 8/24/2020 Depo. 12:23-25-13:1-6 (Ex. D); Arthur Bentley 12/11/2020 Depo. 117:6-7 (Ex. C); Ex. F Christopher Loethen 4/26/2021 Depo. 16:6-12; Jason Johnson 5/4/2021 Depo. 32:1-2; 64:22-23 (Ex. E)).

**Pain and Suffering/
Medical Complaints in the Jail *Generally***

10.     From December 2019 to April 2020, Bilal Hill experienced severe pain while in Phelps County Jail. (Bilal Hill 8/24/2020 Depo. 9: 4-11 (Ex. D)). He complained about this pain to Defendants Nurse Kelley, Dr. Bentley and Jail employees. (*Id*.)

11.     Throughout his time in Phelps County, his pain was a 10 out of 10. (Bilal Hill 8/24/2020 Depo. 19:19-20:13 (Ex. D)). Mr. Hill always informed defendants that his pain was extreme. (Bilal Hill 8/24/2020 Depo. 40 (Ex. D)).

12.     Mr. Hill had been healthy and athletic his entire life before this cluster of symptoms and knew that something was wrong. (Bilal Hill 8/24/2020 Depo. 33-34 (Ex. D)). Throughout his time at Phelps County Jail, Mr. Hill relayed this continually to defendants, who would also witness

2

him crying and screaming persistently and did nothing about it.  (Bilal Hill 8/24/2020 Depo. 33-35 (Ex. D)).

13.     Multiple inmates in Mr. Hill's pod testified it was obvious that Mr. Hill was in pain and suffering. (Jason Johnson 5/4/2021 Depo. 26: 12-15 (Ex. E); Ex. G:  Mark Sooter 5/5/2021 Depo. 19)

14.     Mark Sooter was an inmate at Phelps County with Hill. He was housed with him and interacted with him regularly. (Mark Sooter 5/5/2021 Depo. 18 (Ex. G)) He testified it was obvious that Hill was suffering a week or two into Hill's symptoms (Mark Sooter 5/5/2021 Depo. 43 (Ex. G)).

15.     Jason Eric Johnson, also an inmate at Phelps County with Hill, also testified to the clear, constant suffering Hill experienced. (Jason Johnson 5/4/2021 Depo. 18:21-19:2. (Ex. E)) Johnson testified that Hill's pain was "constant pain all day, 24 hours a day." *Id.*

16.     Sooter recalls Hill's problems started in December 2019. Hill was in so much pain (Mark Sooter 5/5/2021 Depo. 19 (Ex. G)).

17.     Sooter noticed at first it was the shoulder, and then his neck swelled, and then his voice changed – it was "pretty dramatic" – from a deep loud voice, to a high pitched squeaky voice (Mark Sooter 5/5/2021 Depo. 20 (Ex. G); Ex. H:  Joseph Muscato 4/29/2021 Depo. 48:8-50:1; Ex. I: Audio Files 5967006 from October 2019 and 8914859 from March 2020).

18.     Sooter testified that Hill lost a lot of weight, and you could start seeing that "almost immediately." (Mark Sooter 5/5/2021 Depo. 44 (Ex. G))

3

19.     Johnson confirmed Hill's visibly stark weight loss: "He lost a lot of weight fast." (Jason Johnson 5/4/2021 Depo. 35:12 (Ex. E)).

20.     Christopher Loethen, another inmate at Phelps County with Hill, also witnessed Hill's fast deterioration: "He was always up and going, but once he got sick, he was bedridden. He deteriorated fast, I could see it."  (Christopher Loethen 4/26/2021 Depo. 44:19-45:1 (Ex. F)).

21.     Johnson testified he could see the swelling lump on Hill's neck and that everyone in the pod saw it as well: "it was like a little alien was on it. it was real big. . . . Everybody that was in the pod saw it." (Jason Johnson 5/4/2021 Depo. 22: 4-24 (Ex. E)).

22.     Hill was in so much pain that he couldn't get up to get his breakfast tray.  "[Hill] couldn't eat. He couldn't hold a tray." So Jason Johnson and other inmates got the trays for him. (Jason Johnson 5/4/2021 Depo. 42:12-18 (Ex. E)). Sometimes, the Phelps County correctional officers wouldn't let someone else grab it, and he was forced to go without food. (Mark Sooter 5/5/2021 Depo. 33 (Ex. G)).

23.     Johnson testified that Hill's pain was so significant that he had to walk Hill to the bathroom and to the shower. (Jason Johnson 5/4/2021 Depo. 18:21-19:2 (Ex. E)).

24.     Towards the end, Sooter testified that Hill was in so much pain that he couldn't stand up to use the restroom. Hill would pee in a cup or a shampoo bottle, and one inmate was compassionate enough to dump his pee cups and rinse them for him (Mark Sooter 5/5/2021 Depo. 38 (Ex. G)).

25.     Johnson confirmed that he would help Hill pee into cups, that Johnson would them dump for him. He said Hill was experiencing "too much pain," that fellow inmates helped him pee

4

into cups because he couldn't make it to the bathroom. "Half the time, he couldn't get to the bathroom, so I dumped the piss for him." (Jason Johnson 5/4/2021 Depo. 41:14-42:5 (Ex. E)).

26.    Because Hill received no help from Defendants, other inmates purchased Tylenol for Hill for his pain.   (Jason Johnson 5/4/2021 Depo. 49:10-15 (Ex. E)).

27.    Sooter said of Hill's condition, "He laid in bed and moaned and cried and screamed. I mean this went on for months and months and months. And it was so bad that, I mean, people in here were just tired of really."   "*I feel like I watched this man die right in front of me.* It was every night, every morning. I mean, moaning and crying. It was hard to go through with him really." (Mark Sooter 5/5/2021 Depo. 23 (Ex. G))

28.    Johnson confirmed Sooter's testimony regarding Hill's screams of pain. "He was in so much pain. Hollering all night. In severe pain."   (Jason Johnson 5/4/2021 Depo. 18:21-19:2 (Ex. E)). Johnson explained Hill would "constantly holler every night, screaming and hollering that he's in pain."   (Jason Johnson 5/4/2021 Depo. 29:6-10 (Ex. E)).

29.    Johnson allowed Hill to sleep in his bed and Johnson slept on the floor because Hill was in so much pain. Johnson testified people in the pod got to be aggravated because Hill was "hollering so much every night" that it was "causing problems." Thus, Johnson kept Hill "right next to me so I can keep an eye on him."   (Jason Johnson 5/4/2021 Depo. 34:5-20 (Ex. E)).

30.    Sooter testified, "*you just saw this healthy individual shrivel up to a – to a different – I mean, a different life form almost*." (Mark Sooter 5/5/2021 Depo. 45 (Ex. G)) "*I couldn't even describe with words how bad it was* and how miserable it was for not just him, but for everyone just to see him like that, I mean screaming, moaning, like nonstop. I've never been

5

through that much pain…. I didn't comprehend the pain level that would make you sit there and scream and moan like that. I mean it was every day all day." (Mark Sooter 5/5/2021 Depo. 55 (Ex. G)).

31.   Johnson testified Hill "was like a skeleton."  (Jason Johnson 5/4/2021 Depo.  36:1-5 (Ex. E)).

32.   Sooter said Hill told Phelps County Jail employees about his pain every day, but these complaints were ignored: "every single shift, he talked to ever CO here." (Mark Sooter 5/5/2021 Depo. 24, 31-32 (Ex. G)). Sooter testified that when Hill would call the officers for help, the officers would "just hang up on him almost every time," or they would refuse to even answer him. (Mark Sooter 5/5/2021 Depo. 31-32 (Ex. G)).

33.   Johnson confirmed that Hill was visibly suffering, yet Phelps County Jail employees ignored Hill's constant complaints of pain: Johnson testified that "Anybody with a mind would know that [Hill] was in pain, that he was hurting." (Jason Johnson 5/4/2021 Depo. 30:11-12 (Ex. E)). He said "You could see the pain. You could see in his eyes and his hollering. . . you come on the pod and you – you would look at him, you could tell that man is in serious pain. (Jason Johnson 5/4/2021 Depo. 26:18-27:1 (Ex. E)). "He fall out all over the floor, try to get attention from the people to send him to the doctor. [The correctional officers] wouldn't do none of that." (Jason Johnson 5/4/2021 Depo. 26:18-27:1 (Ex. E)).

34.   Johnson was so concerned for Hill that he would advocate for Hill to correctional officers himself, and would say "Mr. Hill is on the floor, he is in pain and he needs help."  (Jason Johnson 5/4/2021 Depo. 45:10-14 (Ex. E)). Yet the correctional officers did nothing. "All the time while we push the button [to call the CO's] they see him through the camera. They see him on the

6

floor. They just think everything was a joke." (Jason Johnson 5/4/2021 Depo. 45:16-21 (Ex. E)).
"They did not care if he was in pain or not. They do not care what was going on." (Jason Johnson
5/4/2021 Depo. 47:25-48:10 (Ex. E)).

35.     Sooter said ACH likewise did not seem to take medical needs seriously. "It seems
like they almost run it as a business operation . . . it's just impossible to get you any kind of outside
medical care . . . it seems like all they care about is getting their fee and they don't really care
about the outcome of what, you know, medical help is needed." (Mark Sooter 5/5/2021 Depo. 26-
27 (Ex. G)).

36.     Throughout his time at Phelps County, Nurse Kelley accused Mr. Hill of faking his
pain during this timeframe; the Jail defendants were dismissive of him.  (Bilal Hill 8/24/2020
Depo. 59-63 (Ex. D))

37.     Hill requested outside care, diagnostics, and/or treatment on at least eight different
occasions and each time his requests were ignored. (PCJ 33; 43; 56; 288; 57; 250; 16; and 12).

### *December 2019*

38.     At the outset of his symptoms, Mr. Hill experienced and complained to defendants
about severe pain in his back that radiated down his left arm. (Bilal Hill 8/24/2020 Depo. 15-6 (Ex.
D)).

39.     From December 2019 until Mr. Hill's cancer diagnosis, he would cry and scream
often in his cell because of his extreme pain.  (Bilal Hill 8/24/2020 Depo. 58-59 (Ex. D)).

40.     Phelps County Jail employee Richard Spadoni interacted with Hill once in late
2019, he encountered him outside the pod. Spadoni asked him what was going on, and he said he

7

was making multiple requests for medical. Hill said he had pain and stiffness and soreness in his neck and shoulder area, and he "was adamant the nurse wasn't addressing his needs." (Ex. J: Richard Spadoni 3/29/2021 Depo. 35).

41.     Phelps County Jail employee Sergeant Lorts told Spadoni he had noticed some swelling around Hill's neck in late 2019. (Richard Spadoni 3/29/2021 Depo. 60 (Ex. J)).

42.     Spadoni thought that they should've taken Hill to the hospital as early as 2019. (Richard Spadoni 3/29/2021 Depo. 67 (Ex. J)).

### *January 2020*

43.     On January 13, 2020, Mr. Hill reported to the Phelps County Jail Staff that he was experiencing constant pain in his left shoulder that had been ongoing for one week. (PCJ 35). After this visit, Mr. Hill's symptoms only worsened and he continued complaining to all that he was getting worse not better. (Bilal Hill 8/24/2020 Depo. 22-27 (Ex. D)).

44.     Sergeant Glenn called Dr. Bentley who prescribed 1000mg of Tylenol twice daily for 3 days and instructed Mr. Hill to see the nurse the following day. (PCJ 35).

45.     Mr. Hill also filled out a sick call request form on January 13, 2020 where he reported "extreme" back and neck pain shooting from his shoulder blade to his neck. (PCJ 36)

46.     On January 14, 2020, Nurse Kelley evaluated Mr. Hill. He weighed 196 lbs., had a pulse of 62 and had a blood pressure of 124/80. Nurse Kelley noted that his pain began two weeks prior. She noted that he did not experience pain with activity, walking, or working out. Instead, Nurse Kelley noted that Mr. Hill's pain increases with inactivity. (PCJ 34; Dionne Kelley 12/9/2020 Depo. 150:24-151:16 (Ex. B)).

8

47.     On the same evaluation form dated January 14, 2020, Dr. Bentley diagnosed Mr. Hill with a pulled muscle and prescribed him 16 days of prednisone. (PCJ 34; Arthur Bentley 12/11/2020 Depo. 121:25- 122:3 (Ex. C))

48.     On January 21, 2020, Mr. Hill fills out a sick call request form. He states that he has been "misdiagnosed" as the level of pain in his neck and back is "increasing". He also says that he is starting to have muscle spasms in his shoulder, and asks to get x-rays to ensure the medical staff is taking the right precautions. Finally, he asks for two extra mattresses until the problem can be solved. (PCJ 33).

49.     On January 22, 2020, Mr. Hill filed another request to the medical because his symptoms were worsening. (Bilal Hill 8/24/2020 Depo. 27-30 (Ex. D)).  During this timeframe, Mr. Hill's voice began to change (it became raspy), he began having breathing difficulties and he developed a lump on his neck.  (Bilal Hill 8/24/2020 Depo. 27-30 (Ex. D)). When Mr. Hill met with Dr. Bentley and Nurse Kelley about his worsening and new symptoms, they did nothing and did not take him seriously. (Bilal Hill 8/24/2020 Depo. 30:9 –16 (Ex. D)). To the contrary, Nurse Kelley and Dr. Bentley were more interested in when Mr. Hill may transfer out of Phelps County or be released than his worsening medical condition. (Bilal Hill 8/24/2020 Depo. 30-32 (Ex. D)).

50.     On January 25, 2020, Mr. Hill reported to the Phelps County Jail staff that he was experiencing sharp, shooting, pulsating pain under his left nipple. This was in addition to the ongoing left shoulder and neck pain that he had been experiencing for three weeks.  (PCJ 31-32).

51.     Nurse Kelley evaluated Mr. Hill on January 27, 2020. Mr. Hill stated that "basically my shoulder and back was bothering me most" Nurse Kelley notified Dr. Bentley by phone of her findings. No additional orders were given at that time. (PCJ 30).

9

52.     On January 30, 2020, at 9:29 pm, Phelps County Jail employee Rodger Anderson sent an email to jail supervisors and Nurse Kelley stating that Mr. Hill "is very upset and states that he is not getting help for his back pain." (PCJ 259).

53.     Four minutes later, at 9:33 pm on January 30, 2021, jail employee, Scott Dowdy responded to Rodger Anderson's email and stated "[Bilal Hill] put on a good show last week for us claiming he was having severe pains. A couple hours later he was having a high jump contest in the pod with other inmates. Not something someone with a major back issue would do." (PCJ 260).

54.     Sergeant Dowdy admits that he thought Mr. Hill was faking his health complaints. (Ex. K: Scott Dowdy 3/9/2021 Depo. 78:21-24).

55.     Phelps County Jail employees were unaware, however, that Dr. Bentley specifically told Mr. Hill that he could continue working out, in part because it made him feel better. Dr. Bentley further stated that working out would not cause any additional harm to continue working out/exercising despite his reported shoulder, neck, and back pain. (Ex. L: Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 65:22-66:15; Arthur Bentley 12/11/2020 Depo. 120:20-121:2; 248:7-249:1 (Ex. C)).

### *February 2020*

56.     Mr. Hill again complained about all of these symptoms and his worsening condition in a February 6, 2020 grievance. (Bilal Hill 8/24/2020 Depo. 36-37 (Ex. D)). Specifically, Mr. Hill stated, "It's a (*sic*) 8th Amendment Violation for the deliberate indifferent in my medical care as well as cruel and unusual punishment." He went on to say he had been in "extreme pain for the past month" and "misdiagnosed by the nurse/doctor on two occasions both time of which cost me

10

$15.00 to be misdiagnosed and still in pain." He says that he gets "no sleep" and again requests "to go the emergency room to have this problem resolved." (PCJ 43).

57.     Also on February 6, 2020, Lieutenant Joe Taylor, the Phelps County Jail Administrator, sent an email to all correctional employees and Nurse Kelley stating "I am requesting whomever works in control between now and Monday morning to keep an extra eye on Bilal Hill being housed in D-pod. If he is observed exercising in any kind of way I would like to know the date and time please." (PCJ 264).

58.     Phelps County Jail concedes that the treatment of Bilal described in the February 6, 2020 grievance is a violation of the jail's standard of care for inmates. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 110:15-23 (Ex. L))

59.     On February 12, 2020, Mr. Hill filed another grievance questioning the competence of the medical staff. He stated that he has "been in extreme pain for over a month and continue[s] to get misdiagnosed by the medical staff." He goes on to say that "I have completely exhausted the grievance procedure for results only to have staff and the nurse lie and say that it appears that I'm ok and that they have recently observed me working out which is far from the truth." He suggests his only remedy is to file a "1983 Civil Suit for deliberate indifference to [his] medical needs." (PCJ 56).

60.     In Mr. Hill's February 12, 2020 grievance he asked for outside medical care for the third time by saying "all I have asked is that I be seen by an outside care provider who is equipped with the proper equipment to diagnose my medical condition (Emergency Room)." (PCJ 56).

11

61.     Dr. Bentley examined Mr. Hill on February 12, 2020. His weight was 190, which Dr. Bentley noted was down from 196. Dr. Bentley also noted that Mr. Hill appeared agitated and complained of pain, but nevertheless said it was a "normal exam" and that Mr. Hill could buy Tylenol as needed. (PCJ 26).

62.     By this time, the Phelps County Jail had developed concern about the medical care ACH was providing Mr. Hill. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 119:11-19 (Ex. L)).

63.     Lieutenant Taylor contacted ACH about getting a second opinion about Bilal Hill's medical care. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 64:5-7 (Ex. L)).

64.     On February 16, 2020, Mr. Hill filed another grievance. He stated, "I have been in severe pain for over a month now." He continued, "I have been seen by a medical staff here and clearly continue to be misdiagnosed. I am suffering daily due to gross negligence on behalf of the medical staff." He also requested that his medical complaints be sent to the U.S. Marshals, and for the fourth time he requested to be seen by an outside doctor who has the medical equipment to properly diagnose him. (PCJ 288).

65.     In response to this grievance on February 16, 2020, Lieutenant Joe Taylor told Mr. Hill that his "medical condition is being reevaluated by a team of doctors at ACH." (PCJ 288).  By mid-February 2020, Lieutenant Joe Taylor questioned whether ACH was doing its job because Mr. Hill's condition continued to deteriorate under ACH's care. (Joseph Taylor 4/30/2021 Personal Depo. 15:18-16:16 (Ex. N)). So he asked ACH to review in mid-February 2020 why that was happening.    (Joseph Taylor 4/30/2021 30(b)(6) Depo. 112:16-113:7 (Ex. L)). ACH represented to the Phelps County Jail that it would conduct a medical "board review" of the adequacy of Mr. Hill's care. (Joseph Taylor 4/30/2021 Personal Depo. 17:14-25 (Ex. N)).  Mr.

Taylor understood, naturally, that the "board" would consist of multiple doctors who would set about to ensure Mr. Hill was receiving the right course of treatment. CITE. ( Joseph Taylor 4/30/2021 Personal Depo. 18:5-12 (Ex. N))  The "board" turned out to be a board of one: ACH's Corporate Medical Director, Defendant Travis Schamber (who has since left ACH). Dr. Schamber testified that he reviewed 21-pages of documents that he received from an in-house attorney. (Travis Schamber 11/2/ 2020 Depo. 18:18-19:4, 21:23-22:4 (Ex. Q)).  Reading those documents alone—which did not include Mr. Hill's grievances about his woefully inadequate medical care, or available bloodwork tests—Dr. Schamber concluded Mr. Hill was receiving "objectively reasonable care." *Id.*, pp: 60:22-61:19. Dr. Schamber also testified that in 120 of the 120 similar "board" reviews he had conducted for ACH, he concluded in every single one that ACH was providing appropriate medical care. *Id.*, pp: 83:2-16. For each one, he followed the same process of reviewing the subset of documents that an in-house attorney for ACH had sent to him. *Id.*, pp: 19:5-20:20.

66.      From January to February 17, 2020, Mr. Hill has requested many times to received diagnostic testing but no defendant every provided that.  (Bilal Hill 8/24/2020 Depo. 38-40 (Ex. D)).

67.      On February 17, 2020, Mr. Hill filed another grievance. He stated, "I have been seen by a nurse/doctor on at least 4 different occasions only to be misdiagnosed and treated as if the severity of my medical condition is of minimal to no concern!" He went on to say, "I have been suffering for over 30 days in extreme pain due to some sort of neck, back and shoulder injury. The medical diagnosis from the doctor/nurse here in Phelps County Jail is neglecting my health care needs to a point that my injury seems to be deteriorating daily as the pain worsens. This is definitely a display of gross negligence, deliberate indifference, and malpractice." (PCJ 57).

68.     In the same February 17, 2020 grievance, Mr. Hill asked for a fifth time to receive outside care. He stated, "all I have asked is that I be sent to the (ER) to be seen by a physician that can run the proper tests to pinpoint what needs to be done." (PCJ 57).

69.     Finally, in Mr. Hill's February 17, 2020 grievance he says "I'm begging for medical help!!!" (PCJ 57).

70.     This instance with Mr. Hill is the only time in Nurse Kelley's 20-year plus career and Dr. Bentley's 46-year career where a patient begged them for help. (Dionne Kelley 12/9/2020 Depo. 227:23-228:22 (Ex. B); Arthur Bentley 12/11/2020 Depo. 187:25-188:1 (Ex. C))

71.     The Phelps County Jail admits that no inmate should ever have to beg for help while in its custody. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 127:2-12 (Ex. L))

72.     Nurse Kelley responded to Mr. Hill's February 17, 2020 grievance by saying that Dr. Bentley and the U.S. Marshals Service were aware of his condition, prior visits, orders and each inmate request. (PCJ 4; 57; Dionne Kelley 12/9/2020 Depo. 222:18-223:3 (Ex. B)).

73.     On February 20, 2020, Mr. Hill filled out a sick call request form stating that he has "a growth in my neck in one of the areas I have complained to be in severe pain." (PCJ 57).

74.     Correctional Officer Ratcliff at Phelps County Jail described the bulge on Mr. Hill's neck as the size of a baseball. (Ex: M:  Kathleen Ratcliff 10/7/2020 Depo. 28:5-23).

75.     Nurse Kelley evaluated Mr. Hill on February 21, 2020. She noted that his weight had dropped to 180 lbs., which is a loss of 16 lbs. since January 27, 2020. Nurse Kelley also noted

14

that Mr. Hill had no decrease in his range of motion and no difficulty ambulating. Nurse Kelley makes no mention of the growth on Mr. Hill's neck. (PCJ 24; PCJ 30)

76.     On February 21, 2020, Dr. Bentley ordered a Complete Blood Count (CBC) check and a chemical profile to evaluate for a possibly infected lymph node and diagnosed Mr. Hill with a muscle pull of the left trapezius. (PCJ 23; Arthur Bentley 12/11/2020 Depo. 203:23-204:1-25 (Ex. C)).

77.     Mr. Hill was so desperate to receive proper outside diagnostic care that he threatened to fight the jail defendants in hopes they would beat him to the point he would be taken to the hospital.  (Bilal Hill 8/24/2020 Depo. 44-47 (Ex. D)).

78.     On February 22, 2020, Phelps County Jail employee Rodger Anderson emails all corrections employees to say, "Hill has made threats of punching officers so that [Phelps County Jail Officers] will beat him up so he can go to the hospital." (PCJ 269),

79.     On February 25, 2020, Mr. Hill filed another grievance affirming the fact that he has made medical personnel and jail administration aware of his severe pain and deteriorating medical condition that is worsening. (PCJ 248).

80.     In the February 25, 2020 grievance, Mr. Hill also states that he is losing feeling in his left arm. (PCJ 248).

81.     Nurse Kelley received Mr. Hill's February 25, 2020 grievance where he alerted her that he was losing feeling in his left arm. She responded by saying "Mr. Hill if you have new symptoms or conditions I suggest filling out a sick call request form to see the physician." (PCJ 248).

15

82.     When Dr. Bentley learned that Mr. Hill had numbness in his left arm, he knew that his condition was something sinister/cancer. (Arthur Bentley 12/11/2020 Depo. 170:15-174:1 (Ex. C)).

83.     However, Dr. Bentley did not learn of the numbness in Mr. Hill's left arm until March 30, 2020, 34 days after Mr. Hill initially reported it to Nurse Kelley in a medical grievance, because Nurse Kelley failed to communicate Mr. Hill's February 25, 2020 complaint of left arm numbness to Dr. Bentley. Upon, learning of the numbness in Mr. Hill's left arm, Dr. Bentley referred him for outside care. (Arthur Bentley 12/11/2020 Depo. 209:20-215:19 (Ex. C); PCJ 248; PCJ 12; PCJ 11).

84.     Mr. Hill continued to endure pain and suffering between the time that Mr. Hill first reported the left arm numbness to Nurse Kelley on February 25, 2020 and the time when Dr. Bentley learned of the information on March 30, 2020 (causing Dr. Bentley to seek outside care for Mr. Hill). (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 150:2-10 (Ex. L)).

85.     On February 27, 2020. Mr. Hill made another grievance. He sated "with the amount of pain I have been having my back shoulder and left arm. (sic) It is safe to say I have severe muscle and tendon injuries." He went on to say that "the only way to find out the extent of these injuries is to have a MRI done." This is the sixth time he requested outside care or evaluation. (PCJ 250).

86.     Nurse Kelley responded to the February 27 2020 grievance by saying "This is a question you probably should have asked the Physician during your visit on yesterday afternoon. Fill out a sick call request form to be placed back on the list to see the physician on Wednesday." (PCJ 250).

87.     This response from Nurse Kelley falls below Phelps County Jail's standard of care. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 152:15-24 (Ex. L))

88.     Nurse Kelley laughed at and mocked Mr. Hill when he complained of his weight loss and worsening condition; Dr. Bentley was also dismissive.  (Bilal Hill 8/24/2020 Depo. 42-44 (Ex. D)).

89.     By the end of February 2020, Mr. Hill believed he was going to die in jail and expressed that to the defendants and his sister, Plaintiff Lady Smith. (Bilal Hill 8/24/2020 Depo. 40-1 (Ex. D)

### *March 2020*

90.     Mr. Hill filed another medical request in early March that did not result in him receiving any diagnostic testing. (Bilal Hill 8/24/2020 Depo. 47 (Ex. D)).

91.     On March 4, 2020, Mr. Hill made another grievance stating, "I have a serious medical conditions that are being overlooked purposefully by the doctor. I have lost 20lbs. since I first complained. I feel like I am going to die." (PCJ 252). Nurse Kelley waited six days to respond to Mr. Hill. When she responded she said "What is your Grievance?" (PCJ 252)

92.     Phelps County Jail admitted that Nurse Kelley's response to Mr. Hill is "unacceptable" and acknowledged no inmate should be treated in this manner. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 154:1-155:7 (Ex. L))

93.     On March 6, 2020, Nurse Kelley drew blood from Mr. Hill, and his blood work was sent out to the lab. (PCJ 18-19).

17

94.     The lab results revealed that three samples from Mr. Hill's blood (Creatinine, Potassium, and Total Carbon Dioxide) were outside the normal limits. (PCJ 18-19; Dionne Kelley 12/9/2020 Depo. 252:5254 (Ex. B):1; Arthur Bentley 12/11/2020 Depo. 223:24-230-15 (Ex. C)).

95.     Neither Nurse Kelley nor Dr. Bentley provided Mr. Hill with a copy of his lab results. (Dionne Kelley 12/9/2020 Depo. 256:5-9 (Ex. B)).

96.     Instead, and despite the blood test results being outside the normal limits with regard to three different substances, Dr. Bentley advised Mr. Hill that his lab results were normal. (PCJ 18-19; Dionne Kelley 12/9/2020 Depo. 256:5-9 (Ex. B); Arthur Bentley 12/11/2020 Depo. 232:3-9 (Ex. C)).

97.     Phelps County Jail deemed Dr. Bentley's actions with the blood tests as "troubling" and inconsistent with the jail's standard of care for inmates. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 161:20-162:6 (Ex. L)).

98.     On March 7, 2020, Mr. Hill completed another sick call request form saying, "the pain in my bicep hurts so bad I haven't slept in days. Also my neck has swollen to a size that it seems to be interfering with my breathing[,] it hurts extremely bad as well. The pain in my back has not diminished either." (PCJ 16).

99.     In the same March 7 sick call request, for the seventh time, Mr. Hill requested outside care/evaluation. He stated, "I need emergency medical attention ASAP!" He goes on to say "I have been suffering for over 60 days and having to take dangerous levels of Ibuprofen to try and deal with the pain." (PCJ 16).

### *March 2020 Medical "Review Board"*

100.    In mid-February, Lieutenant Taylor petitioned ACH's "Medical Review Board" to review the care ACH was providing Mr. Hill. (Ex. N:  Joseph Taylor 4/30/2021 Personal Depo. 15:18-16:16, 16:17-25, 17:14-25; Joseph Taylor 4/30/2021 30(b)(6) Depo. 112:16-113:7 (Ex. L)).).

101.    He did so after communicating to Sheriff Lisenbe that something needed to be done. There were concerns from the jail supervisors and Mr. Taylor that "there was something needing to be done, he needed to be looked at, a second opinion or whatever. . . . and I agreed with him." (Ex. O:  Richard Lisenbe 4/29/2021 Personal Depo. 11:13-20).

102.    ACH provided the "board" review for Mr. Hill because it was concerned about litigation.  (Ex. P: Jennifer Nolawski 12/15/2020 Depo. 29-32).

103.    Defendant Travis Schamber, Corporate Medical Director for ACH at the time of Mr. Hill's incarceration at Phelps County, conducted this "review." (Ex. Q:  Travis Schamber 11/2/2020 Depo. 6-7). As the Medical Director, he oversees the medical operations of ACH. (Travis Schamber 11/2/2020 Depo. 9-10 (Ex. Q)). This involves making sure medical care is successfully delivered.   (Travis Schamber 11/2/2020 Depo. 10 (Ex. Q)). This role involved providing a medical "board" review of the health care doctors are providing to inmates. (Travis Schamber 11/2/2020 Depo. 7 (Ex. Q)). He has conducted such a review at least 120 times. (Travis Schamber 11/2/2020 Depo. 7 (Ex. Q)).

104.    Dr. Schamber testified he never recalled a time out of over 120 times where his "board" review resulted in referring an inmate to outside diagnostic testing; nor could he think of

a single time out of over 120 where he concluded the care provided was anything other than objectively reasonable. (Travis Schamber 11/2/2020 Depo. 82:15-83:16 (Ex. Q)).

105.    On March 9, 2020, Dr. Schamber sent his "board" review conclusions to an ACH Nurse Manager Lisa Nolawski.  (Travis Schamber 11/2/2020 Depo. 15-6 (Ex. Q)).

106.    Dr. Schamber's conclusion as ACH's corporate medical director was that Mr. Hill was receiving objectively reasonable care and that Mr. Hill should be monitored for symptom exaggeration (stating "consider an activity log to see if patient subjective complaints match activity level"). (Travis Schamber 11/2/2020 Depo. 15-6 (Ex. Q)).

107.    The only thing Dr. Schamber did to reach this conclusion was, per ACH custom and practice, review 21 pages of documents provided to him by ACH's in-house counsel. (Travis Schamber 11/2/2020 Depo. 18-22 (Ex. Q)).

108.    Dr. Schamber did not, as part of his "board" review, look at bloodwork that was available and indicated three high readings.  (Travis Schamber 11/2/2020 Depo. 34-42 (Ex. Q)). Dr. Schamber was aware these labs were available for his "board" review at the time he looked at the 21 pages of documentation provided by legal counsel.  (Travis Schamber 11/2/2020 Depo. 50 (Ex. Q)).

109.    Likewise, Dr. Schamber did not review Mr. Hill's grievances where he alleges complaints about medical care. (Ex: R:  *See* Hill-Schamber 1-21).

110.    Accordingly, on March 9, 2020, Lieutenant Taylor received an email from ACH stating Dr. Schamber's findings of Mr. Hill's medical care: "The case has been reviewed, and it appears from the record that the patient is receiving objectively reasonable care based on the

20

complaints given. One recommendation is to consider an activity log to see if patient subject complaints match activity level as it is documented that the patient has a rather normal exam." (PCJ 287).

111.    Lieutenant Taylor felt ACH misled him about their efforts to provide a second opinion regarding the medical care Nurse Kelley and Dr. Bentley provided Mr. Hill. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 132:12-22 (Ex. L); Joseph Taylor 4/30/2021 Personal Depo.28:24-29:12 (Ex. N))

### *Hill's March 2020 "Medical Watch"*

112.    On March 17, 2020, the jail defendants put Mr. Hill in a medical isolation cell after being found on the floor of D-Pod by Sergeant Jackson.  (Bilal Hill 8/24/2020 Depo. 47-52 (Ex. D); Ex. S:  Marvin Jackson 3/31/2021 Depo. 55- 71). Sergeant Jackson testified that when he arrived, Hill was lying on the floor and said he was hurting. Jackson escorted him to the holdover cell so he could be observed. Hill needed help walking so Jackson braced him as he walked, it seemed like "he was weak". (Ex. T:  Marvin Jackson 4/6/2021 Depo. 104). When they reached the holdover cell, Hill asked for a medical request form and Jackson gave him one. (Marvin Jackson 3/31/2021 Depo. 55- 71 (Ex. S)).

113.    Sergeant Jackson then emailed all correctional employees stating that "Hill was observed laying on the floor by the steps in D pod and stated that he was not able to get up by himself because of his pain." Mr. Hill was moved to medical watch for observation. (PCJ 271).

114.    Fellow inmate Mark Sooter recalls on this date that Hill "laid down in the floor" and was "crying miserably" in the "fetal position." He testified that the door to the pod opened, Sergeant Jackson stepped over Hill, and jerked him off the ground and pulled him out of the wing.

21

The COs kept Hill up front for a while, and he said he and the other inmates "thought he was finally getting medical treatment," but he wasn't. (Mark Sooter 5/5/2021 Depo. 33-34 (Ex. G)).

115.     Fellow inmate Christopher Loethen confirmed Sooter's testimony on the fallacy of the "medical watch: "There was times that they had taken him out of the wing where we thought that they had taken him to the hospital or to a doctor to get other medical attention but apparently all they did was took him up front and observe him for a few days and then they would just bring him back and put him in the pod." (Christopher Loethen 4/26/2021 Depo. 41:8-14 (Ex. F)).

116.     While in the medical observation cell, the jail staff checked on Mr. Hill every 15 minutes. At every check, Mr. Hill was observed laying on the floor. (PCJ 302). During his time in that cell, he received no care despite being in extreme pain. (Bilal Hill 8/24/2020 Depo. 47-52 (Ex. D)). While in the medical isolation cell, he screamed, cried and would lay on the cold concrete floor to help alleviate his pain. (Bilal Hill 8/24/2020 Depo. 47-52 (Ex. D)). Nobody provided aid to his deplorable condition on that day. (Bilal Hill 8/24/2020 Depo. 47-52 (Ex. D)).

117.     From March 17 until his diagnosis, Mr. Hill continued complaining to defendants about his worsening condition. (Bilal Hill 8/24/2020 Depo. 53 (Ex. D)).

118.     On March 18, 2020, Mr. Hill was seen by medical staff. He weighed 175 lbs. He had lost 21 lbs. in six weeks. (PCJ 15; PCJ 30).

119.     Mr. Hill was moved to a medical observation cell on March 18, 2020. He remained in the holding cell for 9 days, until March 29, 2020. (PCJ 273; PCJ 345-365).

120.     The jail captured video of Mr. Hill in the medical observation cell, but the jail failed to preserve it. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo.79:5-80:2 (Ex. L)).

121.    On March 27, 2020, Mr. Hill is evaluated by the medical staff for chest pain and rapid audible breathing. No new orders are issued by the medical staff. (PCJ 14).

122.    On March 28, 2020 he was again evaluated by the medical staff for complaints of shoulder pain. Nurse Kelley noted that he only gets minimal relief to the back and shoulder pain from the Tylenol. (PCJ 13).

123.    On March 30, 2020, Mr. Hill filled out a sick call request form. He stated that he was still experiencing severe pain in his back and left arm. Further, he stated that 75% of this left arm was completely numb and he continues to lose mobility in his arm daily. (PCJ 12)

124.    In the March 30, 2020 sick call request form, Mr. Hill asked for outside medical care and evaluation for the eighth time. Specifically, he said "I am in desperate need of an MRI." (PCJ 12)

125.    Comparing recorded audio from October 2019 to March 2020 of Mr. Hill shows significant medical deterioration.  For example, Mr. Hill does not even sound the same in the calls. In March 2020 his voice sounds faint, raspy and like a female.  A layperson could compare the calls and conclude something was wrong with Mr. Hill.  (Mark Sooter 5/5/2021 Depo. 20 (Ex. G); Joseph Muscato 4/29/2021 Depo. 48:8-50:1 (Ex. H); Audio Files 5967006 from October 2019 and 8914859 from March 2020 (Ex. I)).

126.    Recorded video calls from the same timeframe also support the same inferences. (Audio Files 5967006 from October 2019 and 8914859 from March 2020 (Ex. I)).

*April 2020*

127.    On April 1, 2020, Mr. Hill is evaluated by Dr. Bentley. His weight has dropped to 168 lbs. He lost 28 lbs. since January 27, 2020. (PCJ 11; PCJ 30).

128.    During Dr. Bentley's April 1, 2020 evaluation of Mr. Hill, he noted that he has not found the reason for his severe pain and he referred Mr. Hill to the emergency room. (PCJ 11).

129.    On April 1, 2020, Mr. Hill was evaluated in the emergency room at Phelps County Regional Hospital. After performing an MRI the doctors diagnosed him with terminal lung cancer. (Ex. U: PhelpsCtyReg. 65-74)

130.    Phelps County Regional transferred Mr. Hill to Cox Health in Springfield, Missouri where we was evaluated by Dr. Fawks (Ex. V: Cox Health 106-107).

131.    Dr. Fawks noted that Mr. Hill had progressive and unrelenting shoulder and arm pain for the previous three months. He also noted that Mr. Hill lost 40 lbs. in three months. Dr. Fawks described Mr. Hill as looking skeletal and emaciated in that his facial muscles were wasting away. Further, Dr. Fawks described Mr. Hill has having a ketotic smell, which he said is akin to a dead corpse, meaning his body had entered the dying process. (Cox Health 106-107 (Ex. V); Ex. W: Ian Fawks' 3/15/2021 Depo. 9:7-12:2). Dr. Fawkes testified Mr. Hill likely had that smell for at least a month before he arrived. (Ian Fawks' 3/15/2021 Depo.11:17-13:8 (Ex. W)).

132.    Dr. Ian Fawks diagnosed Mr. Hill with Stage 4 terminal lung cancer on April 2, 2020. (Ian Fawks' 3/15/2021 Depo.8:16-10:4 (Ex. W)).

133.    When asked why Dr. Fawkes considered Mr. Hill's case to be an "unfortunate" one, he explained:

24

Q. I'm trying to find it in here, but at one point in a couple of your reports, uh, you – you called this an unfortunate case. What did you mean by that?

A. So honestly, you know, I've -- I've been a medical director in a prison, I've treated prisoners with the Army, and, um, I've been a physician since, uh, 1997, and I think it was very sad that he had to, um, learn this diagnosis when there's nothing to be done about it. And so when he came in, there was nothing we could do but treat his pain and help him through the process of dying.

Q. As a physician, and with the experience you've described, was it surprising to you that it took as long as it did for Mr. Hill to get outside care, uh, in a hospital like yours?

A. Yes.

Q. Explain why.

A. Uh, just from my experience, I don't see how anyone could have missed, um, and not treated a person with pain that ultimately was caused by cancer.

Q. And by the time Mr. Hill presented to you, if -- if you set aside your role as a physician, do -- do you think Mr. Hill's objective physical condition was something that it was pretty obvious to anyone that this man wasn't well?

A. It's really --

A. It's really difficult to remove myself as a physician since I've been doing it for so long, but the reality is, he was emaciated, skeletal appearing, and had an odor of death. I would think that anybody, regardless of the background, would know that something was wrong with him.

25

(Ian Fawks' 3/15/2021 Depo. 22:23-24:12 (Objections omitted)) (Ex. W)).

### *Post-Diagnosis*

134.    Bilal Hill died on January 14, 2021 due to his terminal cancer. (Ex. X:  Third Amended Complaint para. 36).

135.    According to Dr. Muscato, Phelps County Jail Defendants' expert, Defendants Dr. Bentley and Nurse Kelley missed several red flags that should have prompted additional testing to diagnosis Mr. Hill.  (Joseph Muscato 4/29/2021 Depo. 19:18-20:17 (Ex. H)).

136.    Because of the way Nurse Kelley and Dr. Bentley handled the Bilal Hill case, neither of them provide medical services in the Phelps County Jail anymore. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 16:11-17:12 (Ex. L))

137.    Despite his terminal diagnosis and the state in which Dr. Fawks found Mr. Hill on April 2, 2020, ACH believes Mr. Hill received better healthcare from ACH than he would have received outside of the Jail.  (Ex. Y:  Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 68:7-13).

138.    Nurse Nolawski, as a nurse manager and trainer for ACH, likewise does not believe there is anything to learn to improve patient outcomes from Mr. Hill's case. (Jennifer Nolawski 12/15/2020 Depo. 75-77 (Ex. P)).

139.    In fact, ACH as a whole does not believe there is anything to learn from Mr. Hill's terminal cancer diagnosis to include in its continuing quarterly improvement process or policies/procedures.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 58:19-59-19; 87:01-13 (Ex. Y)).

140.    ACH does not intend to use anything learned from Mr. Hill's case to train for improving future medical outcomes. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 63:14-22 (Ex. Y)).

141.    ACH has never changed a policy or practice as a result of an adverse medical outcome that led to a lawsuit (even those ACH has settled).  (Jillian Bresnahan 5/17/2021 30(b)(6) Depo. 202:13-203:6 (Ex. Y)).

142.    ACH cannot identify a single lawsuit related to an adverse medical outcome that prompted ACH to conduct additional training to improve future outcomes.  (Jillian Bresnahan 5/17/2021 30(b)(6) Depo. 202:13-203:6 (Ex. Y)).

## ACH

143.    ACH has a "continuous quarterly improvement" program (CQI) intended to share information about patient cases to improve future outcomes.  (Jennifer Nolawski 12/15/2020 Depo. 75-77 (Ex. P)).

144.    As a nurse trainer for ACH, Ms. Nolawski agrees it is a deviation from the standard of care to omit subjective information provided by the patient from medical records.  (Jennifer Nolawski 12/15/2020 Depo. 103-106 (Ex. P)).

145.    ACH nurses are expected to discuss grievances with the ACH site doctors. (Jennifer Nolawski 12/15/2020 Depo. 108 (Ex. P)).

146.    ACH expects its nurses to create a grievance log of an inmates subjective complaints. (Jennifer Nolawski 12/15/2020 Depo. 136-7 (Ex. P)).

147.    There is no evidence Nurse Kelley created a grievance log for Mr. Hill. (Jennifer Nolawski 12/15/2020 Depo. 139 (Ex. P)).

148.    Phelps County Jail felt misled by the way ACH handled Mr. Hill's third party review of his care. This put Mr. Hill's health in jeopardy and caused him to endure additional and unnecessary pain and suffering. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 62:7-63:19; 64:5-17 (Ex. L); Richard Lisenbe 4/29/2021 PCJ 30(b)(6) Depo. 65:5-13 (Ex. EE)

149.    Dr. Schamber's "board review" was fraudulent on multiple levels because it was not a "board" and cherry picked information to reach a conclusion that, every time, is favorable to ACH.  (Ex Z:  Nathaniel Evans' 2/24/2021 Depo. 131:8-132:2).

150.    According to Dr. Joseph Muscato, the Jail Defendants' medical expert, ACH's "board review" is a flawed system that looks like a rubber stamp for ACH.  (Joseph Muscato 4/29/2021 Depo. 45:10-47:16 (Ex. H)).  Lieutenant Joseph Taylor and Dr. Evans also testified that this process reeked of fraud (or a synonymous term) since it seemed implausible that every ACH "board" review in a sample size that large would arrive at the same conclusion.  (Joseph Taylor 4/30/2021 Personal Depo. 20:17-21:11; 22:4-23:4 (Ex. L); Nathaniel Evans 2/24/2021 Depo. 131:8-132:2 (Ex. Z)).

151.   ACH cannot explain how it lost and why it did not retain email(s) related to Dr. Schamber's "board" review in contravention to its own document retention policies.  (Ex. AA:  Angela Moriarity 4/9/2021 Depo. 21-22)

- She did not know what effort ACH undertook to locate the missing emails. *Moriarity Dep.* 21:1-9

28

- She did not speak with Mr. Mohammed or anyone to determine what type of reasonable search was conducted to locate the missing emails. *Id.* at 21: 13-16.

- She did not know what, if anything, was done to either collect or recover the missing emails. *Id.* at 21:23-22:4.

- And from an IT or technical perspective, she answered "I don't know" when asked if she could provide anything to the Court regarding what steps were taken to recover the missing emails. *Id.* at 21:18-22.

152.    And from an IT or technical perspective, she answered "I don't know" when asked if she could provide anything to the Court regarding what steps were taken to recover the missing emails. *Id.* at 21:18-22.

153.    Even by the time of his deposition, Dr. Schamber, the Corporate Medical Director, was unaware that Mr. Hill had been diagnosed with terminal lung cancer.  (Travis Schamber 11/2/2020 Depo.  34 (Ex. Q)).

154.    Mr. Hill's weight loss was significant and frequently associated with progressive NSCLC and should have triggered Dr. Bentley to perform a more timely diagnostic workup. (Dr. David L. Mayhew Expert Report dated February 16, 2021, p. 9-10 (Ex. E); Mayhew affidavit (Ex. F)).

155.    Dr. Bentley and Nurse Kelley were more interested in when Mr. Hill may transfer out of Phelps County or be released than his worsening medical condition, implying the cost of treatment was a concern. (Bilal Hill 8/24/2020 Depo. 30-32 (Ex. D)).

156.    Mr. Hill suffered significantly more because of the care and treatment, or lack thereof, provided by Dr. Bentley, Nurse Kelley and Dr. Schamber. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 150:2-10 (Ex. L); PCJ 16).

157.    To a reasonable degree of medical certainty, the choice of Dr. Bentley to not seek any diagnostic testing, more likely than not, contributed to advancement of Mr. Hill's disease. To a reasonable degree of medical certainty, the diagnostic delay experienced by Mr. Hill, more likely than not, directly resulted in Mr. Hill's death. To a reasonable degree of medical certainty, initiation of diagnosis and treatment at an earlier date would have, more likely than not, significantly improved Mr. Hill's survival, with a >50% improvement in median survival and/or an approximate 45-54% chance at long-term survival. To a reasonable degree of medical certainty, Dr. Bentley's refusal to adequately manage Mr. Hill's pain, more likely than not, resulted in significant worsening and prolongation of Mr. Hill's physical and mental suffering and anguish. (Dr. David L. Mayhew Expert Report February 16, 2021, p. 16 (Ex. E); Mayhew affidavit (Ex. F)).

158.    To a reasonable degree of medical certainty, Dr. Bentley and Nurse Kelley significantly deviated from the standard of care in abdication of any diagnostic workup for Mr. Hill despite clearly progressive symptoms. (Ex. E: Dr. David L. Mayhew Expert Report dated February 16, 2021, p. 16; Ex. F: Mayhew Affidavit). Further, Dr. Bentley committed deliberate indifference and medical negligence relative to his care of Mr. Hill. (Ex. BB:  Dr. Ian Evans' Second Expert Report p. 8-9, and Ex. CC:  Dr. Evans' Affidavit).

### Phelps County Jail

159.    The jail staff had access to Bilal Hill's medical records and the medical staff could access his grievance records. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 68:7-69:18 (Ex. L))

160.    The jail did not need Dr. Bentley's approval to address Mr. Hill's suffering. (Arthur Bentley 12/11/2020 Depo. 71:12-72:2 (Ex. C))

161.    The Phelps County Jail is the ultimate authority on which inmates get access to outside care. (Arthur Bentley 12/11/2020 Depo. 241:25-242:4 (Ex. C))

162.    Sergeant Jackson confirms Hill's medical complaints were talked about around the jail (Marvin Jackson 3/31/2021 Depo. 35 (Ex. S)). The officers on his squad (the day shift) were aware of the fact that Mr. Hill was submitting multiple health complaints. (Marvin Jackson 3/31/2021 Depo. 36 (Ex. S)).

163.    Sergeant Jackson and Lieutenant Taylor, his supervisor, had a conversation about how it was a "repeated thing" that Hill was requested to see medical "several times;' he was "constantly putting in requests, we didn't know why," and they "wondered what was going on". (Marvin Jackson 3/31/2021 Depo. 13-17 (Ex. S)).

164.    At one point, Sergeant Jackson went to Nurse Kelley about Hill's medical requests because he had put in multiple requests and this was "curious" to him: "When an inmate makes multiple requests there is usually an issue…anytime an inmate is constantly asking for something, asking for the same thing [] it needs to be investigated." (Marvin Jackson 3/31/2021 Depo. 27-30 (Ex. S)).

31

165. Sergeant Jackson noticed the change in Hill's voice. (Marvin Jackson 3/31/2021 Depo. 83 (Ex. S); Marvin Jackson 4/6/2021 Depo. 97 (Ex. T)).

166. Officer Ratcliff testified that it was "obvious" Mr. Hill was suffering while incarcerated at Phelps County Jail under the care of ACH. However, she could only offer him sympathy and prayer. She testified that her hands were tied as she was prevented him from getting outside care. (Kathleen Ratcliff 10/7/2020 Depo. 14:15-15:21 (Ex. M)).

167. Officer Ratcliff testified that Mr. Hill showed numerous outward signs of pain, including groaning, moaning, and crying along with a very slow gait and numerous verbal complaints. (Kathleen Ratcliff 10/7/2020 Depo. 19:8-20:15 (Ex. M)).

168. The fact that Hill wasn't sent to the hospital in December 2019 or even February 2020 made Officer Spadoni question the level of care ACH was providing Hill (Richard Spadoni 3/29/2021 Depo. 69 (Ex. J)). Spadoni "just felt that they weren't looking into his complaints as deeply as they should have. . . he should have gone to the emergency room. And we should have either got a yes or no from them, whether he was actually having problems." (Richard Spadoni 3/29/2021 Depo. 69 (Ex. J)).

169. Officer Spadoni did not feel that Mr. Hill was receiving adequate info from medical about what Mr. Hills medical problems actually were (Richard Spadoni 3/29/2021 Depo. 70 (Ex. J)).

170. In Officer Spadoni's opinion, he does not feel ACH properly handled Hill's complaints. "Somebody that was making that many requests and was as adamant about his pain situation, he should have received outside medical care, diagnostic care." He thinks they "should

32

have acted quicker than they did." He thinks ACH failed to take Hill's complaints seriously. (Richard Spadoni 3/29/2021 Depo. 101, 103, 104-05 (Ex. J)). He thinks others at Phelps County believe so too, but nobody's come out and expressed it (Richard Spadoni 3/29/2021 Depo. 105 (Ex. J)).

171.    Phelps County Jail maintains that the standard of care for correctional medicine is that you cannot let an inmate's health deteriorate. Phelps County Jail admits that ACH failed to uphold this standard of care relative to the care and treatment of Mr. Hill. (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 58:20-60:10 (Ex. L)).  Phelps County Jail contracts with ACH to provide them inmate health care, and in doing so, they rely on the licensed professional physicians and health care providers to provide them with the information they need.   If they say to send an inmate for outside medical care, we send them.  (Joseph Taylor 4/30/2021 Personal Depo. 27:25-28:10 (Ex. N)).

172.    Phelps County Jail classified ACH's care and treatment of Mr. Hill as "not very good." (Joseph Taylor 4/30/2021 PCJ 30(B)6) Depo. 176:13-17 (Ex. L)).

173.    To Sergeant Johnston's knowledge, no efforts have been made to identify how things could have been done differently. (Ex. DD:  Jeremiah Johnston 3/18/2021 Depo. 168-169).

## ACH's Policies, Customs, and Procedures

174.    ACH provided Phelps County Jail a Proposal for Inmate Medical Services at the Phelps County Detention Center, dated October 19, 2017 (Ex. EE:  Richard Lisenbe 4/29/2021 PCJ 30(b)(6) Depo. 25:6-26:11; PCJ 1113-1147).

175.    ACH represented to Phelps County Jail that "The truth is if you're incarcerated in a jail whose healthcare is managed by ACH, you will be healthier than if you go to your own doctor." (PCJ 1128)

176.    ACH further represented to Phelps County Jail that "more than half the time our lawsuits are meritless and the patient simply did not get something they wanted." (PCJ 1129)

177.    ACH also boasts "Our CEO is adamant that we not let profit motive get in the way of doing the right thing. We are proud that we can honestly say the ACH team has never had a judgment levied against it." (PCJ 1129)

178.    ACH trains its clients like Phelps County to "take no responsibility for inmate health care". (Ex. FF:  Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Ex. 29: "Introduction to Correctional Healthcare" DVD)

179.    Sergeant Jackson confirms they were trained to defer to medical staff when it came to inmate medical issues. (Marvin Jackson 3/31/2021 Depo. 53 (Ex. S)).

180.    ACH trained Phelps County that, absent an emergency, only the site doctor could send inmates for outside care like diagnostics and testing.  Ex. GG:  Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Ex. 1)

181.    ACH's training materials admit it is a deviation from the standard of care to let an inmate's health deteriorate. ("Introduction to Correctional Healthcare DVD"  (Ex. EE))

34

182.    ACH's president and founder markets to clients that ACH keeps costs down by identifying inmates with serious medical conditions and "bonding them out" or waiting for them to transfer to other facilities. Specifically, Dr. Johnson stated: "He stated that when you think about the increase in health insurance costs, that is unheard of at 3 % but because they were able to work with him, *they were able to identify sick cases ahead of time and he's been able to get those really bad cases OR'd[2] or sent elsewhere so that he was not responsible for those and it doesn't come off the contract*."  (Ex: HH:  Davies County Minutes)

Yet again, this mindset starts at the top.  Speaking to Daviess County in 2004, ACH's Founder stated:

> One of the first things [ACH] would do is to train the staff, not only the nurse but also the correctional officers how to not take any medical responsibility because right now they are taking responsibility as they have to make a judgment call as to whether somebody goes to the doctor, etc. He stated there is a system whereby they can remove all of that responsibility and place that on the doctor, which is what they do.
> . . .
> They also have quarterly meetings where they implement a quality improvement program with written policies and procedures that belong to the Sheriff to protect him and written procedural protocols for the nurse so they have a written system of how they approach things and then there is the training of professional officers and nurses on how to transfer responsibility to the doctors so that they are not the ones at risk. (Davies County Minutes (Ex. HH))

183.    The federal government investigated ACH for this business practices.   Ex. II: 6/16/2015 Letter to Judge Johnson from Mr. Cantrell regarding Ms. Kingston-Strayer's allegations.

184.    Dr. Bentley repeatedly asked Mr. Hill when he was leaving Phelps County Jail. (Bilal Hill 8/24/2020 Depo. 30:15-32:7 (Ex. D). (objections omitted)).

---

[2] "OR'd" is shorthand for released from custody on "own recognizance".

185.    ACH has a propriety ADVANCED Risk Management Program. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Ex. 1 (Ex. GG)

186.    ACH trains clients and takes the position that "health is not the goal of inmates seeking care." ("Introduction to Correctional Healthcare DVD" (Ex. EE))

187.    ACH further trains and takes the position that "instant gratification is the goal for inmates requesting medical care". ("Introduction to Correctional Healthcare DVD" (Ex. EE))

188.    ACH trains clients and takes the position that "inmates are known to exaggerate their symptoms." ("Introduction to Correctional Healthcare DVD" (Ex. EE))

189.    ACH trains clients and takes the position that "jailers can prevent themselves from being successfully sued by not taking any medical responsibility." Training also includes "Eighty percent of detainees seek care for comfort."("Introduction to Correctional Healthcare DVD" (Ex. EE))

190.    ACH advertises to clients like Phelps County that it will save the jail money. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 40:23-41:17 (Ex. Y)).

191.    ACH advertises that it reduces clients' legal liabilities. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 40:23-41:17 (Ex. Y)).

192.    ACH helps clients like Phelps County design medical policies and procedures for the jail and provides training on such issues. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 42:05-8; 69:08-14 (Ex. Y))

193.    ACH required the Jail, absent an emergency, to defer all decisions regarding outside care to ACH. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 42:19-24. (Ex. Y))

194.    ACH provides regular training to clients like Phelps County through Missouri Jail Summits, where clients hear presentations and receive the accompanying PowerPoint slides. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 87:23-88:22 (Ex. Y)).

195.    One such presentation is "Just the Facts, Appropriate Documentation in Jails. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 88:24-89:17 (Ex. Y)).

196.    The training focuses heavily on making medical documentation an asset for litigation.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 91:3-9 (Ex. Y)).

197.    Nowhere does the training speak about the importance of creating accurate medical records for improved medical diagnostics or outcomes.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 91:24-92:19 (Ex. Y)).

198.    But this training material makes dozens of references to litigation and litigation strategy.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 90:19-91:9 (Ex. Y)

199.    ACH trained jails that it is a deviation from the standard of care to allow an inmate's health to deteriorate.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 96:17-98:11 (Ex. Y)).

200.    ACH provided training through a PowerPoint at a Jail Summit and a DVD video to Phelps County regarding "The Jail is Not a Health Spa, the Legal Basis for Correctional Health Care."  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 131:23-132:16 (Ex. Y)).

201.    This training focuses heavily on risk management and litigation strategy.  Ex. JJ: Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Ex. 31: "A jail is Not a Health Spa" DVD )

202.    ACH agrees that there was a gap in communication with Phelps County regarding Phelps County's understanding that it could not send Mr. Hill for outside care absent ACH's approval.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 166:1-9 (Ex. Y)).

203.     ACH has been sued numerous times for wrongful death or serious personal injuries stemming from allegations that a delay in sending an inmate for outside care caused injury or death.  (Ex. KK:  Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Ex. 10-28 (Ex. EE); Ex. LL: Complaints filed in *Burden et. al. vs. Grant County Fiscal Court, et al.*, Case No. 2:14-cv-00054-WOB-JGW (3/25/2014; *Nugent et. al., vs. Advanced Correctional Healthcare, Inc., et. al.*, Case No. 4:18-cv-02042-AGF (12/6/2018); *Hehrer vs. Clinton County, et al.*, Case No. 1:20-cv-01079-JTN-RSK (11/9/2020); *Strayer et. al. vs. Dearborn County Sheriff, et. al.*, Case No. 4:12-cv-0098-RLY-WGH (3/5/2013); and *Ivey v. Audrian Cnty.*, Case No. 2:17 CV 82 CDP, USDC 7/16/2019 opinion.

204.     ACH provided 13 training DVD's to Phelps County.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 253:20-254:17 (Ex Y)).

205.     On such DVD is Introduction to Correctional Healthcare, which is conducted by ACH founder and former CEO Dr. Robert Johnson.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  253:13-254:11 (Ex. Y)

206.     Two other DVD's provided to Phelps County are "Just the Facts" and "The Jail is Not a Health Spa"; both videos are taught by Jessica Young, Esq. the current CEO of ACH.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 255:16-256:13; 257:09-258:05 (Ex. Y))

207.     All three of these videos—in both tone, demeanor and substance—are dismissive and condescending of inmate medical needs and instead focus on advancing ACH's goals of risk management and cost containment.  *Id.*

208.     *David Brown II, as Independent Administrator of the Estate of David Brown, deceased v. ACH, et. al.,*  Case No. 18-cv-01168-JBM-JEH (C.D. Ill. 2018) – the decedent Mr. Brown died when health declined rapidly over two weeks and ACH's site

doctor and nurse refused to send him to outside care despite obvious signs of declining health.  Mr. Brown entered the jail with kidney and prostate issues and needed to use a catheter.  Mr. Brown complained about 10/10 flank pain and that he was struggling to urinate (indicating he urinated small amounts many times a day).  After about two weeks of declining health, ACH and its medical staff took no action and did not send him for outside evaluation.  Despite pleading that "something ain't right" and requesting to go to the hospital, ACH did nothing and he died two weeks after booking into the jail.  ACH settled this matter and did not change its policies, practices or training.  This incident also received media attention.  CITE (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 230-31; 243-44 (Ex. Y), and Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibits 18 and 22 (Ex. KK)).

209. *"Lawsuit Filed After Three Inmates Die Under Medical Care at Jail in Alabama"* – A national media article from CNN outlined three fatalities that became federal lawsuits related to inmates who died from treatable conditions when their health deteriorated.  They were never sent for outside care by ACH.  The article begins "The deaths sound like they come from the logs of a Civil War POW encampment, but all three are alleged to have befallen detainees at the Madison County Jail in Huntsville, Alabama, while they were awaiting trial in 2013."  The common thread in all three cases is "that the county and ACH reached a 'deliberately indifferent' agreement to delay or deny care as a cost -saving measure . . . and delayed or denied medically necessary referrals to outside providers."  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 16 (Ex. KK)).

First, Deundrez Woods, only 19 years old, became highly disoriented and his health declined rapidly over a couple weeks.  After 11 days of declining health, his foot reeked so

badly the guards made him clean it out. When his mom visited him, his lips were discolored and he was confused and disoriented. She begged them to take him to the hospital. ACH did not do so and he died days later of a gangrene infection. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 220:7-234:19 (Ex. Y)).

Second, Nikki Listau checked into the jail with withdrawal symptoms. She fell and broke several bones. She was found naked and incoherently rambling on a jail floor. She was not provided medical care or taken to a hospital. She died in the jail. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 234:20-235:22 (Ex. Y)).

Third, Tanisha Jefferson checked into the jail at only 30 years old. In a 16-day timeframe, she complained of severe abdominal pain and received no treatment. She complained numerous times of her pain and inability to have a bowel movement. She was eventually given laxatives when her pain became so bad she could hardly walk. At the end of the 16 days, she complained she was sweating and could not breathe. The nurse sent her back to her cell. She was not sent for outside care until days later after being found unresponsive in the jail. She died at the hospital. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 235:23-238:20 (Ex. Y)).

ACH settled these three lawsuits and did nothing to change its policies, customer or training as a result. (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 232-40 (Ex. Y), and Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo Ex. 20. (Ex. KK)

210. *Robert Weintraub, as Natural Parent and Surviving Heir of William Weintraub, deceased, and as Administrator of the Estate of William Weintraub,* Case 1:15 -cv- 01213 –AT (N.G. Ga. 2015) – Dr. Weintraub was a Ph.D. Physics profession whose life had taken a bad turn. He was being transported from a jail facility in Colorado to one

in South Carolina.  On April 14, 2015 he begin transport.  In transit, he complained of severe stomach pain related to an ulcer.  On April 18. 2015, he arrived at the Daviess County, Indiana jail, an ACH-managed facility.  During his six day stay at the ACH-managed facility, he experienced severe pain, was clearly ill and begged for care.  He also filed medical requests that went untreated.  While in Daviess County, the ulcer grew and the pain was so intense that Dr. Weintraub passed out on the floor.  Like Hill, he would moan throughout the night and wake up other inmates.  Even other inmates banged on the doors and yelled for medical to help Dr. Weintraub.  ACH ignored these pleas.  At that time, Dr. Weintraub had lost 46 pounds since being arrested.  Despite these symptoms of a serious illness, the nurse (five days after Dr. Weintraub arrived at the ACH facility) only gave him antacids.  His health continued to decline, yet ACH did not treat him and allowed him to continue his transfer to South Carolina.  He died the day he left the ACH-managed facility in the transit vehicle because a bleeding ulcer allowed toxic fluid to accumulate in his gut.  ACH settled the Weintraub case and did not change its policies, customs or training as a result of his preventable death.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 203-8 (Ex. Y), and (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 9 (Ex. KK).

211.    *Lamonte Brazelton v. ACH, et al.* Case No. 4:16-cv-29 (N.D. Ind. 2016) – During a 5-day span in August 2016, Mr. Brazelton experienced severe pain, uncontrollable nausea and the inability to eat and had constant diarrhea.  He had obvious signs of appendacitis and the doctor's course of treatment did nothing to alleviate his condition.  Mr. Brazelton continued deteriorating rapidly.  Only after Mr. Brazelton's mother intervened did the jail send him to the hospital.  He was diagnosed with acute appendicitis and had to wait several days for the poison to clear his body to have surgery.

41

But for his mother's intervention and threat of a lawsuit he would have died in jail.  ACH settled this matter and did not change any policy, custom or training as a result.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 240-43 (Ex. Y), and (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit  21 (Ex. KK)

212.  *"Broken Jail Healthcare System Poses Dangers Behind Bars"* – This national CBS news piece references six preventable deaths in ACH-managed facilities. One case involved the death of Danny Ray Burden in Grant County, Kentucky.  On the day Mr. Burden, in his 30s, checked into an ACH managed facility he had extraordinarily high blood sugar and COPD.  In the hours following his check-in, he sought emergency medical attention and showed signs of rapidly deteriorating health.  ACH did not send Mr. Burden for outside care and he died in the jail.  *See also* CITE BURDEN COMPLAINT. Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 209-11 (Ex. Y); and Jillian Bresnahan 5/17/2021  ACH  30(b)(6)  Depo.  Exhibits.  11  and  19  (Ex.  KK))  (also  available  at https://www.cbsnews.com/news/broken-jail-healthcare-system-poses-danger-behind-bars/).

A second inmate, 39-year-old Dante Wilson, also died under ACH's care when complaints of heart-attack symptoms went ignored.  He complained multiple times and was sent to his cell and then collapsed and died.  During the investigation of the death, the ACH facility nurse responded "Oh, yeah, we don't want to drag it out. Shit happens."  ((Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  218-19 (Ex. Y); (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 19 (Ex. KK))

213.  *David Ivey v. ACH, et al.* Case No. 2:17 CV 82-CDP (E.D. Mo. July 16, 2019)(order denying summary judgment on ACH official capacity claims) – asthmatic

inmate who had withdrawal symptoms died two nights after booking in an ACH-managed facility.  Over those two nights, he exhibited worsening symptoms of withdrawal and other issues, including seizures, vomiting, defecating himself and decreased appetite.  He was not sent for outside care and died in the jail.  The district court held that ACH's training gave rise to official capacity claims and denied summary judgment.  ACH settled the case and, like all other cases, did not change its policies, customs or training as a result of this fatality.  https://casetext.com/case/ivey-v-audrain-cnty.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  Exhibit 19 (Ex. LL))

214.  *Raymond Nugent v. ACH,*  4:18-cv-2042-AGF (E.D. Mo.) – Mr. Nugent developed clear symptoms of appendicitis, a treatable condition.  Rather than monitor and treat these symptoms, ACH ignored Mr. Nugent and never sent him for outside care.  Mr. Nugent's appendix ruptured and he died alone in his cell in the jail.  This case remains pending.  (Ex. LL).  Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 211-12. (Ex. Y)).

215.  *Lester v. ACH,* 14:17-cv-158 (W.D. Ky 2017) – ACH delayed taking Mr. Lester, despite signs of a serious medical need related to detoxification, for outside care.  Mr. Lester died in jail as a result of the lack of treatment.  ACH settled this matter and did not change its policies, customs or training as a result of this preventable death.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 211-12 (Ex. Y); Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 12 (Ex. KK).

216.  *Schlarb v. ACH* - Brittany Rae Schlarb died at age 35 after 5 days in the Summit County, Ohio jail, an ACH-managed facility.  She showed signs of drug detoxification and dehydration.  She showed clear signs of needing hospitalization two days before her death but was never taken for outside care or treatment.  She died in the

jail.  ACH settled the case pre-suit and did not change its policies, customs or training as a result of this preventable death.  (Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  212-14 (Ex. Y); Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. Exhibit 13 (Ex. KK)).

217.  *Rhonda Hehrer, as Personal Representative of the Estate of Joseph Hehrer, deceased, v. ACH et al.* 1:20-cv-01079-JTN-RSK (W.D. Mich.) – This 91-page complaint details how Mr. Hehrer, a 26-year-old inmate jailed for a DUI, like Mr. Hill, exhibited numerous symptoms of suffering and deterioration but did not receive outside care until near death (he died four days after being admitted to the hospital).  Mr. Hehrer began feeling sick on March 1, 2018 and from then until March 9th had a cascade of worsening symptoms, including repeatedly vomiting blood, hypothermia, nausea, lethargy, visible yellow bruising on his body, low blood pressure and weight loss.  Despite continued deterioration, ACH did not send him for outside care.  He died of diabetic ketoacidosis, a preventable condition.  This case is pending.  Hehrer Complaint, Ex. LL, pp. 16-38; Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  214-15 (Ex. Y); Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo.  Exhibit. 14 (Ex. KK)).

218.  *Timothy Strayer v. ACH, et. al.,* Case 4:12-cv-00098-RLY-TAB (S.D. Ind.) – In this case Mr. Strayer complained repeatedly to jail and ACH personnel about his deteriorating medical condition.  He entered the jail with a hernia that worsened dramatically over a couple weeks.  This caused intense pain, increasing delirium, vomiting, and an inability to eat.  Jail and medical personnel ignored his pleas and by the time he was finally taken to the hospital he was diagnosed with a near-fatal septic ulcer.  ACH settled this matter and did not change any policy, practice or training as a result of the near-fatal ulcer and suffering resulting from the delay in care.  (Strayer Amended Complaint, Ex. LL,

pp. 4-6; Jillian Bresnahan 5/17/2021 ACH 30(b)(6) Depo. 203 (Ex. Y); Jillian Bresnahan

5/17/2021 ACH 30(b)(6) Depo. Exhibit. 10 (Ex. KK)).

Respectfully Submitted

*/s/ Charles C. Eblen*
Charles C. Eblen, #55166
Brandon K. Gutshall, #61848MO
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO  64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
ceblen@shb.com
bgutshall@shb.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

       COMES NOW Plaintiff, by and through undersign counsel, and certifies that they served an original copy of **LADY MAAKIA CHARLENE SMITH'S AFFIRMATIVE STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** by delivering the same along with a copy of this Certificate of Service via Electronic Mail, this 26th day of July 2021, to the following counsel of record:

Michael G. Berry
Brittany Briggs
NEWMAN COMLEY PC
601 Monroe Street
P.O. Box 537
Jefferson City, MO  65102
Telephone:  573-634-2266
michaelberry@ncrpc.com
briggsb@ncrpc.com
**ATTORNEY FOR DEFENDANTS PHELPS COUNTY SHERIFF'S DEPARTMENT; PHELPS COUNTY JAIL; SHERIFF RICHARD L. LISENBE; KELLY RATCLIFF; SERGEANT GLENN; AND LIEUTENANT JOE TAYLOR**

J. Thaddeus Eckenrode
Lisa H. Howe
ECKENRODE MAUPIN
11477 Olde Cabin Rd.
Suite 110
St. Louis, MO 63141
314-726-6670
Fax: 314-726-2106
jte@eckenrode-law.com
lhh@eckenrode-law.com
**ATTORNEY FOR DEFENDANTS DR. ARTHUR BENTLEY, DIONNE KELLEY, DVANCED CORRECTIONAL HEALTHCARE, INC., AND DR. TRAVIS SCHAMBER**

                    Respectfully submitted,
                    */s/ Charles C. Eblen*
                    Charles C. Eblen, #55166
                    Brandon K. Gutshall, #61848MO
                    SHOOK, HARDY & BACON L.L.P.
                    2555 Grand Boulevard
                    Kansas City, MO  64108-2613