UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LADY MAAKIA CHARLENE SMITH,            )
personal representative of the Estate of       )
Bilal Hasanie Hill, deceased,                   )
                                                          )
           Plaintiff,                               )
                                                          )
    vs.                                               )        Case No. 4:20 CV 804 JMB
                                                          )
RICHARD L. LISENBE, *in his official*        )
*capacity*, DR. ARTHUR BENTLEY,            )
DIONNE KELLEY, KELLY RATCLIFF,           )
JOE TAYLOR, ADVANCED                        )
CORRECTIONAL HEALTHCARE, INC.,          )
and DR. TRAVIS SCHAMBER,                   )
                                                          )
           Defendants.                            )

## MEMORANDUM AND ORDER

On October 4, 2019, Bilal Hasanie Hill was detained at the Phelps County Jail after being arrested by the United States Marshal Service.  While in pretrial detention, he sought medical care from jail officers for a variety of symptoms and was seen by medical personnel employed by Advanced Correctional Healthcare, Inc. ("ACH"), which provides medical personnel and healthcare to the detainees at the jail.  On April 1, 2020, he was transported to an emergency room and then to the Cox Health where he was diagnosed with metastatic lung cancer, for which there was no cure.  Hill was thereafter granted compassionate release to the care of his sister, Lady Maakia Charlene Smith, on April 9, 2020.  He passed away on January 14, 2021.

Hill filed a complaint on June 19, 2020 and Smith filed a third amended complaint on May 26, 2021 (Doc. 122), as the personal representative to his estate, pursuant to 42 U.S.C. § 1983 and state law.[1]  She alleges that the individual defendants, Dr. Arthur Bentley, nurse Dionne Kelley,

---

[1] Hill and Smith will be referred to as plaintiff or by name.

Sheriff Richard L. Lisenbe, Sergeant Deborah Glenn, officer Kelly Ratcliff, Lieutenant Joe Taylor, Dr. Travis Schamber, and Does 1-15 (hereinafter "County defendants"), were deliberately indifferent to Hill's serious medical needs (Count I), that defendants ACH, Phelps County Sheriff's Department, Phelps County Jail, Lisenbe (in his official capacity), Schamber, and Bentley (in his official capacity) employed unconstitutional policies, practices, and/or customs and failed to train or supervise (Count II), that defendants Bentley, Schamber, Kelley, and ACH engaged in medical negligence (Count III), and that they negligently inflicted emotional distress (Count IV). On July 27, 2021, Count IV was dismissed (Doc. 172). And, on December 9, 2021, plaintiff filed a stipulation pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) dismissing with prejudice defendants Lisenbe (in his individual capacity), Phelps County Sheriff's Department, Phelps County Jail, and Glenn, and dismissing without prejudice Does 1-15 (Doc. 195).[2]

Now pending before the Court are the motions for summary judgment filed by the County defendants (Doc. 127), defendant Schamber (Doc. 145), and the motions for partial summary judgment filed by defendant Kelley (Doc. 148), defendant Bentley (Doc. 151), and defendant ACH (Doc. 154).[3] Plaintiff filed a consolidated response in opposition and the motions are fully briefed (Docs. 166, 178, and 188). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the following reasons, the County defendants' motion is **GRANTED in part and MOOTED in part** (Doc. 127), defendant Schamber's motion is **GRANTED in part and MOOTED in part** (Doc. 145), defendant Kelley's motion is **DENIED in part and MOOTED**

---

[2] Thus, the pending claims in this lawsuit are: Count I against Bentley, Kelley, Ratcliff, Taylor, and Schamber; Count II against ACH, Schamber, Lisenbe (in his official capacity), and Bentley (in his official capacity); and Count III against Bentley, Schamber, Kelley, and ACH.

[3] Kelley, Bentley and ACH do not seek summary judgment on Count III alleging medical negligence.

in part (Doc. 148), defendant Bentley's motion is **DENIED in part, GRANTED in part, and MOOTED in part** (Doc. 151), and defendant ACH's motion is **GRANTED in part and MOOTED in part** (Doc. 154).[4]

### Background

The following relevant facts are undisputed or taken in a light most favorable to the non-moving party, in this case, plaintiff.

When Hill was booked at the Phelps County Jail on October 4, 2019, he was initially screened by Ratcliff and Hill reported no complaints about this back or shoulder (Plaintiff's Statement of Uncontroverted Material Facts ("PSUMF"), ¶ 6). Hill's first point of contact with medical staff at the jail was a medical screening by Kelley, a licensed practical nurse, on October 8, 2019 (Doc. 150,[5] ¶¶ 3, 32). At the time, he was a one-pack-a-day cigarette smoker, exercised regularly, weighed 196.5 pounds, was 6'3" tall, and did not report any significant medical issues (PSUMF ¶¶ 6,7).

Hill began experiencing pain in December 2019 and complained about it to jail employees[6] (PSUMF ¶ 10).[7] In early January, 2020, he complained to Ratcliff about pain in various parts of

---

[4] Each motion is mooted in part to the extent that they seek judgment on Count IV which was dismissed after the motions for summary judgment were briefed.

[5] Defendants' individual statements of uncontroverted facts are listed by the document number generated by CM/ECF and internal paragraph designations. Exhibits are referenced by the document number and page number generated by CM/ECF.

[6] Throughout her statement of uncontroverted material facts, plaintiff refers to "jail employees," "defendants," "correctional officers," and others in generic terms. Even the County defendants frequently group themselves together in their memorandum in support of summary judgment (Doc. 128). Such statements are generally irrelevant to the issue of whether any particular defendant violated plaintiff's constitutional rights.

[7] For example, in late 2019, officer Richard Spadoni (who is not a defendant in this lawsuit) approached Hill because he noticed that he had requested medical care (Doc. 167-10, p. 4). Spadoni observed Hill to look normal, but Hill told him that he was in pain and had stiffness and soreness in his neck and shoulder area (Id.). In response, Spadoni told another officer to speak to the nurse and determine "what their intentions were" (Id.). He also told Hill to fill out a medical request form (Id. 5). Spadoni understood that the medical providers at the jail were attending to Hill's needs (Id. 6). The parties do not specify what medical care Hill asked for or received prior to January 13, 2020. However,

his body and she directed him to fill out a sick call request form (Doc. 167-13, p. 4).  On January

13, 2020, Hill reported to Glenn that he had constant pain in his left shoulder that began a week

prior (PSUMF ¶ 43; Doc. 167-1, p. 18).[8]  That same day, he filled out a sick call request form

requesting a doctor or nurse visit and indicating that he had "extreme back and neck pain shooting

from shoulder blade to neck" (PSUMF ¶ 44, Doc. 167-1, p. 19).  In response, Glenn contacted

Bentley, who was the physician on site at the Phelps County Jail (PSUMF ¶¶ 4, 44).  That same

day, Bentley prescribed 1000 mg of Tylenol, twice daily for three days and directed Hill to see the

nurse the next day (PSUMF ¶ 44; Doc. 167-1, p. 18).  The next day, Hill was examined by Kelley

who noted that he reported his pain began two weeks ago at night, that he does not experience pain

with movement but rather when he is inactive (PSUMF ¶ 46; Doc 167-1, p. 17).  Upon a physical

examination, Bentley diagnosed Hill with a pulled trapezius muscle, prescribed a tapering dose of

prednisone (an anti-inflammatory steroid) for 16 days, and directed him to reduce his workouts

(PSUMF ¶ 47; Doc. 169, ¶ 26).[9]  Bentley expected Hill's condition to resolve in about 6 weeks

(Doc. 167-3, p. 9).  A week later, on January 21, 2020, Hill filled out another sick call request form

complaining of new and worsening symptoms and requesting further testing (x-ray) and

accommodations (extra mattresses) (Doc. 167-1, p. 16).  However, he declined to be seen by Kelley

on that day (Doc. 150, ¶ 40).[10]

---

in his deposition, Hill testified that he sought care from correctional officers and that he was given ibuprofen prior to his first appointment with the nurse (Doc. 167-4, p. 7).

[8] When Hill reported his medical concern, Glenn filled out a "Muscle-Skeleton/Muscle Pain-Strain" form that outlined symptoms (the "subjective" portion), set forth vital signs (the "objective" portion presumably taken by Glenn), listed a standard pre-printed treatment plan, and indicated the physician's orders (Doc. 167-1, p. 18).

[9] Bentley specifically told Hill that "it wouldn't do any harm to work out as long as he didn't overdo it, and that it probably would be a good while before he got over it" (Doc. 169-2, p. 5).

[10] Plaintiff states that on January 22, 2020 he filled out another request for medical care (PSUMF ¶ 49).  To support this statement, plaintiff cites to his deposition; however, the cited evidence does not support this purported fact (See Doc. 167-4, pp. 9-10).

On January 25, 2020, Hill reported to a correctional officer[11] that he had a sharp/shooting/pulsating pain under his left nipple that had lasted for 10-15 minutes (PSUMF ¶ 50; Doc. 169, ¶ 35).  Hill's symptoms were notated on a "Circulatory/Chest Pain" form which states that he had pain in his left neck and shoulder (and in particular under his left nipple), did not have heart disease, diabetes, elevated blood pressure, other medical conditions, nausea, vomiting, shortness of breath, or abnormal sweating (Doc. 167-1, p. 14).  Bentley did not believe Hill was suffering from a cardiac problem and directed that he be given 500 mg of Tylenol once, that his vitals be rechecked in 2 hours (and to inform the doctor if they are abnormal), and that he be referred to see the nurse (Id. 15; Doc. 169, ¶ 35).  It is unclear from the medical records whether his vitals were rechecked that day.  Around this time period, Hill testified that Bentley asked him when he was "going home" and stated that "you know, if you're going home, because maybe it's something that you could take care of when you get on the outside" (Doc. 167-4, p. 10).

Nonetheless, Kelley followed up with Hill on January 27 (Doc. 167-1, p. 13).  The medical record is difficult to decipher, but it appears to indicate that Hill denied chest pain and cardiac related discomfort but that he complained of stiff neck/back muscles and stated that "basically my shoulder and back is bothering me the most" (Id.).  No new orders were received by the nurse from Bentley and Hill was directed to "continue the current physician order on exercise/activity" (Id.).  At some point at the end of January, Hill relayed other symptoms to Bentley and Kelley including a lump on his neck (Doc. 167-4, p. 9).  He further informed them that he was having trouble breathing, that his voice was changing and that it was hard for him to swallow (Id. 9-10).  In response, Bentley gave him three days' worth of Tylenol (Id. 10).  The medical records themselves

---

[11] It is unclear to whom Hill relayed his symptoms because the signature at the bottom of the form is unreadable (Doc. 167-1, p. 14).

do not reflect that Hill complained of trouble breathing or swallowing, either in January or February, 2020, and it is unclear whether Kelley told Bentley about Hill's additional symptoms. Also during this time period (and through April, 2020), his pain woke him up at night and caused him to cry, holler, and scream – again, the medical records do not reflect these reactions to his pain (Doc. 167-4, pp. 10-11).[12]

On February 6, 2020, Hill submitted a grievance to jail officials stating that he has been in "extreme pain" for the last month, that he has been misdiagnosed, that he is in pain that causes sleeplessness, and that he should be sent to an emergency room (Doc. 167-1, p. 21).  In response, Lieutenant Taylor, the jail administrator, stated:

> I have spoken to the nurse, she informs me that you have seen the Dr. on two occasions about your back.  Three times total, you paid for two visits.  I was also informed that the Dr. explained to you what the issue is with your back and what you needed to do to help relieve the issue.  You have been treated with predisone, plus Tylenol on two separate occasions.  You have been observed exercising with regularity and jumping up and down.  I am not sure what it is you are wanting?  If it is Tylenol you want whenever you want it you will have to purchase it on commissary.  I have talked to the nurse after our conversation in the Horseshoe. She is going to get Tylenol for you for the next five days and put you on the Dr.'s list for next week.  You must follow the Dr.'s orders.  I will follow up after the Dr. sees you next week.
>
> (Id.).[13]

That same day, Hill was seen by Kelley ("per C.O. request") – upon examination, his lungs and chest were "clear to auscultation," he had a normal heart rate, and it is noted that he was told to "cont. [decreasing] activity per Dr. order" (Doc. 157, p. 24; Doc. 169 ¶ 39).

---

[12] Various inmates at the jail testified about Hill's condition during the relevant time period.

[13] Jail officials, including Taylor, apparently unaware that Hill was not told to stop exercising by Bentley, kept tabs on his exercising and expressed disbelief about his pain level/medical condition in light of his continuing to exercise (PSUMF ¶¶54, 55, 57; Doc. 169 ¶¶ 37-8).

Hill filled out another grievance on February 12, again stating that he was in extreme pain and had been misdiagnosed – this grievance was forwarded to the doctor following his appointment on that day (Id.). At that appointment, Dr. Bentley examined Hill and noted that his weight was down to 190 pounds, that he was agitated and complained of pain, but that he had a "normal exam" (PSUMF ¶ 61). He directed Hill to take Tylenol as needed (Id.).

Hill filled out other grievance forms on February 16 and 17, 2020 (Doc. 167-1, pp. 40, 57). He again indicated that he was in extreme pain (and inferred that the pain medication was not working), that his condition was deteriorating daily, and that he needed more tests and care to determine the cause (Id.). At this point, Taylor became "skeptical" about the treatment that Hill was receiving (Doc. 167-14, p. 4). Thus, in response to the grievances, Taylor indicated that the medical staff were aware of his medical requests including the ones made in the grievance and that his "medical condition is being re-evaluated by a team of Dr's of ACH" (Doc. 167-1, p. 40). To facilitate that re-evaluation, Taylor contacted Jennifer Nolawski (who is not a defendant herein), the regional nurse manager for ACH, and requested a review of Hill's care (Doc. 170 ¶ 54).[14] That review was conducted by Dr. Schamber, a physician who worked for ACH (Doc. 170, ¶ 55-6).

On February 20, 2020, Hill made another request for medical care, this time stating that he had a growth on his neck in an area he previously stated was in severe pain.[15] When Kelley evaluated him the next day, she noted that his weight was down to 180 pounds but that he had no problems walking and that his range of motion had not decreased;[16] she did not mention the growth

---

[14] Taylor believed that Hill's care would be evaluated by a "review board" but did not know anything about how the review would be conducted (Doc. 167-14, p. 5).

[15] This document was not included in the parties' submissions and is attached to this memorandum and order as Appendix A. It is designated as PCJ-25 by the parties.

[16] When Hill asked Kelley and Bentley whether it was normal for him to lose weight, Kelley laughed at him and Bentley appeared unconcerned (Doc. 167-4, p. 13). Kelley also told Hill that he was losing weight because he had stopped working out (Id.).

on his neck in the medical record and there is no evidence that she relayed this condition to Bentley (Doc. 167-1, p. 11). She did note that Bentley would see him on his next day at the prison (Id.). On February 22, Glenn emailed Kelley and jail supervisors stating that Hill was complaining of pain and being disruptive; he was moved to a single cell, given an ice pack, and offered a medical request form (Doc. 170, ¶ 46). In response, Taylor stated that Hill should "remain in a holding cell on medical observation until evaluated by medical" (Doc. 157-4, p. 18).

Hill filled out another grievance on February 25, prior to seeing Bentley, stating that he was losing feeling in his left arm, reporting the growth on his neck, that he had been in severe pain for 60 days, and that his condition was getting worse (Doc. 167-1, p. 30). In response, Kelley told him to fill out a sick call request form (Id.). There is no evidence that Kelley relayed the information from the grievance to Bentley. The next day, Bentley examined Hill, ordered blood work to evaluate a possible lymph node infection (which he described as the size of a peanut), and noted a history ("Hx") of a muscle pull in the left trapezius (Doc. 167-1, p. 10). The next day, February 27, Hill filled out another grievance again stating that he was in pain and that he needed additional diagnostic testing (Doc. 167-1, p. 31). In response, Kelley told him that he should have asked Bentley about this the day before and that he should fill out another sick call request form (Id.). In a subsequent grievance on March 4, Hill again stated that he had a serious medical condition and that he "feel[s] like [he] is going to die" (Doc. 167-1 p. 32). In a response six days later, Kelley states "[w]hat is your grievance?" (Id.).

The lab results revealed that Hill's white blood cell count, RBC, hemoglobin, hematocrit, MCV, MCH, MCHC, RDW-SD, platelet count, MPV, ANC, glucose, BUN, BUN/creatinine ratio, sodium, chloride, anion gap, and calcium were within normal ranges but that that his creatinine,

potassium, and total carbon dioxide were outside the recommended ranges (Doc. 167-1, p. 8-9). The lab noted on the report that "results may be altered due to not being [sent] down in timely manner.  Sample collected at 1800 did not come to lab until 0300 3/7/20" (Id.).[17]  Bentley testified that this statement is "a disclaimer that [the test results] could be inaccurate" (Doc. 167-3, p. 17). Nonetheless, Bentley told Hill at the time that his test results were normal and there is no evidence that the labs were repeated (PSUMF ¶94, 96).

Hill submitted another request for medical care on March 7, 2020[18] stating that the pain in his bicep was causing sleeplessness, that his neck was swollen and interfering with his breathing, that his back pain was not diminished, that he needed to take "dangerous levels of ibuprofen," and that he needed emergency care (Doc. 167-1, p. 7).  He was not seen by medical staff – instead, a note on the form indicates that he was scheduled for a follow up with the doctor (Id.).

Dr. Schamber completed a review of Hill's medical care on March 9, 2020 and found that it was "objectively reasonable" – this conclusion was relayed by Taylor on that day (Doc. 170 ¶ 56-7; Doc. 169 ¶ 81).  Schamber conducted his review by looking at 21 pages of medical records related to Hill – he only reviewed the records submitted to him by Kelley through ACH's corporate counsel (Doc. 169, ¶¶ 82-3).  He did not review Hill's grievances, examine Hill, or otherwise treat Hill (Doc. 169, ¶ 84, 85).  During this time period, Taylor did not have much contact with Hill; he saw him "on occasion" in the jail pods but did not watch him and did not observe him (Doc. 167-14, p. 7).  Taylor believed Hill was being treated by the medical providers; jail officials did not send inmates for medical care outside of the jail except in emergency situations and upon the

---

[17] As indicated above, Bentley ordered the blood testing on February 27, 2020.  Kelley attempted to draw Hill's blood on March 4, but he was uncooperative (Doc. 169, ¶ 55).  She attempted again on March 5, but he was again uncooperative (Id. ¶ 56).  Hill's blood was subsequently drawn on March 6 (Id. ¶ 57).

[18] The record is dated February 7, 2020, but it is clear that it was filled out on March 7.

medical professional's recommendation, and jail officials deferred to the medical professional's opinion that an inmate did not need outside medical care (Doc. 167-14, p. 7).

On March 17, Sergeant Jackson found Hill laying on the floor in his pod and saying that he was in pain.  He escorted Hill to a "holdover" cell for observation by video surveillance and gave Hill a medical request form (Doc. 167-19, p. 14).  According to a contemporaneous email from Jackson to other officers and Kelley, Hill "stated that he was not able to get up by himself because of his pain" and that he was moved for "medical watch" (Doc. 167-1, pp. 37, 41).  Medical watch consisted of a period of observation from 11:21 a.m. to 3:00 p.m where Hill was observed every 15 minutes laying on the floor (Id. 41).  Hill testified that he was laying on the cool floor and on occasion a concrete bench in the cell to alleviate pain (Doc. 167-4, pp. 14-15).  He also testified that he cried, screamed, and beat on the door to get attention but that no medical care was given (Doc. 167-4, p. 15).  There is no evidence that either Ratcliff or Taylor were aware of this.

The next day, March 18, 2020, Hill was examined by Bentley for his swollen neck.  Hill's weight was measured at 175 pounds, but Bentley otherwise stated that the exam was normal, that his labs were normal, and that no medication was needed (Doc. 167-1, p. 6).  Bentley checked a box indicating "no other complaints by patient" and directed him to follow up as needed (Id.).  Nonetheless, after that appointment, Kelley indicated in an email to jail staff that "we are going to maintain observation and documentation this week . . . ." (Doc. 167-1, p. 38).  Hill was housed in a holding cell for medical observation from March 19 to March 29 (Doc. 167-1, pp. 43-63).  Medical observation is a term used by the jail to indicate that an inmate was placed in a single-man cell where it was easier for correctional staff to observe the inmate.  There is no evidence in the record that a medical watch resulted in new or additional medical care; indeed, there is no evidence that Hill was seen by Bentley or Kelley from March 18 to March 27.  Moreover, it is

unclear from the record who, either jail personnel or medical personnel, were in fact observing Hill and his condition during that week.

On March 27, Hill was evaluated for chest pains and rapid breathing – he was given 1000 mg of Tylenol as needed and directed to follow up as needed (Doc. 167-1, p. 5).  The next day, nurse Kelley followed up and Hill denied further chest pain (Doc. 167-1, p. 4).  He stated, however, that he only gets minimal relief for his shoulder pain with the Tylenol (Doc. 167-1, p. 4).  Two days later, he filled out another sick call request, stating that he was still in severe pain in his back and left arm, that his left arm was 75% numb, and that he was in desperate need of diagnostic testing (Doc. 167-1, p. 3).

Dr. Bentley evaluated Hill on April 1, 2020 and noted that his weight had dropped to 168 pounds, that he could find no reason for Hill's pain, and that he should be referred to an emergency room (PSUMF ¶ 127, 128).  At the emergency room, Hill was examined by a doctor who ordered an MRI of his neck area; the MRI revealed a mass on his neck and shoulder area that was suspected cancer (Doc. 169 ¶ 69).  The next day, Hill was diagnosed with terminal, metastatic lung cancer by Dr. Ian Fawks at Cox Health. (PSUMF ¶ 132, Doc. 169 ¶ 70).  In making his diagnosis, Dr. Fawks stated that Hill was "emaciated, skeletal appearing, and had an odor of death.  I would think that anybody, regardless of the background, would know that something was wrong with him" (PSUMF ¶ 133).  Hill was granted compassionate release from incarceration and subsequently died on January 14, 2021 (PSUMF ¶ 134).

For several months while Hill was at the jail, he complained to Ratcliff about his pain (Doc. 167-13, p. 5).  She observed his suffering which included: "Facial expressions. He would moan and groan. Cry. Hunched over. He walked with a very slow gait. I mean, you know, there were

numerous -- numerous outwardly appearances as well as vocal."[19]  As the months progressed into February and March, 2020, she observed decreased activity; and, at the end of March she observed the lump on his neck which she described as being a little smaller than her fist.  (Doc. 167-13 pp. 5-6).  Ratcliff stated that she could only refer Hill to medical personnel and offer her sympathy, concern, and prayer because her hands were tied by the limitations of her job (Id.).

At times throughout the relevant time period, Hill was unable to get out of bed to urinate or to get his own food or water (Doc. 167-4, pp. 15, 17).  Hill testified that at some point during his stay at the Phelps County Jail, Kelley would tell him that "you're not in that much pain.  You need to stop it.  You need to cut it out" (Doc. 167-4, p. 16).

### Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Anderson, 477 U.S. at 247.  The non-moving party may not rest upon mere allegations or denials in the pleadings.  Id. at 256.  "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment.  Id. at 248.  The Court must

---

[19] She did not observe weight loss because Hill had a blanket around him when she saw him, as other inmates did also, to ward of the cold (Doc. 167-13, p. 6).

construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant.  Id. at 255.

**Discussion**

## I.      **Count I: Deliberate indifference**

As a pretrial detainee, Hill was entitled to the protections guaranteed by the Due Process Clause of the Fourteenth Amendment and had "at least as great a protection as that afforded convicted prisoners under the Eighth Amendment." Luckert v. Dodge County, 684 F.3d 808, 817 (8th Cir. 2012) (quotation marks and citations omitted); City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 244-245 (1983).   A pretrial detainee's claim that he was given an unconstitutional level of medical care is routinely examined under the same rubric as Eighth Amendment claims for deliberate indifference to a serious medical condition.    Therefore, a plaintiff must show that he suffered from an objectively serious medical condition, that defendants actually knew of a risk to his health, and that they deliberately disregarded it.  Vaughn v. Green County, Ark., 438 F.3d 845, 850 (8th Cir. 2006).[20]  A serious medical condition is one that has been diagnosed by a physician or one that is so obvious that a layperson would recognize the necessity of medical attention.  Davis v. Buchanan County, Missouri, 11 F.4th 604, 623 (8th Cir.

---

[20] In the context of an excessive force claim filed pursuant to § 1983, the Supreme Court has held that "a pretrial detainee can prevail [on a due process claim] by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Kingsley v. Hendrickson, 576 U.S. 389, 398 (2015).  This ruling has been extended to pretrial detainee's medical needs claims in the Second, Sixth, Seventh, and Ninth Circuits.  Bruno v. City of Schenectady, 727 Fed.Appx. 717, 720 (2nd Cir. 2018) (unpublished); Brawner v. Scott Cnty, Tn, 14 F.4th 585 (6th Cir. 2021); Miranda v. County of Lake, 900 F.3d 335, 352-353 (7th Cir. 2018); Gordon v. County of Orange, 888 F.3d 1118, 1120, 1122-1125 (9th Cir. 2018). The Eighth Circuit, however, has explicitly confined Kingsley to excessive force claims.  Whitney v. City of St. Louis, Mo, 887 F.3d 857, 860 n.4 (8th Cir. 2018).  As has the Fifth, Tenth, and Eleventh Circuits.  Kingsley. Cope v. Cogdill, 3 F.4th 198, 207 n.7 (5th Cir. 2021); Strain v. Regalado, 977 F.3d 984, 991 (10th Cir. 2020); Dang by and through Dang v. Sheriff, Seminole County, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017).  The Third and Fourth Circuits have declined to address the issue and there is no First Circuit case on point.  Moore v. Lufffey, 767 Fed.Appx. 335, 240 n.2 (3rd Cir. 2019); Mays v. Sprinkle 992 F.3d 295, 300-301 (4th Cir. 2021).

2021).  A defendant acts with deliberate indifference when he recognizes that a substantial risk of harm exists and knows that his conduct is inappropriate in light of that risk.  Id. (quotation marks and citation omitted); Barton v. Taber, 908 F.3d 1119, 1124 (8th Cir. 2018) (noting that a plaintiff must establish the objective and subjective components of a deliberate indifference claim). Negligence or a failure to alleviate a risk that a prison official should have perceived is insufficient to show deliberate indifference.  Leftwich Trustee of Statutory Class of Next of Kin to Leftwich v. County of Dakota, 9 F.4th 966, 972 (8th Cir. 2021).

### A.      County Defendants: Taylor and Ratcliff

Taylor and Ratcliff argue that they are entitled to qualified immunity; that they were not deliberately indifferent to plaintiff's needs and that they did not violate clearly established law. "Qualified immunity shields a government official from suit under § 1983 if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kelsay v. Ernst, 933 F.3d 975, 979 (8th Cir. 2019) (citations omitted).  "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  Morgan v. Robinson, 920 F.3d 521, 523 (8th Cir. 2019) (quotation marks and citations omitted).  The doctrine "protects all but the plainly incompetent or those who knowingly violate the law." City of Tahlequah, Oklahoma v. Bond, __ U.S. __, 142 S.Ct. 9, 11, 2021 WL 4822664, *2 (2021).

It is within the Court's discretion to determine which prong of the qualified immunity analysis to address first.  Kelsay, 933 F.3d at 979.  The first prong requires an analysis of plaintiff's deliberate indifference claim against each defendant.  As to the second prong, a right is clearly established when it is "sufficiently clear that every reasonable official would have understood that

what he is doing violates that right.'" Rivas-Villegas v. Cortesluna, __ U.S. __, 142 S.Ct. 4, 7, 2021 WL 4822662, *2 (2021) (per curiam) (citation omitted).   Although a direct case on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." Id.   In other words, "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." City of Tahlequah, Oklahoma, 142 S.Ct. at 11 (considering a Fourth Amendment excessive force claim).  In the context of an Eighth/Fourteenth Amendment case alleging deliberate indifference to a serious medical need, a plaintiff may demonstrate a clearly established right at a less specific level than required to demonstrate the clear establishment of a Fourth Amendment right.  See McRaven v. Sanders, 577 F.3d 974, 981–82 (8th Cir. 2009) (defining a pretrial detainee plaintiff's clearly established right simply as "[a] detainee's right to medical treatment").

As set forth above, plaintiff alleges in Count I that defendants Ratcliff and Taylor were deliberately indifferent to Hill's serious medical need.  There is no dispute that Hill suffered from a serious medical need, even though the individual defendants did not know the full contours of his medical condition.[21]  See Barton v. Taber, 820 F.3d 958, 965 (8th Cir. 2016) ("We determine whether an objectively serious medical need exists based on the attendant circumstances, irrespective of what the officer believes the cause to be.").  As to correctional officers, "deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment . . . ." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).

---

[21] In their brief, the County defendants state that "the individual Phelps County Defendants knew Mr. Hill was experiencing pain and making requests for medical attention" but that they did not know that he was suffering from lung cancer and that they did not know that he was "suffering an acute medical emergency" (Doc. 128, pp. 7-8).

There is no dispute that neither Ratcliff nor Taylor interfered with or delayed any prescribed medical treatment.  The evidence instead reveals that Ratcliff directed Hill to seek medical care through a medical request form, and Taylor likewise reached out to medical staff regarding Hill's medical condition, responded to his grievances, sought a second opinion regarding the care that Hill was receiving, and placed Hill in medical watch to more closely observe his condition.  Plaintiff argues, however, that these defendants should have done more.

A prison official who is "not involved in treatment decision made by the medical unit's staff and 'lacked medical expertise, ... cannot be liable for the medical staff's diagnostic decision[s].'"  Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)).  He may "rely on a medical professional's opinion if such reliance is reasonable." McRaven, 577 F.3d at 981.  That reliance is not reasonable if it is evident or obvious to a layperson that the treatment decisions are inadequate or inappropriate.  See Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006).  Thus, in McRaven, the correctional officers' reliance on medical professional's conclusion that an inmate did not need to be hospitalized was unreasonable where they knew an inmate had taken psychotropic medication that was not his, where they knew that he was under the influence of drugs and not merely alcohol, and where they should have known that the medical professional's judgment was based on the mistaken belief that the inmate was under the influence of alcohol and not drugs.  Id. 577 F.3d at 981.  In that case, the defendants were aware of medical information that the medical professional was not aware of and it was unreasonable for them to rely on a medical opinion based on information they knew to be false.

In this case, defendants Taylor and Ratcliff were not aware of any information regarding Hill's medical condition that Kelley and Bentley were also not aware of.  That is, they did not

unreasonably rely on the medical professional's treatment of Hill because they did not have any additional information or expertise that would have informed them that the treatment decisions were obviously inappropriate.  Certainly, both Ratcliff and Taylor were concerned that Hill's medical issues were not being resolved by the medical professionals and Taylor took various actions to further Hill's medical treatment including talking to the treatment providers and seeking a second opinion.  While they may not have agreed with the medical care or whether their actions may not have been sufficient to avert Hill's suffering, there must be "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995).  "Deliberate indifference is equivalent to criminal-law recklessness."  Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011).  There must be "a highly culpable state of mind approaching actual intent."  Choate v. Lockhart, 7 F.3d 1370, 1374 (8th Cir. 1993).  There must be "apathy or unconcern."  Rellergert v. Cape Girardeau County, MO, 924 F.2d 794, 797 (8th Cir. 1991).

No reasonable jury would find that either Taylor or Ratcliff were unconcerned or apathetic to Hill's needs; they ensured that Hill received medical treatment from the medical staff on demand.  While plaintiff may be able to demonstrate that they were negligent in failing to take any additional steps, like sending Hill to outside medical professionals for a second opinion, or that in hindsight they would have acted differently, no reasonable jury would find that these defendants were reckless, apathetic, or aware that treatment decisions were plainly inappropriate.

Even if these defendants were deliberately indifferent to Hill's needs, "[t]he law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."  Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002).  Prison supervisors who lack medical expertise cannot be held liable for decisions made by medically

trained prison staff.  See, e.g., Drake ex rel Cotton v. Koss, 445 F.3d 1038, 1042-43 (8th Cir. 2006) (holding that jailers could not be held liable for a psychiatrist's determination that a pretrial detainee was not suicidal); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (holding that a prison superintendent could not be held liable for a prison doctor's failure to properly diagnosis symptoms of an impending stroke); Camberos, 73 F.3d at 176 (holding that a prison treatment director and a prison warden could not be held liable for "the medical staff's diagnostic decision not to refer [an inmate] to a doctor for treatment of his shoulder injury").  Therefore, it was not clearly established law that either Taylor or Ratcliff were required to acquire different medical treatment than provided by medical staff or that they were required to override the medical professional's opinions and refer Hill's medical complaints to different providers.

Accordingly, Ratcliff and Taylor are entitled qualified immunity on Count I.

### B.      Medical Defendants: Bentley and Kelley

"[I]f any claim of medical indifference ... is to succeed, it must be brought against the individual directly responsible for [plaintiff's] medical care."  Kulow v. Nix, 28 F.3d 855, 859 (8th Cir. 1994) (quoting Brown v. Wallace, 957 F.2d 564, 566 (8th Cir. 1992)).   In this case, those defendants are Kelley and Bentley.

These defendants generally argue that they provided medical care whenever Hill requested it, that the medical care included examinations and pain medication, and that Hill was not entitled to demand specific care.  They further argue that Hill's symptoms would not have made it apparent that he was suffering from an aggressive cancer, that the treatment decisions were appropriate in light of what they believed was the underlying medical condition, and that there was nothing they could have done to prevent Hill from succumbing to cancer.  Finally, Kelley argues that she was not responsible for any treatment decisions and could not override Bentley's decisions.

As set forth above, "deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence," and "must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." Schaub, 638 F.3d at 914–15 (cleaned up and citation omitted).  "The existence of a possible alternate course of treatment, which may or may not have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm." Dulany, 132 F.3d at 1241 (cleaned up) (citing Farmer v. Brennan, 511 U.S 825, 844 (1970)).  It is well established that a plaintiff's disagreement with a course of treatment or denial of a demand for specific care does not rise to the level of a constitutional violation.  See Cejvanovic v. Ludwick, 923 F.3d 503, 507 (8th Cir. 2019) (stating that a "mere disagreement with treatment decisions…does not rise to the level of a constitutional violation").  And, even if Kelley's and Bentley's conduct were considered medical malpractice, such conduct would not be sufficient to state a constitutional violation under § 1983.  See Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008) (stating that medical malpractice is not actionable under the Eighth Amendment) and McRaven, 577 F.3d at 982 ("Negligent misdiagnosis does not create a cognizable claim under § 1983.").

In light of the difficulty of showing deliberate indifference, see Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998), a jury may find that Bentley provided adequate treatment in light of the knowledge that he had.  It is undisputed that he initially believed that Hill had a muscle injury that could be remedied by prednisone, Tylenol and time, and that he sent Hill to the emergency room when he could not determine the cause of his condition.  A jury may find that these actions did not show a lack of concern for Hill's medical condition.  Likewise, a jury could find that Kelley also

was not deliberately indifferent because she also examined Hill upon request and referred him to the doctor who could provide medications and treatment decisions.

However, a jury could also find that both Bentley's and Kelley's treatment was so woefully inadequate as to demonstrate deliberate indifference. For example, a jury could find that they delayed treatment, no matter how brief, that contributed to his unnecessary suffering. Boyd v. Knox, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation"). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. See Schaub, 638 F.3d at 919 (citing Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999)); Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995).

In this case, a jury could find that the need for medical attention was obvious to a layperson – other inmates and correctional staff were aware that Hill needed medical attention and that his condition was deteriorating over time. Plaintiff has presented evidence from which a jury could conclude that these medical defendants ignored and disregarded escalating and troubling symptoms including increases in pain not alleviated by Tylenol, weight loss, numbness, immobility, growths, and a rapidly deteriorating appearance. In the face of Hill's declining condition, these defendants only chose to engage in conservative treatment – ineffective pain medication, office visits, and a blood test. A jury could find that these defendants failed to make

minimally competent medical decisions in the face of an illness that was devastating Hill's physical health and causing significant suffering.

In addition, expert testimony, while mostly speaking to medical negligence, could be considered by a jury as demonstrating deliberate indifference.  Plaintiff's expert, Dr. David L. Mayhew, opines that giving Hill Tylenol and prednisone "[was] entirely inadequate for symptomatic management of severe pain" (Doc. 168-5, p. 13).  Plaintiff's second expert, Dr. Nathaniel R. Evans, opined that both Kelly and Bentley "performed below the standards" for a nurse and doctor, respectively (Doc. 16-7, p. 2).  He further states that the nurse failed to take corrective action in the face of "grossly obvious objective signs of progressively worsening severe illness" and that Bentley provided "substandard medical evaluations and treatments of Mr. Hill [that] missed obvious signs of cancer and subjected Mr. Hill to many weeks of brutal suffering" (Doc. 168-7, p. 3).

A jury could also find that from February to April, Bentley persisted in a course of treatment that was wholly ineffective, failed to take steps that were medically necessary, and was therefore deliberately indifferent to Hill's medical needs.  Redmond v. Kosinski, 999 F.3d 1116, 1120 (8th Cir. 2021) (stating that deliberate indifference can be shown by "grossly incompetent or inadequate care so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care") (cleaned up).  The evidence (again in a light most favorable to Hill) could show that Bentley engaged in an easy, conservative, and less efficacious course of treatment even though Hill frequently explained his severe and worsening symptoms and his physical appearance was notably changing.  See  Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990); Cotton v. Hutto, 540 F.2d 412, 414 (8th Cir. 1976).  At most, Bentley provided ineffective Tylenol for pain relief and ordered one blood test notwithstanding Hill's severe and debilitating pain.  Moreover, a jury could

find that he failed to employ needed medical or diagnostic testing even though he did not know what was causing Hill's symptoms.  Green v. Carlson, 581 F.2d 669, 675 (7th Cir. 1978), aff'd, 446 U.S. 14 (1980); Smith, 919 F.2d at 93.  A jury could also find that Kelley's failure to disclose crucial information from the doctor, most notably the growth in Hill's neck, among other things, evidenced a deliberate indifference to his health.  Finally, if Hill's testimony is to believed (as it must be at this stage of the proceedings), he informed both Kelley and Bentley of troubling symptoms that they did not include in their medical reports, did not appear to consider at the time in making their treatment decisions, and otherwise ignored.  Certainly, a jury could consider Dr. Fawk's assessment of Hill's physical state on April 1 and find that both Bentley and Kelley wholly ignored his significant pain and suffering.

Accordingly, Bentley and Kelley are not entitled to summary judgment on Count I.

## II.      Count II: Unconstitutional policy, custom or practice and failure to train or supervise

 "A corporation acting under color of state law cannot be liable on a respondeat superior theory."  Smith v. Insley's Inc., 499 F.3d 875, 880 (8th Cir. 2007).  Rather, to support a claim against such a corporation or county, the plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury."  Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006); Mick v. Raines, 883 F.3d 1075, 1079 (8th Cir. 2018); Monell v. Dep't of Social Services of City of New York, 436 U.S. 658 (1978).   An "official policy" can either be unconstitutional on its face or one that is inadequate based on the deliberate or conscious choices of a decisionmaker.  Szabla v. City of Brooklyn, Minn, 486 F.3d 385, 389 (8th Cir. 2007).  It is a "deliberate choice of a guiding principle or procedure made by the [ ] official who has final authority regarding such matters."  Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  To show an unconstitutional custom, plaintiff must demonstrate:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Johnson v. Douglas Cty. Med. Dep't, 725 F.3d 825, 828 (8th Cir. 2013).

Finally, plaintiff may show a deliberately indifferent failure to train or supervise by showing a "pattern of similar constitutional violations by untrained employees."  S.M. v. Lincoln County, 874 F.3d 581, 585 (8th Cir. 2017).  The Eighth Circuit has "consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim."  Mahn v. Jefferson Cty., Missouri, 891 F.3d 1093, 1099–100 (8th Cir. 2018) (citation omitted); see also  Granda v. City of St. Louis, 472 F.3d 565, 568 (8th Cir. 2007) ("A claim brought against a municipality under § 1983 is sustainable only if a constitutional violation has been committed pursuant to an official custom, policy, practice or custom of the city.").

Plaintiff highlights three policies or practices that she believes violate the Constitution:

1.  Jail's policy of rote deference to ACH and not referring an inmate to outside care unless he is in acute distress;

2.  ACH's policy/custom of delaying or avoiding sending inmates to outside care to avoid cost and acting as a litigation risk-manager and not a healthcare company.

3.  ACH's policy of engaging in a sham board review process.[22]

---

[22] Plaintiff redundantly names ACH, Schamber, and Bentley, in his official capacity, as to this Count.  Naming all three entities adds nothing to this claim because plaintiff will only be entitled to one relief, not relief from each of these three entities.  Accordingly, they will be referred to as ACH.

As to the last practice/policy, plaintiff has presented no evidence that ACH's review process is unconstitutional on its face or was a moving force behind any Constitutional violation.[23]  See Szabla, 486 F.3d at 389 (noting that an official unconstitutional policy is one that compels a Constitutional violation).

As to the second policy/custom, Plaintiff argues that ACH has a policy of delaying medical care in order to save costs and minimize litigation exposure.  To support this claim, plaintiff does not point to any official policy, but rather relies on dubious evidence that appears irrelevant and inadmissible (PSUMF ¶¶ 182-218).  See Fed.R.Civ.P. 56(c)(1)(B) ("A party asserting that a fact is genuinely disputed must support the assertion by  . . . showing that . . . an adverse party cannot produce admissible evidence to support the fact.").  If a plaintiff has failed to support an assertion of fact as required by Rule 56(c), the undersigned may grant summary judgment if there is an entitlement to relief.

Plaintiff first argues that ACH's founder and former CEO expressed a policy of identifying sick inmates, getting them released from prison, and thereby avoid paying for their medical care (and consequently reducing inevitable increases in costs) (PSUMF ¶ 182).  To support this statement, plaintiff relies on obvious hearsay: minutes from a Daviess County (Indiana) Commissioners meeting on September 27, 2004, purportedly stating that ACH minimizes medical costs by transferring inmates out of facilities contracting with ACH (Doc. 167-34).[24]  As ACH points out, it is unclear how the statement is admissible or relevant; it was made by a former CEO

---

[23] Indeed, Plaintiff's entire argument on this policy likens it to a fraudulent endeavor and not a Constitutional violation.

[24] The remainder of the minutes make clear that it was a meeting to discuss how to mitigate healthcare costs in jails. While the Court has no doubt that ACH, a corporation, is interested in minimizing costs for its clients and limiting litigation exposure, there is no showing that ACH's interests were captured in an official policy or indeed in a widespread and prevalent custom or practice.  And, ACH can certainly market itself as a company that can reduce a jail's constitutional liability – as set forth above, jail officials can avoid liability if they reasonably rely on the treatment decisions of medical professionals of the type employed by ACH.

and there is no evidence that it represents current policy.  Plaintiff also relies on a 2015 letter purportedly stating that ACH was being investigated by the Office of the Inspector General for the Department of Health and Human Services (Doc. 167-35).  The actual contents of the letter are a far cry of plaintiff's statement of fact that "[t]he federal government investigated ACH for this business practice" (PMUSF ¶ 183); instead, the letter, which is again hearsay, states nothing more than an allegation that ACH was defrauding Medicare, by acquiring a sick inmate's premature release from prison, was being forwarded to a regional office for review.  Plaintiff fails to support this statement of fact with citation to the record and it is inadmissible on hearsay and relevance grounds.

Plaintiff further argues that ACH has been sued repeatedly for injuries stemming from delays in medical care and generally cites to a variety of cases from Illinois, Georgia, Alabama, Indiana, Kentucky, Michigan, Ohio, and one case from Missouri (PMUSF ¶¶ 203, 208-218).  But being sued (as oppose to admitting fault or receiving an adverse judgment) hardly proves that ACH engages in a "continuing, widespread, [and] persistent" pattern and practice of constitutionally defective medical care that was the moving force behind the allegedly deficient care received by Hill.  Without placing any of these cases in context or providing any of the underlying facts in an admissible format, plaintiff seeks to draw the conclusion that ACH must be providing unconstitutional medical care across the board and that by not changing its ways it has failed to adequately train its employees.  The Court, again, finds it troubling that Plaintiff includes various "facts" in her statement of uncontroverted facts, that are not facts at all but merely allegations made in various lawsuits and contained in various documents.  This section of plaintiff's statement of uncontroverted material facts is not consistent with Local Rule 4.01(E).  For example, there is no admissible evidence that "[l]ike Hill, he would moan throughout the night and wake up other

inmates" (referring to a lawsuit filed in Georgia in 2015) (PMUSF ¶ 210).   Plaintiff presents no affidavits or deposition testimony attesting to any fact in these cases and merely provides case synopses.  Plaintiff has offered no argument why these statements are admissible.  Finally, plaintiff's reliance on Wever v. Lincoln County, Nebraska, 388 F.3d 601 (8th Cir. 2004) and Andrews v. Fowler, 98 F.3d 1069 (8th Cir. 1996), for the proposition that these lawsuits placed ACH on notice that its policy/custom was unconstitutional is misplaced.  In both cases, the prior notification of unconstitutional policies was the result of incidents at the same jail/police department in question – not incidents from other jails or other jurisdictions.

Plaintiff next states that "Dr. Bentley *repeatedly* asked Mr. Hill when he was leaving Phelps County Jail" (PSUMF ¶ 184 (emphasis added)).  But the evidence only supports a claim that Bentley asked Hill *once* on January 27th when he was going home and that he may be able to care for his medical condition once he is released.  From this statement, plaintiff would ask the Court (and a jury) to infer that Bentley was delaying care in an effort to wait until Hill was released from jail.  But the record does not bear out this inference; there is no evidence that Bentley was aware of when Hill would be released or that subsequent medical treatment (or lack thereof) was based on an assumption that Hill would be released.  In any event "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to withstand summary judgment.  Anderson, 477 U.S. at 252; See Shields v. Illinois Dep't of Corrections, 746 F.3d 782, 796 (7th Cir. 2014) ("Such isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy . . . .").

Plaintiff next generally refers to an "ADVANCED Risk Management Program" (PSUMF ¶ 185), an "Introduction to Correctional Healthcare DVD," and other training DVDs (PSUMF ¶¶ 186-201, 204-207) for the proposition that ACH's training material "focus[es] on advancing

ACH's goals of risk management and cost containment" (PSUMF ¶ 207).  Plaintiff does not specify that any remaining defendant (that is, Bentley or Kelley) was given this training material, that they followed the material contained therein, or indeed that they were aware of the material. Plaintiff simply fails to tie any of this training material to Bentley and Kelley; she fails to show that any of the material contained in these exhibits inflicted an actionable injury in this case (as to this particular claim).  Plaintiff's evidence, while emitting some smoke, does not reveal a fire.[25]

The admissible and relevant evidence reveals that Bentley was "never trained by [ACH] to discuss the cost of treatment or medications.  He was only trained to use his professional judgment in caring for patients" (Doc. 153 ¶ 99).[26]  ACH did not prohibit medical professionals from referring inmates to care outside of the jail (Doc. 153 ¶ 108).  Thus, on the record before the Court, plaintiff cannot prevail on the second claim that ACH essentially employed policies/customs that placed cost/litigation mitigation over care that led to his injuries.

Plaintiff's first claim is related to his additional claim that "ACH is a litigation risk-management company that required the Jail to follow an unconstitutional policy and trains its clients to adhere its unconstitutional policy of abdicating all medical responsibility for inmate care" (Doc. 166, p. 39).  In these claims, plaintiff argues that ACH markets itself, trained Phelps County Jail personnel, contracted with the jail, and compelled the jail to adopt its unconstitutional policy of funneling all healthcare decisions through the site practitioner in an effort to limit the jail's liability for Constitutional violations.  Thus, plaintiff argues, jail employees, like Taylor and Ratcliff, failed to seek outside medical care because they believed they could only do so in acute emergency situations.  As stated above municipal liability cannot attach unless there is an

---

[25] The Court reserves the opportunity to revisit evidentiary issues/objections at trial.

[26] Plaintiff's dispute of this statement only encompasses training Bentley received on how to give a deposition.

underlying substantive claim against an employee of the municipality.  See Turpin v. County of

Rock, 262 F.3d 779, 784 (8th Cir. 2001) (concluding that a county was entitled to summary

judgment because officers were granted summary judgment on qualified immunity grounds).[27]

And, plaintiff has presented no case authority that ACH can be liable under Monell based on the

jail's policies or the actions of its employees in furtherance of that policy.  As set forth above, the

Constitution allows that non-medical personnel are entitled to rely on the decisions of medical

personnel.  Ratcliff and Taylor did just that and no reasonable jury would find that they were

deliberately indifference to plaintiff's serious medical needs.   There being no underlying

substantive constitutional violation at the hands of the County defendants, plaintiff's Monell claim

must fail as a matter of law.

Accordingly, defendants are entitled to summary judgment on Count II.

---

[27] In Kuha v. City of Minnetonka, 365 F.3d 590 (8th Cir. 2003), the Eighth Circuit recognized an exception to the rule stating that "a municipality that operates under a policy or custom that unconstitutionally deprives a citizen of his or her rights may be liable under § 1983. This is true even if the arresting officers are not held responsible because of some good faith belief, meriting qualified immunity." Id. at 603 abrogated in part on other grounds en banc, Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 395–96 (8th Cir. 2007).  In that case, the Court found that officers were entitled to qualified immunity because, even though they violated plaintiff's constitutional rights, it was not clearly established that their conduct was unlawful.  The Court nonetheless found that plaintiff could proceed on a Monell claim because "'the action that is alleged to be unconstitutional implements or executes'" an *official policy*. Kuha, 365 F.3d at 603, quoting Monell, 436 U.S. at 690.  Unconstitutional official policies do not require the same attention to causation and culpability that are necessary to establish unconstitutional custom or practice.  Kuha, 365 F.3d 603-6.  Thus, "where . . . the plaintiff points to an allegedly unconstitutional official policy, alleges that municipal employees complied with that policy, and claims that such compliance caused the deprivation of his or her constitutional rights, causation and culpability are not at issue."  Id. at 605-6.  In such a circumstance, an analysis "must proceed under the direct route to Monell liability, which does not require a separate and distinct showing of 'deliberate indifference.'"  Id. at 605.  In Kuha, where the Court found that the individual defendants did violate plaintiff's Fourth amendment rights but that he was entitled to qualified immunity, the plaintiff could still proceed on a claim that official city policy led directly to the constitutional violation.

Plaintiff does not mention Kuha or argue that it applies in this case.  The case is distinguishable because the Court already has found that a reasonable jury would not find that Taylor and Ratcliffe were deliberately indifferent to plaintiff's serious medical needs.  See McCoy v. City of Monticello, 411 F.3d 920, 922 n. 3 (8th Cir. 2005) (noting that only Kuha represents an exception to the general rule which applies when no individual liability on the underlying substantive claim is found).

### III.  Dr. Travis Schamber

### A.      Count I (deliberate indifference)

As noted above, Schamber's involvement in Hill's treatment was limited: he reviewed 21 pages of medical records and concluded that the medical care Hill received was objectively reasonable.  In a § 1983 action, a supervisor cannot be held liable on a theory of respondeat superior for his or her employees' allegedly unconstitutional actions.  See White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994).  As pointed out by defendants, a supervisor can be liable if a plaintiff shows that he "personally participated in or had direct responsibility for the alleged violations" or "that the supervisor actually knew of, and was deliberately indifferent to or tacitly authorized, the unconstitutional acts."   McDowell v. Jones, 990 F.2d 433, 435 (8th Cir. 1993).  There is no evidence that Schamber was personally involved in Hill's care or that he knew of and approved of unconstitutional acts.  Plaintiff makes much of the fact that Schamber only reviewed 21 pages of medical records hand-picked by corporate counsel.  This fact, however, does not shed light on whether Schamber was *deliberately* indifferent to Hill's medical needs.

Accordingly, Schamber is entitled to summary judgment on Count I.

### B.      Count III (Medical Malpractice)

In order to make out a prima facie case of medical negligence, plaintiff must provide: "(1) proof that an act or omission of the defendant failed to meet the requisite medical standard of care, (2) proof that the act or omission was performed negligently, and (3) proof of a causal connection between the act or omission and the injury sustained by the plaintiff."  Tompkins v. Kusama, 822 S.W.2d 463, 464 (Mo. Ct. App. 1991) (quotation marks and citations omitted).  Schamber argues that he cannot be liable for medical malpractice because there was no physician/patient relationship.  Millard v. Corrado, 14 S.W.3d 42, 49 (Mo. Ct. App. 1999) ("A physician-patient

relationship is essential to a claim for medical malpractice.").  In making his argument, defendant appears to gloss over the fact that ACH is contractually obligated to provide medical care at the Phelps County Jail and the contours of Schamber's duties at ACH are not well defined.  In any event, such a relationship exists when "the patient or someone acting on the patient's behalf knowingly employs a physician who consents to treat the patient.  Generally, a physician-patient relationship is created only where the physician personally examines the patient."  Id. (citations omitted).  Of course, there is no evidence that Schamber examined Hill, diagnosed Hill's condition, prescribed a treatment plan, or even offered advice to Bentley as to Hill's care.  Corbet v. McKinney, 980 S.W.2d 166, 169 (Mo. Ct. App. 1998) ("Where the consultant physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so.").

Plaintiff does not address whether there was a doctor/patient relationship between Schamber and Hill such that Schamber could be liable for medical malpractice.  And, there is a dearth of clear evidence that would demonstrate that such a relationship exists.

Accordingly, Schamber is entitled to summary judgment on Count III.

### Conclusion

For the above reasons, the County defendants' motion is **GRANTED in part and MOOTED in part** (Doc. 127), defendant Schamber's motion is **GRANTED in part and MOOTED in part** (Doc. 145), defendant Kelley's motion is **DENIED in part and MOOTED in part** (Doc. 148), defendant Bentley's motion is **DENIED in part, GRANTED in part, and MOOTED in part** (Doc. 151), and defendant ACH's motion is **GRANTED in part and MOOTED in part** (Doc. 154):

1. Summary Judgment is **GRANTED** in favor of Defendants Taylor, Ratcliff, and Schamber on Count I;

2. Summary Judgment is **GRANTED** in favor of ACH, Schamber, Bentley (in his official capacity), and Lisenbe (in his official capacity) on Count II;

3. Summary Judgment is **GRANTED** in favor of Schamber on Count III.

The Clerk of Court shall enter judgment accordingly at the conclusion of this matter. Trial shall commence on Count I as to Bentley and Kelley and Count III as to Bentley, Kelley and ACH on **May 16, 2022 at 9:00 a.m.**  This matter is SET for an in person Final Pretrial Conference on **April 28, 2022 at 9:30 a.m.**

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of February, 2022