**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| LADY MAAKIA CHARLENE SMITH, personal representative of the Estate of BILAL HASANIE HILL, deceased, <br><br>             Plaintiffs, <br><br> vs. <br><br> ADVANCED CORRECTIONAL HEALTHCARE, INC., et. al. <br><br>             Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )      Case No. 4:20-CV-00804-JMB |

**PLAINTIFF LADY MAAKIA CHARLENE SMITH'S
TRIAL BRIEF**

Bilal Hill suffered for months as untreated lung cancer—unmitigated by pain management—transformed him from a fit 42-year-old male into a skeletal, emaciated and bed-ridden shell of his former self.  During those months, Mr. Hill did not receive adequate medical care, diagnostic testing or pain management from Phelps County Jail's medical services contractor Advanced Correctional Healthcare ("ACH").  This happened because, while ACH calls itself a healthcare company, its business objectives focus on liability avoidance, risk-management and "waste reduction" (saving money), not patient care.  The consequence of this business philosophy are the focus of trial:  for at least two months, Bilal Hill suffered from Stage-4 lung cancer in the Phelps County Jail while the Defendants ACH (and its employees Dr. Arthur Bentley and Nurse Dionne Kelley) watched Mr. Hill's rapid deterioration.  This is not a case of professional misjudgment—Mr. Hill's extreme deterioration was obvious to many lay witnesses.  Instead, ACH

intentionally delays care because ACH knows that delay transfers medical responsibility elsewhere—county jail detainees are incarcerated short-term, meaning they go home or are sent elsewhere (i.e. their medical needs becomes someone else's problem).  ACH, therefore, knows that running out the clock on a medically needy inmate's stay is advantageous to its business model.

To that point, the evidence will show that ACH and its employees intentionally delayed getting Mr. Hill appropriate care by refusing to send him for outside treatment and diagnostics. Because ACH contracts exclusively with county jails—where inmates are housed short-term— ACH knows that delaying care made running out the clock on Mr. Hill's stay at Phelps County economically advantageous because his transfer to the state or federal government (i.e. taxpayers) removes a financial and administrative liability.  But Mr. Hill's health became so grave that delay was no longer an option.  The evidence related to how and why this happened is critical to a jury's determination of relevant issues in this case.

As detailed below, Defendants' misconduct in this case presents for the jury three overarching questions:  (1) should the Defendants have taken steps sooner than they did to adequately treat, diagnose and manage Mr. Hill's pain when his health declined precipitously and only worsened over time under their care; (2) was this failure to adequately treat, diagnose and manage Mr. Hill's pain—something countless guards, inmates and other disinterested witnesses testified was an obvious and worsening problem—mere oversight, or the result of a trained corporate practice; and (3) what damages are available to Mr. Hill if Plaintiff proves her claims, and should all damages be submitted to the jury in a unified, not a bifurcated, trial?

## I.   THERE IS OVERWHELMING EVIDENCE THAT BILAL HILL HAD A SERIOUS MEDICAL NEED THAT WAS OBVIOUS TO LAY PEOPLE AND DEFENDANTS CHOSE NOT TO ADDRESS IT.

The jury will decide whether Defendants should have done more to adequately diagnose what was causing Mr. Hill's obvious decline in health and mitigate his untreated pain and suffering.  The evidence will show that it was obvious to prison guards, inmates, Mr. Hill's criminal lawyer, family members, the jail's expert witness and the treating physician from Springfield, Missouri who diagnosed Mr. Hill with terminal cancer that he had a serious medical need and was suffering.[1]  This evidence will demonstrate liability for both medical malpractice and deliberate indifference.  Plaintiff will present this evidence through diverse witnesses and numerous records.  A short summary of Plaintiff's proof will show:

- Mr. Hill lost 28 lbs. in 65 days from January 27, 2020 to April 1, 2020; (PLTF 5.0026; PLTF 5.0007)

- He complained at every opportunity to Dr. Bentley and Nurse Kelley about his worsening symptoms and pain;

- His energy and affect changed remarkably;

- His voice starkly changed, which a jury will hear on audio and video evidence;

- He screamed and moaned constantly every day;

- He looked gravely ill (described as skeletal, emaciated, and with flesh wasting away from his body);

- He had a golf- to baseball-sized mass growing on his neck;

- He had a ketotic smell (the same as a decomposing corpse);

---

[1] Unlike most cases, where a jury is left to imagine or speculate about the state of a party's physical condition, here the jury will get to see Mr. Hill's condition first hand. At trial there will be an abundance of video evidence showing how Mr. Hill not only lost 28 lbs. in 65 days, but his voice, overall appearance, and complaints of pain changed dramatically from January 2020 to April 1, 2020. In support of its position, Plaintiff directs the Court to just two of many videos that depict Mr. Hill's rapidly deteriorating condition. *See* PLTF 31 (January 8, 2020 video) compared to PLTF 47 (March 9, 2020 video).

- He could not perform basic life functions like eating, urinating or defecating by himself;

- He aged dramatically in a short time; and

- He slept on the cold concrete floor to aid his pain.

Everyone from jailers, inmates, family members and others recognized Mr. Hill was suffering and had a serious medical condition that only worsened over time.  Mr. Hill himself knew not only that he was suffering, but he also recognized that Defendants misdiagnosed him.  Mr. Hill made this abundantly clear to Defendants.  On 13 different occasions, Mr. Hill documented his concerns to the Defendants that he was in severe pain and/or that he had been misdiagnosed.[2] Moreover, on 10 different occasions, Mr. Hill pleaded for the Defendants to provide him with outside care and/or diagnostic testing to try and alleviate his continued pain and suffering.[3]  Rather than honor Mr. Hill's (literal) cries for help, Defendants largely ignored him, and failed to adequately account for his continued deterioration.

### a.    Lay Witness Testimony is Admissible about Mr. Hill's Deteriorating Condition.

Contrary to Defendants' positions in their *limine* motions, Plaintiff is not offering lay testimony about causation or medical diagnosis.  Rather, Plaintiff will present testimony from lay witnesses and experts about individuals' perception (i.e., their five senses) of Mr. Hill's deteriorating state.  The evidence is clear that Mr. Hill's overall condition deteriorated from January 2020 to April 2020.  Not only did Mr. Hill lose 28 lbs. in 65 days (*See* PLTF 5.0026; PLTF 5.0007), but his voice, overall appearance, and complaints of pain changed dramatically.  *See*

---

[2] *See* PLTF 5.0032; PLTF 5.0029; PLTF 5.0027-28; PLTF 5.0029; PLTF 5.0052; PLT 11.0010; PLTF 5.0053; PLTF 5.0021; PLTF 9.0008; PLTF 9.0012; PLTF 5.0012; PLTF 10.020; and PLTF 5.0008.

[3] *See* PLTF 5.0029; PLTF 5.0029; PLTF 5.0052; PLTF 11.0010; PLTF 5.0053; PLTF 10.0015-17; PLTF 9.0010; PLTF 5.0012; PLTF 10; PLTF 5.0008.

PLTF 31 (January 8, 2020 video) compared to PLTF 47 (March 9, 2020 video). As such, witnesses should be able to testify about their *observations* and/or *perceptions* relative to Mr. Hill and his condition. *See U.S. v. Peoples*, 250 F.3d 630, 639 (8th Cir. 2001) ("Cavanaugh testified about his first-hand observations of one of the robberies. He also gave his opinion, formed in the course of his investigation of one of the robberies, regarding the relationship among the four robberies. Accordingly, we conclude that the district court did not abuse its discretion in admitting Lieutenant Cavanaugh's opinions that were drawn from his personal observations regarding the robberies.").

To the extent the Court determines the witnesses' observations and perceptions rise to the level of opinions, Rule 701 "requires that lay witness opinion need only be rationally based on perception and helpful to a determination of a fact in issue." *In re Air Crash at Little Rock Arkansas, on June 1, 1999*, 291 F.3d 503, 515-16 (8th Cir. 2002) (citing Fed. R. Evid. 701). "Personal knowledge or perceptions based on experience is a sufficient foundation of such testimony. *Id.* Under Rule 701, lay opinion testimony, based on experience, perceptions, or personal knowledge should be admitted, and only when the proffered testimony approaches an authoritative medical diagnosis is expert testimony required. *See, e.g.*, *Rochell v. Ross*, 5:16-CV-5093, 2021 WL 4243404, at *5 (W.D. Ark. Sept. 16, 2021) (allowing lay opinion testimony under Rule 701 relating to observations of the plaintiff's mental and physical health, mental anguish, and the plaintiff's subjective health complaints); *Mason v. United States*, 402 F.2d 732, 738-39 (8th Cir. 1968) ("A lay witness can *and should* relate specific objective observations of a person's conduct, condition or behavior though such a witness may express an opinion on the sanity issue where he has been qualified by sufficient association with and opportunity to observe the subject.") (emphasis added); *In re Air Crash at Little Rock, Arkansas*, at 515 (holding that a college

professor's testimony regarding the chances that a student could become a music teacher after suffering from injuries in a crash was admissible when the teacher's testimony was based on his observations of the student, his experience, and personal knowledge).

Furthermore, admission of lay opinion about Mr. Hill's deteriorating condition is actually *required* here, under the applicable Eighth Circuit's Jury Instruction 4.22, which reads: "[a] serious medical need is one that has been diagnosed by a physician as requiring treatment or one *that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention*." (emphasis added). The applicable jury instruction actually requires lay testimony about Mr. Hill's "serious medical need," necessitating the proffer of the very testimony Defendants seek to exclude through their motion in *limine*.

Defendants' lay witnesses will not offer expert opinions or attempt a diagnosis of Mr. Hill's ailments. If such testimony is elicited at trial, a timely objection is the proper way to exclude any improper evidence from being heard by the jury—not a blanket prohibition on the very testimony required under the operative Eighth Circuit jury instruction. Plaintiff seeks only to introduce evidence that witnesses observed Mr. Hill suffering and that Mr. Hill's health deteriorated over time. Expert opinion is not necessary for this. Simply put, lay testimony regarding observations of Mr. Hill's condition and his deterioration over time are plainly admissible at trial.

### b.    Party Admissions from ACH Confirm it Violated the Standard of Care.

Party admissions contained in ACH's own training video "Introduction to Correction Healthcare" (PLTF 148), taught by the founder and owner of ACH, Dr. Norman Johnson, demonstrate that ACH acknowledges that it violated the standard of care. This video evidence, which the jury will see, sets what ACH defines as the appropriate standard of care for correctional medicine in jails. Based on the standard set forth in the screenshot below (and related explanation

Case No. 4:20-CV-00804-JMB

in the video), any reasonable juror will agree that ACH violated this standard of care relate to Mr.

Hill's case:



PLTF148, v. 1,[4] 7:15; *Shelton v. U.S.*, 804 F .Supp. 1147, 1155-56 (E.D. Mo. 1992) (under Missouri law, a defendant's own admission can set the relevant standard of care) (citing to *Baker v. Gordon, et al.*, 759 S.W.2d 87, 91 (Mo. App. W.D.1988)).

Thus, at trial, Plaintiff will present the chronology of Mr. Hill's obvious decline and untreated pain.  Numerous witnesses and documents will show that it was obvious to a layperson that Mr. Hill had a serious medical need and that his condition was deteriorating rapidly.  All the while, the Defendants did nothing but blow Mr. Hill off and prescribe Tylenol.  This defies the above standard of care and will satisfy the standard for deliberate indifference and punitive damages.

## II.   THE FAILURE TO PROVIDE ADEQUATE CARE, DIAGNOSITCS, AND PAIN MANAGEMENT RESULTED FROM ACH'S PURPOSEFUL BUSINESS MODEL.

The next question for the jury is *why* did Mr. Hill's health deteriorate for so long before receiving adequate care, diagnostic testing and pain management?  Was it (as ACH will contend) a mere oversight that is only clear with the benefit of hindsight?  Or was it the result of an intentional, trained business practice that seeks to avoid sending inmates to outside care because

---

[4] *See also* PLTF-71; and PLTF-20, p 60 (below):



it is advantageous for ACH (i.e. make it someone else's problem)?  Plaintiff submits that the
evidence will answer the latter question affirmatively.

> **a.    ACH's Attempt to Eliminate All Evidence of Intent Depends Upon an
> Incorrect View of the Law.**

Intent is a critical component to Plaintiff's liability and damages claims in this case.  ACH
knows this, but it wants to prevent the jury from hearing highly relevant and damaging evidence
related to ACH's corporate intent, which Plaintiff will show through ACH documents that train
employees to trivialize inmate requests for care; curate medical records to make them a litigation
asset; and prioritize risk and litigation management over inmate healthcare.  Evidence on this issue
is highly relevant and the jury should see, among other evidence, the ACH training DVD's and
PowerPoints on this subject.

In its *in limine* motions, ACH argues that the Court should preclude all direct and
circumstantial evidence of ACH's misconduct that delayed Mr. Hill's care and diagnosis.  ***But
ACH is a defendant***.  Yet ACH wants the jury to hear this case in a fictitious vacuum where the
jury receives no evidence about how ACH does business, or trains its employees like Defendants
Bentley and Kelley to perform their job function as ACH's agents.  ACH would have the jury
pretend that Defendants Bentley and Kelley had no employer; they were just working in the jail as
independent medical professionals uninfluenced by the training, goals and directives of their
corporate employer, ACH.

The jury should hear the evidence in an accurate context—Defendants Bentley and Kelley
acted as trained employees of ACH whose business practices and training are at issue—rather than
a misleading vacuum that whitewashes ACH's involvement from any jury consideration.  The law
supports this.  ACH's suggestion that Plaintiff can only prove her Missouri tort claims against
ACH by proving vicarious liability based on the conduct of Defendants Kelley and Bentley is

inaccurate:  Plaintiff can prove her state tort and punitive damage against ACH both through respondent superior **and** ACH's own direct misconduct.  *Koon v. Walden*, 539 S.W.3d 752, 775 (Mo. App. E.D. 2017) (affirming punitive damages award against a hospital based *both* on vicarious liability *and* the separate conduct of the corporation).

Moreover, even if Plaintiff only had claims against Defendants Bentley and Kelley (which is not the case), their status as employees of ACH and how ACH expects them to do their jobs (as evidenced through training and other documents) is relevant to motive, intent and state of mind. Fed. R. Evid. 404(b)(2).  That is, the jury needs to answer the critical question of *why* medical professionals like Defendants Bentley and Kelley failed to adequately treat, diagnose Mr. Hill, and mitigate his pain, when the evidence will demonstrate that he had a serious medical need that was obvious to even lay people, and only continued to deteriorate under their care.  Plaintiff's evidence will provide an answer:  ACH tries to avoid sending inmates for outside care; trains its employees to trivialize inmate requests for outside care; curates medical records to make them a litigation asset; and prioritizes risk and litigation management over inmate healthcare.  Viewed through this appropriate lens—as trained employees of ACH—a jury can properly infer that Defendants Bentley and Kelley sought to further ACH's trained objective.  This motive, intent and state of mind evidence is critical context for the direct claims against Defendants Bentley and Kelley for deliberate indifference and punitive damages.  Fed. R. Evid. 404(b)(2).

**b.     The Law Permits Plaintiff's Direct and Circumstantial Proof of Intent to Support Her Claims of Deliberate Indifference and Punitive Damages.**

"Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors."  *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004).  Further, "[t]o determine a corporation's intent, the inquiry depends in part on

corporate policies, but also to some extent on the intent of corporate employees." *Id.* at 902-03;

*White Communications, LLC v. Synergies3 Tec Services, LLC*, 4 F.4th 606 (8th Cir. 2021) (pattern

of prior bad conduct was relevant to show intent).

At trial, direct and circumstantial evidence will demonstrate Defendants' conduct was

intentional, not mere oversight.   Representative examples of this proof are:

- ACH's founder and president stated that ACH tries to identify the sickest inmates and wait for them to transfer to another facility to avoid the cost and administrative burden of caring for them;

- Dr. Bentley asked Mr. Hill when he was transferring out of Phelps County and suggested Mr. Hill could wait to get outside care when he left Phelps County;

- ACH's trains its personnel how sanitize medical charts and records to make them a litigation asset;

- The medical records created by Defendant Kelley were devoid of critical information related to Mr. Hill's complaints and medical history, such that Dr. Bentley and Dr. Travis Shamber (who provided a second opinion for ACH) always reviewed sanitized records;

- When Phelps County doubted the adequacy of the treatment being provided to an inmate, it requested a second opinion from ACH's medical director, but the "second opinion" here was just a sham designed to paper the files for litigation purposes, not provide any additional care to the patient because ACH has *never* provided additional medical care based on this review process;

- ACH trains its employees and clients in video training and in person to be dismissive and skeptical of inmate complaints (particularly requests of outside care) training, among other things, that:

  o "Health is not the goal of inmates seeking care."

  o "Eighty percent of detainees seek care for comfort."

  o "Instant gratification is the goal of inmates seeking medical care."

  o "Inmates are known to exaggerate all their symptoms."

  o "Take no responsibility for inmate health care."

- ACH's PowerPoint trainings likewise evidence a focus on litigation and risk-management, not health care, and show a dismissiveness toward responsibility for inmate care.

**c.     ACH's Attempt to Preclude *All Evidence* of Its Misconduct and Business Practices Is Misguided.**

ACH wants the Court to preclude the jury from any understanding of ACH's role in this case—both as a party and as Defendants Bentley and Kelley's employer.  This effort is misguided for the reasons discussed above.  And while Plaintiff will address all of ACH's *in limine* motions directly, for the Court's benefit, Plaintiff will set forth below a few non-exclusive examples why ACH's desired evidentiary framework finds zero support in the Federal Rules of Evidence.

**Example 1 – ACH's Claim that Dr. Travis Schamber's "Board Review" of Mr. Hill's Care is Irrelevant.**

ACH argues that Dr. Schamber's "board review" (then an ACH corporate officer) regarding the adequacy of Mr. Hill's care in March 2020 (when Mr. Hill's health was dire) is completely irrelevant.  When Dr. Schamber performed this "board review", he was the corporate medical director at ACH.  The reason he performed the review was his client (a lay person, Phelps County jail director, Joe Taylor) was becoming increasingly skeptical about whether ACH was providing Bilal Hill with adequate medical care because Mr. Hill only continued to deteriorate rapidly under ACH's watch.  Joseph Taylor 4/30/2021 Personal Depo. 15:18-16:16, 16:17-25, 17:14-25; Joseph Taylor 4/30/2021 30(b)(6) Depo. 112:16-113:7).

The evidence at trial will show that this "second opinion" from ACH had nothing to do with determining whether Mr. Hill was receiving adequate care.  Instead, it furthered ACH's interest of trying to run out the clock on Mr. Hill's time in Phelps County and papering its file as a litigation asset to show that ACH was supposedly doing something to care for Mr. Hill.  While there will be extensive testimony, documents and other evidence on this issue at trial, the below exhibit (PLTF-115) highlights that the "board review" had nothing to do with ensuring Mr. Hill

was receiving adequate care; it was instead a litigation-focused document intended to protect ACH while hoping Mr. Hill would transfer elsewhere:



Response to RNM:
"The case has been reviewed, and it appears from the record that the patient is receiving objectively reasonable care based on the complaints given. One recommendation is to consider an activity log to see if patient subjective complaints match activity level as it is documented that the patient has a rather normal exam."

CONFIDENTIAL

PLTF-115.  First, the obvious:  nothing about this looks like a document designed to help patient medical care.  Instead, it is a litigation document.  And, contrary to what ACH's corporate medical director told Phelps County, there are three statements from ACH that are egregiously inaccurate: (1) Mr. Hill's exam was "normal" (many witnesses will testify his health was dire by then; in fact, the jury will see it for themselves via videos of Mr. Hill); (2) his activity level does not match his complaints (i.e. he is lying—documenting this is trained by ACH); and (3) Mr. Hill was receiving objectively reasonable care (yet ACH's training says you cannot let a patient's health deteriorate). Because these representations to Phelps County, supposedly allaying its concerns about Mr. Hill's care and declining health, are misrepresentations, it is unsurprising that ACH wants to exclude this document and other evidence related to Mr. Hill's "board review".  But all evidence related to this process is unquestionably relevant and the jury should consider it for Plaintiff's liability and punitive damages claims.

**Example 2 – ACH's Position that Dr. Norman Johnson's Statement That ACH Avoids Costs by Waiting for Inmates to Transfer Elsewhere is Irrelevant and Inadmissible.**

ACH wants to exclude evidence that its founder and owner, Dr. Norman Johnson, declared that it is ACH's intentional business practice of avoiding costs and administrative liabilities by intentionally delaying care for very sick inmates by waiting for them to become someone else's problem.  On one hand, it is understandable why ACH does not want a jury hear this evidence—it proves ACH's business model is intentional and irreconcilable with basic concepts of human dignity and the law.  And it is exactly what happened to Bilal Hill in this case.

But what these exhibits are highly relevant to intent; and the document containing this evidence sails over ACH's desired evidentiary roadblocks.  First, ACH does not dispute that Dr.

Case No. 4:20-CV-00804-JMB

Johnson attended this meeting; nor does it dispute that he said to the Daviess County Commissioners what is highlighted below:

**DAVIESS COUNTY**
**COMMISSIONERS MINUTES**
**SEPTEMBER 27, 2004**

The Daviess County Commissioners met Monday, September 27, 2004 at 5:30 p.m. in the Commissioners Room of the Daviess County Courthouse with President Steve Myers and Secretary Tony Wichman present.  Vice-President Jim Truelove was unable to attend.

President Steve Myers called the meeting to order.

**MINUTES:**

Tony Wichman made the motion to accept the minutes of the August 23, 2004 and September 13, 2004 Commissioners meetings as presented.  Steve Myers seconded the motion.  Motion carried with both commissioners voting in favor.

**ADVANCED CORRECTIONAL HEALTHCARE:**

Norm Johnson with Advanced Correctional Healthcare, along with Sheriff Jerry Harbstreit, came before the commissioners with a proposal for correctional healthcare.

Sheriff Jerry Harbstreit stated that Daviess Community Hospital has now agreed to give the county a ten percent discount, however he has also been talking to this organization about correctional healthcare and they have a proposal to present that he thinks the commissioners should listen to.  He stated that if they would go with this, there is a contract involved and the commissioners would sign the contract rather than him.

Norm Johnson, founder of Advanced Correctional Healthcare, thanked the commissioners for the opportunity to come before them.  He stated he has been doing this for about eight or nine years now and they are the largest healthcare provider of jails in Indiana.  The point of a program is to consolidate everything they are doing into one package so that they pay all the bills, supplies, all of the medicines and buy all the supplies, etc.  He stated they bring in the necessary staff, which in this case would only be a physician because the Sheriff will be hiring the nurse.  He stated they would train the nurse, guarantee the quality and put in policy and procedure.  They are fully insured which helps to protect the county and the Sheriff.  These programs are all pretty much the same in all of the sites depending on what the Sheriff needs.  He doesn't believe they have ever had a contract that did not save money for the county and the Sheriff as they do an excellent job.

Steve Myers questioned if the county was under contract with them, would the nurse be a county employee or their employee and how would that person be insured if they were to do something wrong.

Mr. Johnson stated that since the nurse would be a county employee, that person would be covered by the county's insurance.  He stated Advanced Correctional Healthcare would bring in their own doctors.  One of the first things they would do is to train the staff, not only the nurse but also the correctional officers how to not take any medical responsibility because right now they are taking responsibility as they have to make a judgment call as to whether somebody goes to the doctor, etc.  He stated there is a system whereby they can remove all of that responsibility and place that on the doctor, which is what they do.  They would have at least two doctors on call here all of the time and the call list would have at least four different people involved to call so there is always a way to get in touch with someone.

Steve Myers asked if they contract with local doctors or if they bring in doctors from other areas.

Mr. Johnson stated that they do both.  They already have an Indiana physician  lined up that can come in here.

Mr. Wichman questioned if the doctor is within a few miles.

Mr. Johnson stated that the doctors are usually not.  Doctors who work in jails are usually circuit riders, they go around to a lot of different places and the rest is handled on the telephone.  In all of the years he has done this, there has never been a time they had to drop everything and run to the jail.  You either know because of experience that something is so bad that somebody has got to go to the emergency room and if they do, then it is covered under the contract.  It is a year's contract, which guarantees the price for a year and puts a cap on it but it gives you a thirty-day out for any rhyme or reason plus it protects you in that they cannot raise the price.  He stated that healthcare costs in Indiana are going up somewhere between 11 % & 16 % a year right now.  He does not know how much their inmate costs have been going up but he would bet it is at least that if not more.  They put a 7% cap on but it is very rare that they ever require 7%, it is usually going to be much lower.   He mentioned another county sheriff they had talked with a few weeks ago who had asked how much their rates were going to be and at that time, he thought rates were going to run about 5 % because they are based upon points of contract but they ended up being 3 %.  He stated that when you think about the increase in health insurance costs, that is unheard of at 3 % but because they were able to work with him, they were able to identify sick cases ahead of time and he's been able to get those really bad cases OR'd or sent elsewhere so that he was not responsible for those and it doesn't come off the contract.

Tony Wichman questioned if they negotiate with the local hospital, ambulance services, etc. (continued)

PTLF-3, p. 2.  Second, any argument that Dr. Johnson's comments as the founder and owner of ACH—particularly at the bottom of the page detailing how ACH tries to transfer sick cases elsewhere—is spurious.  Fed. R. Evid. 402.  This case is about why ACH waited so long to send an obviously ill inmate out for adequate testing and care, and Dr. Johnson's statement clearly answers that question—the conduct was purposeful.

Next, hearsay and authenticity.  ACH admits Dr. Johnson spoke to the Daviess County on that day.  So there is no dispute that he made statements on behalf of ACH that day to Daviess County.  There are, admittedly, two hearsay hurdles to admissibility that are easily cleared under the Federal Rules of Evidence.  First, the document itself is a public record under Fed. R. Evid. 803(8).  Next, the statements in the document:  Dr. Johnson's statements as the founder and owner of ACH are both party statements and adverse admissions, thus the law treats them as non-hearsay.  Fed. R. Evid. 801(d)(2)(A-D) (Dr. Johnson's statements, as founder, owner and then-CEO satisfy four separate criteria for non-hearsay).  As to authenticity, ACH does not dispute that Dr. Johnson made statements on behalf of ACH that day to Daviess County.  Nonetheless, to the extent ACH seeks to exclude PLTF-3 on boilerplate authenticity objections, those objections miss the mark.  Multiple sub-provisions of Fed. R. Evid. 902 demonstrate that this exhibit is a self-authenticating public record.

Because there is no meritorious relevance or technical objection to this exhibit, and because it goes to the heart of this case, it is critical that the jury consider it.

### Example 3– ACH Claims Its Training for Its Doctors, Nurses, and Clients is Irrelevant.

ACH argues that how it trains its doctors and nurses (e.g., defendants in this cas)—and more broadly its business philosophy—is irrelevant.  As discussed above, intent is critical to this case, so this argument makes no sense.  Indeed, ACH employees, as depicted below in ACH's

training are required to behave differently in the correctional healthcare context:



PLTF-141.

Thus, Defendants' position that their training is irrelevant makes no sense. In this case the training is directly relevant to Bentley and Kelley's actions. At trial, Plaintiff's evidence will show that ACH's training and business practice demonstrates that ACH's conduct intentionally avoids sending people like Bilal Hill for adequate medical care.  The jury should weigh these issues at trial.

**III.   PLAINTIFF IS ENTITLED TO NON-ECONOMIC DAMAGES FOR PAIN, SUFFERING, AND LOST CHANCE OF SURVIVAL AS WELL AS PUNITIVE DAMAGES IF SHE PROVES HER CLAIMS, AND ALL DAMAGES SHOULD BE SUBMITTED TO THE JURY IN A UNIFIED TRIAL.**

The final question for the jury is to determine what damages Plaintiff is entitled to if she proves her claims in this case.  As detailed in Plaintiff's Opposition to Defendants' Motion to Bifurcate, all damages should be submitted to the jury in a unified trial as it would be odd and inefficient to conduct an entire second phase of trial with another set of openings, closings, and deliberations solely for a *single exhibit*—Defendants' financial records—that could be placed into evidence in a unified trial and argued to the jury at closings.  To be sure, as set forth above, much of the evidence Defendants' seek to exclude—including, for example, lay witness testimony regarding Mr. Hill's worsening condition, ACH's own admissions regarding the standard of care, and evidence related to ACH's business practices—is evidence that is highly relevant as to the threshold issue of Nurse Kelley and Dr. Bentley's liability on the medical negligence claim as well as Plaintiff's entitlement to compensatory damages, including pain, suffering, and lost chance of survival, as against all Defendants on the Section 1983 claim.  But it becomes even more clear how significant this evidence is when one considers the issue of punitive damages, which Plaintiff seeks as to both claims in this case.  On this issue, the jury must consider whether Defendants' conduct involved reckless or callous indifference to Mr. Hill's federally-protected rights (with respect to the Section 1983 claim) and/or indifference or conscious disregard for Mr. Hill's safety (with respect to the medical negligence claim under Mo. Ann. Stat. § 538.205).  Evidence regarding the motivation and intent behind Defendants' actions, as well as what others observed about those actions (or lack of action) is critical to this inquiry.  The bottom line:  evidence related to Defendants' intent in making the medical care and treatment decisions they made in this case is *inextricably linked* to the very same evidence that the jury will consider when determining whether

19

Defendants' conduct rises to the level of a reckless disregard for Mr. Hill's safety and federal-protected rights

Dated this 5th day of May 2022.

<div style="margin-left: 50%;">

Respectfully submitted,
*/s/ Charles C. Eblen*
Charles C. Eblen, #55166
Brandon K. Gutshall, #61848MO
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO  64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
ceblen@shb.com
bgutshall@shb.com
*Attorneys for Plaintiff*

</div>

Case No. 4:20-CV-00804-JMB

## <u>CERTIFICATE OF SERVICE</u>

I, Charles C. Eblen, an attorney, hereby certify that on **May 5, 2022**, I caused a true and

correct copy of the foregoing **PLAINTIFF LADY MAAKIA CHARLENE SMITH'S TRIAL**

**BRIEF** to be served via Electronic Mail upon the following counsel of record:

   J. Thaddeus Eckenrode
   Lisa H. Howe
   ECKENRODE MAUPIN
   11477 Olde Cabin Rd.
   Suite 110
   St. Louis, MO 63141
   314-726-6670
   Fax: 314-726-2106
   jte@eckenrode-law.com
   lhh@eckenrode-law.com
   **ATTORNEY FOR DEFENDANTS DR. ARTHUR BENTLEY, DIONNE KELLEY,**
   **ADVANCED CORRECTIONAL HEALTHCARE, INC., AND DR. TRAVIS**
   **SCHAMBER**

/s/  *Charles C. Eblen*